UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 08-51207 |
| EAST CAMERON PARTNERS, L.P. | CHAPTER 11 |
| DEBTOR | |

EAST CAMERON PARTNERS, L.P.

| | |
|---|---|
| VERSUS | ADV. NO. 08-05041 |

LOUISIANA OFFSHORE HOLDING, LLC,
EAST CAMERON GAS COMPANY, and
DEUTSCHE BANK TRUST CO. AMERICAS

# THE DEBTOR, EAST CAMERON PARTNERS, L.P.'S, MEMORANDUM IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE SUKUK CERTIFICATEHOLDERS (DOCKET NO. 70), EAST CAMERON GAS COMPANY (DOCKET NO. 60) AND LOUISIANA OFFSHORE HOLDING, LLC (DOCKET NO. 67); THE MOTION FOR MORE DEFINITE STATEMENT OF THE SUKUK CERTIFICATEHOLDERS (DOCKET NO. 70); AND, THE MOTION FOR SUMMARY OF JUDGMENT OF LOUISIANA OFFSHORE HOLDING, LLC (DOCKET NO. 67)

STEWART F. PECK (#10403)
CHRISTOPHER T. CAPLINGER (#25357)
BENJAMIN W. KADDEN (#29927)
ELIZABETH R. CARTER (#31090)
LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
Email: speck@lawla.com; ccaplinger@lawla.com;
bkadden@lawla.com; ecarter@lawla.com
*Attorneys for the Debtor*

## TABLE OF CONTENTS

TABLE OF CONTENTS....................i-iv

TABLE OF AUTHORITIES....................v-x

SUMMARY OF THE DEBTOR'S ARGUMENT....................1

PROCEDURAL AND FACTUAL BACKGROUND....................4

I. Procedural Background....................4

II. Factual Background....................4

A. East Cameron Partners, L.P....................4

B. The Sukuk Loan Transaction....................5

1. Collateralization of the ORRI....................6

2. Loan Treatment Under the Contribution Agreement and Purchase and Sale Agreement....................7

3. Loan Treatment Under the Contributed Conveyance and the Purchased Conveyance....................8

4. Production, Delivery and Marketing Agreement....................9

a. "Loan Covenants"....................9

b. Mortgage and Security Interest....................10

5. Creation of Louisiana Offshore Holding, LLC....................11

LEGAL AUTHORITIES AND ANALYSIS....................14

I. Standards Under Federal Rules of Civil Procedure 8, 12, and 56....................14

A. Federal Rule of Civil Procedure 8....................14

B. Federal Rule of Civil Procedure 12(b)(1)....................15

C. Federal Rule of Civil Procedure 12(b)(6)....................16

D. Federal Rule of Civil Procedure 12(e)....................17

E. Federal Rule of Civil Procedure 56 .....17

II. Subject Matter Jurisdiction over the Present Adversary Proceeding .....18

A. This Court has Valid Subject Matter Jurisdiction over the Adversary Proceeding Under 28 U.S.C. § 1334(b)(2) Because it is a "Core Proceeding" as Defined in 28 U.S.C. § 157(A) and (O) .....18

B. The Holders are the ONLY Party Challenging this Court's Subject Matter Jurisdiction .....19

1. A Justicable Controversy Exists in this Adversary Proceeding .....19

2. This Court Should NOT Abstain From Exercising Subject Matter Jurisdiction over the Debtor's Claim for Declaratory Judgment .....20

III. The Holders Should NOT be Permitted to Utilize a Motion for More Definite Statement to Obtain a "Sneak Preview" of the Debtor's Proposed Plan of Reorganization .....24

IV. The Adversary Proceeding Should NOT be Dismissed Pursuant to Rule 12(b)(6) .....27

A. 11 U.S.C. § 541(b)(4)(B) is NOT Applicable to the ORRI .....27

1. Proper Analysis .....29

a. Was there a transfer pursuant to a written conveyance? .....29

b. Was the thing transferred a "production payment"? .....30

c. Is the transferee an entity that <u>does not participate</u> in the operation of the property from which the production payment was transferred? .....32

d. Can the estate include the ORRI only by virtue of Sections 365 or 542 of the Bankruptcy Code? .....35

2. Case Law .....37

B. The ORRI is NOT an "Account as Defined by the Louisiana Commercial Code, and, Therefore, Chapter 9 of the Louisiana Commercial Code is NOT Applicable .....40

C. When Viewed as a Whole, the Sukuk Loan Transaction is Actually an Antichresis or Pledge of the ORRI as Collateral for a Loan................52

D. The Sukuk Loan Transaction Also Violates the Public Policy of the State of Louisiana and is an Absolute Nullity....................................61

E. The Debtor is NOT Attempting to Utilize the Declaratory Judgment Act to Vitiate or Modify Over Forty (40) Transaction Documents.................68

1. The Debtor is Seeking a Declaration as to the True Nature of the Sukuk Loan Transaction as a Whole.................................68

2. The Debtor is also Seeking a Declaration that the Sukuk Loan Transaction Violates the Public Policy of the State of Louisiana and is an Absolute Nullity..................................................71

F. The Holders' Request for Dismissal of Counts One and Three is Unfounded and Unwarranted..................................................72

1. Dismissal of Count One is not Proper Because the Court has Previously Granted the Requested Relief and the Debtor has NOT Requested a *Permanent* Injunction......................................72

2. Dismissal of Count Three is Also Improper.........................72

V. Summary Judgment is Inappropriate and Unwarranted.............................73

CONCLUSION.........................................................................................73

## TABLE OF AUTHORITIES

### Federal Cases


*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
291 F.3d 336 (5th Cir. 2002)....................17, 27

*Babcock & Wilcox Co. v. McGriff, Seibels & Williams, Inc.*,
235 F.R.D. 632 (E.D.La. 2006)....................17

*Barrera-Montenegro v. U.S.*,
74 F.3d 657 (5th Cir. 1996)....................15

*Blue Cross & Blue Shield of Ala. v. Sanders*,
138 F.3d 1347 (11th Cir. 1998)....................16

*Blum v. Roberts*,
2006 WL 2135457 (E.D.La. 2000)....................17

*Butner v. U.S.*,
440 U.S. 48, 99 S.Ct. 914 (1979)....................28

*C.C. Port, Ltd. v. Davis-Penn Mortgage Co.*,
61 F.3d 288 (5th Cir. 1995)....................16, 27, 29, 41

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S.Ct. 2548 (1986)....................18

*Cincinnati Ins. Co. v. Holbrook*,
867 F.2d 1330 (11th Cir. 1989)....................21

*Cobb v. Contract Transp., Inc.*,
452 F.3d 543 (6th Cir. 2006)....................16

*Conley v. Gibson*,
355 U.S. 41, 78 S.Ct. 99 (1957)....................14, 25

*Doss v. South Cent. Bell Tel. Co.*,
834 F.2d 421 (5th Cir. 1987)....................15

*F.D.I.C. v. Fidelity and Deposit of Md.*,
118 F.R.D. 435 (M.D.La. 1988)....................17

*Gibson v. Deep Delta Contractors, Inc.*,
2000 WL 28174 (E.D.La. 2000)....................17

*Hawkins v. Frick-Reid Supply Corp.*,
154 F.2d 88 (5th Cir. 1946)....................................................................15

*Hishon v. King & Spalding*,
467 U.S. 69, 104 S.Ct. 2229 (1984)........................................................17

*Howell Hydrocarbons, Inc. v. Adams*,
897 F.2d 183 (5th Cir.).........................................................................18

*Indus. Dev. Bd. of the Town of Section, Ala. v. Fuqua Indus., Inc.*,
523 F.2d 1226 (5th Cir. 1975)..................................................................15

*In re American Home Mortgage, Inc.*,
379 B.R. 503 (D.Del. 2008)....................................................................40

*In re Commercial Loan Corp.*,
316 B.R. 690 (Bankr.N.D.Ill. 2004).........................................................70

*In re Dowington Indus. & Agric. Sch.*,
172 B.R. 813 (Bankr.E.D.Pa. 1994)....................................................22, 70

*In re Ecco Drilling Co., Ltd.*,
390 B.R. 221 (Bankr.E.D.Tex. 2008).................................................70-71

*In re Lamar*,
249 B.R. 822 (Bankr.S.D.Ga. 2000)........................................................70

*In re Morande Enter., Inc.*,
346 B.R. 886 (Bankr.M.D.Fla. 2006).......................................................70

*In re Norris*,
192 B.R. 863 (Bankr.W.D.La. 1995)........................................................18

*In re Senior-G&A Operating Co., Inc.*,
957 F.2d 1290 (5th Cir. 1992).......................................38, 56-58, 61

*In re Walker*,
51 F.3d 562 (5th Cir. 1995)....................................................................18

*Kent v. Walter E. Heller & Co., Inc.*,
349 F.2d 480 (5th Cir. 1965)...................................................................15

*Leatherman v. Tarranty County. Narcotics Intelligence and Coordination Union*,
507 U.S. 163, 113 S.Ct. 1160 (1993).......................................................14

*Lehigh Coal & Navigation Co. v. Central R.R. of N.J.*,
33 F.Supp. 362 (E.D.Pa. 1940)....................70

*Lujan v. Defenders of Wildlife*,
504 U.S. 555, 112 S.Ct. 2130 (1992)....................14

*L.W. Laird v. Integrated Resources*,
897 F.2d 826 (5th Cir. 1990)....................15

*Marshall v. Marshall*,
547 U.S. 293, 126 S.Ct. 1735 (2006)....................18

*McCann v. Tex. City Refining, Inc.*,
984 F.2d 667 (5th Cir. 1993)....................16

*Menchaca v. Chrysler Credit Corp.*,
613 F.2d 507 (5th Cir. 1980)....................16

*Mitchell v. E-Z Way Towers, Inc.*,
269 F.2d 126 (5th Cir. 1959)....................17, 25

*Morrison v. Amway Corp.*,
323 F.3d 920....................16

*Mortensen v. First Fed. Sav. and Loan Ass'n*,
549 F.2d 884 (3rd Cir. 1977)....................16

*Nat'l Org. for Women, Inc. v. Schiedler*,
510 U.S. 249, 114 S.Ct. 798 (1994)....................14

*N. Pipline Constr. Co. v. Marathon Pipeline Co.*,
458 U.S. 50, 102 S.Ct. 2858 (1982)....................18

*Parington American Int'l Specialty Lines Ins. Co.*,
443 F.3d 334 (4th Cir. 2006)....................16

*Pringle v. U.S.*,
208 F.3d 1220 (10th Cir.)....................16

*Reese v. Anderson*,
926 F.2d 494 (5th Cir. 1991)....................18

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004)....................16

*Sherwin-Williams Co. v. Holmes County*,
343 F.3d 383 (5th Cir. 2003)..........21

*Shipp v. McMahon*,
199 F.3d 256 (5th Cir. 2000)..........16, 27

*Sloan v. Sharp*,
157 F.3d 980 (5th Cir. 1998)..........16

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506, 122 S.Ct. 992 (2002)..........17

*Trimble v. Asarco, Inc.*,
232 F.3d 946 (8th Cir. 2000)..........16

*Voluntary Purchasing Groups, Inc. v. Reilly*,
889 F.2d 1380 (5th Cir. 1989)..........15

*Ynclan v. Dept. of Air Force*,
943 F.2d 1388 (5th Cir. 1991)..........15

**State Cases**

*Alcolea v. Smith*,
90 So. 769 (La. 1922)..........64

*De Salvo v. Finance Funds Group, Inc.*,
252 So.2d 498 (La.App.Ct. 4th Cir. 1971)..........37, 65-66

*Diamond Serv. Corp. v. Benoit*,
780 So.2d 367 (2001)..........55

*Guste v. Hibernia Nat'l Bank in New Orleans*,
655 So.2d 724 (La.App.Ct. 4th Cir. 1995)..........63-68

*H. Ware & Son v. Morris*,
1871 WL 7002 (La. 1871)..........54

*Hancock v. Bridges*,
547 So.2d 1103 (La.App.Ct. 2nd Cir. 1989)..........54

**Federal Statutes**

Federal Rule of Civil Procedure 8..........14

Federal Rule of Civil Procedure 12(b)(1)..........15

Federal Rule of Civil Procedure 12(b)(6) .......... 16-17

Federal Rule of Civil Procedure 12(e) .......... 18

Federal Rule of Civil Procedure 56 .......... 16, 19-20

Internal Revenue Code § 636 .......... 8, 57

11 U.S.C. §101(42A) .......... 31

11 U.S.C. § 541 .......... 28, 36

28 U.S.C. § 157 .......... 18-19

28 U.S.C. § 1334 .......... 18-19

28 U.S.C. § 2201 .......... 2, 19

**State Statutes**

LA. CIV. CODE, Title XX, Of Pledge .......... 43

LA. CIV. CODE, art. 7 .......... 63

LA. CIV. CODE, art. 1848 .......... 54

LA. CIV. CODE, art. 1913 .......... 63

LA. CIV. CODE, art. 2027 .......... 62, 65

LA. CIV. CODE, art. 2028 .......... 62, 65

LA. CIV. CODE, art. 2029 .......... 65

LA. CIV. CODE, art. 2030 .......... 63-65, 73

LA. CIV. CODE, art. 2439 .......... 49, 54, 58

LA. CIV. CODE, art. 2660 .......... 49

LA. CIV. CODE, art. 3179 .......... 63

LA. CIV. CODE, art. 3182 .......... 63

LA. CIV. CODE, art. 3186 .......... 63

LA. CIV. CODE, art. 3278 .......... 63

LA. REV. STAT. 10:9-102 .......... 48, 58

LA. REV. STAT. 10:9-109 .......... 43-45, 48

LA. REV. STAT. 10:9-310 .......... 49, 52

LA. REV. STAT. 10:9-318 .......... 52

LA. REV. STAT. 31:2 .......... 43

LA. REV. STAT. 31:4 .......... 43, 45

LA. REV. STAT. 31:16 .......... 43, 45

LA. REV. STAT. 31:18 .......... 43-45, 50

LA. REV. STAT. 31:80 .......... 45

**Legal Treatises, Law Review Articles, and Miscellaneous**

Ayman H. Abdel-Khaleq and Christopher F. Richardson, *New Horizons for Islamic Securities: Emerging Trends in Sukuk Offerings*, 7 Chi. J. Int'l 409 (2007) .......... 5

David G. Dunlap, *Issues in Trade and Vendor Financing: "You Scratch my Back and I'll Scratch Yours,"* ADVANCED OIL, GAS AND MINERAL LAW COURSE 1996, STATE BAR OF TEXAS, available online at http://images.jw.com/com/publications/166.pdf (September 1996) .......... 33, 38

Thomas A. Harrell, *A Guide to the Provisions of Chapter Nine of Louisiana's Commercial Code*, 50 LA. L. REV. 711, 722 (1990) .......... 42

Wright and Miller, *Federal Practice and Procedure: Civil 2d*, Section 1255 at 367-8 (1990) .......... 15

140 Cong. Rec. E. 14461 (Oct. 6, 1994) .......... 30

140 Cong. Rec. S. 14461 (Oct. 6, 1994) .......... 30

140 Cong. Rec. E. 2204 (October 7, 1994) .......... 30, 34

MAY IT PLEASE THE COURT:

The Debtor, East Cameron Partners, L.P. ("ECP" or "Debtor") respectfully submits this consolidated Opposition to the Motions to Dismiss filed by the Sukuk Certificateholders (the "Holders") (Docket No. 70), East Cameron Gas Company ("ECG") (Docket No. 60), and Louisiana Offshore Holding, LLC ("LOH") (Docket No. 67); the Motion for More Definite Statement by the Holders (Docket No. 70); and, the Motion for Summary Judgment by LOH (Docket No. 67).

## SUMMARY OF THE DEBTOR'S ARGUMENT[1]

The Debtor seeks a declaratory judgment by this Court that the true character and nature of the asset-securitized sukuk (the "Sukuk Loan Transaction") in which the Debtor is a party is that of a disguised loan and antichresis and not of a true sale and exchange. Additionally, even if this Court determinates that the Sukuk Loan Transaction is not an antichresis, the Debtor is seeking a judgment declaring that the Sukuk Loan Transaction in its present form violates the public policies of the State of Louisiana and is absolutely null and void.

As will be described in greater detail below, the drafters of the various documents underlying the Sukuk Loan Transaction (the "Transaction Documents") went to great lengths to mask the true nature of the transaction by creating a special purpose vehicle and structuring the transaction as a true sale and exchange of the Debtor's overriding royalty interests (the "ORRI") in certain Properties (as defined below). However, when each of the Transaction Documents are reviewed in their entirety, and when all of the Transaction Documents are considered as a single transaction, the only reasonable conclusion is that the Sukuk Loan Transaction is a disguised

[1] The Debtor respectfully notes that this Summary is not intended to be a comprehensive listing of all of the relevant issues, arguments and authorities, but is merely intended as a general description of the Debtor's position.

loan. Accordingly, it follows that the Debtor was never divested of the ORRI and the ORRI was merely used to collateralize the loan.

The Defendants go to great lengths in seeking to preclude the Debtor from bringing the ORRI into the Debtor's estate. First, Defendants argue that a statutory exemption found in 11 U.S.C. § 541(b)(4)(B) precludes the Debtor from including the ORRI in its estate, contending that the ORRI is a covered "production payment." This assertion fails to acknowledge the well-plead allegations in the Debtor's Complaint and incorporated exhibits, which establish that (i) the ORRI was not transferred "pursuant to a written conveyance" as contemplated by the Congress in enacting Section 541(b)(4)(b), (ii) payment of the monies associated with the ORRI is not strictly contingent on production from the Properties, (iii) LOH (to whom the ORRI was transferred) participated in the operation of the Properties, and (iv) the Debtor can include the ORRI in the estate by means other than Sections 365 and 542 of Title 11 of the United States Code (the "Bankruptcy Code").

Second, Defendants incorrectly argue that Chapter 9 of the Louisiana Commercial Code (the "La. UCC") controls the transfer of the ORRI. In order to jam the Sukuk Loan Transaction into Chapter 9 of the La. UCC, Defendants suggest that the object of the alleged sale and exchange, the ORRI, was actually the "sale of an account" as that term is defined in the La. UCC. This argument is based on multiple faulty premises. Defendants also fail to recognize that a portion of the Sukuk Loan Transaction contemplated the *contribution* (or exchange) of the ORRI, and so any provisions of the La. UCC relating to the *sale* of an account are wholly inapplicable. Ultimately, any suggestion that the La. UCC applies to the transfer of the ORRI, does nothing more than distract and divert this Court's attention away from the fact that the Sukuk Loan Transaction is really a disguised loan.

Third, the Holders suggest that the relief sought by the Debtor is beyond the proper scope of this Court's authority under the Declaratory Judgment Act ("the "DJA"),[2] or, alternatively, that the Court should abstain from exercising such authority. In this Adversary Proceeding, the Debtor is not seeking to change, modify or vitiate any of the Transaction Documents. Instead, the Debtor is merely requesting a determination by this Court as to the proper interpretation of the rights and obligations of the parties to the Sukuk Loan Transaction. Such a request is well within this Court's authority under the DJA. Moreover, because this Adversary Proceeding will have a direct and undeniable effect on the Debtor's estate and the viability and content of any plan of reorganization, abstention is wholly improper.

Fourth, by filing their Motion for More Definite Statement, the Holders suggest that the Debtor has failed to adequately plead its allegations and the relief to which the Debtor believes it is entitled. The Debtor avers that under the liberal "notice pleading" requirements set forth in the Federal Rules of Civil Procedure, together with the pretrial procedures and discovery that may be undertaken by the parties to this Adversary Proceeding, the Debtor's Complaint is more than adequate to satisfy the liberal pleading requirements set forth in Rule 8 of the Federal Rules of Civil Procedure. By filing the Motion for More Definite Statement, the Holders are actually attempting to obtain a sneak peek at the Debtor's proposed plan of reorganization. This attempt should be denied.

Fifth, and finally, the Holders' nonchalant and unsupported requests to dismiss Counts One and Three of the Complaint can and should be easily disposed of by the Court.

[2] 28 U.S.C. § 2201.

## PROCEDURAL AND FACTUAL BACKGROUND

### I. Procedural Background

On October 16, 2008 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On that same day, the Debtor filed its Verified Complaint for Temporary Restraining Order, Preliminary Injunction and Declaratory Judgment (the "Complaint") in the instant Adversary Proceeding for purposes of preventing the sale, conveyance, transfer, or liquidation of the ORRI utilized by the Debtor to collateralize a loan from its wholly-owned subsidiary, LOH. On the Petition Date, this Court granted the Debtor's request for a temporary restraining in order prevent the sale, conveyance transfer or liquidation of the ORRI (Docket No. 3). Following substantial briefing by the Debtor, ECG, LOH, the Holders, and Deutsche Bank Trust Company Americas ("Deutsche Bank"), and a hearing on November 7, 2008, this Court entered a Preliminary Injunction (Docket No. 56) on November 18, 2008. Pursuant to the express terms of the Preliminary Injunction, LOH, ECG, Deutsche Bank, and their principals, agents, employees, directors, representatives and any persons acting their behalf or in active concert with them, are restrained and preliminarily enjoined from selling, liquidating, encumbering, conveying, or otherwise transferring all or any portion of the ORRI.

### II. Factual Background

#### A. East Cameron Partners, L.P.

The Debtor is an independent oil and gas exploration and production company that holds leasehold interests in two producing gas and condensate fields in federal waters of the United States, approximately twenty (20) miles offshore of the State of Louisiana, which are identified as East Cameron Block 71 and East Cameron Block 72 (the "Properties"). The Debtor is the officially recognized operator of the Properties, and the federal leasehold interests in the

Properties are administered by the Minerals Management Service of the United States Department of the Interior (the "MMS"). The Debtor's sole source of revenue consists of the proceeds derived from the production and sale of hydrocarbons from the Properties.

### B. The Sukuk Loan Transaction

Beginning in early 2006, the Debtor undertook efforts to procure traditional collateralized financing in order to refinance existing indebtedness related to the Properties, and to help realize the significant development potential of the Properties. However, the Debtor's potential lenders and investors decided to structure the financing as a Shari'ah-compliant transaction in an attempt to create the first asset-backed "sukuk" offering in the United States market.[3] In order to be considered Shari'ah compliant, which was vitally necessary to procure investment from Islamic investors, the loan had to be structured in such a manner as to avoid the ***appearance*** of charging interest or investing in speculative activities.[4]

The loan to the Debtor was ultimately structured as an asset-securitized sukuk, and the ORRI was used to collateralize the loan. The sukuk structure allegedly served a number of purposes, including, but not limited to, making the disguised loan Shari'ah compliant and allowing for a better credit rating on the transaction, while assuring that the transaction would be treated as a loan for tax purposes in order to enjoy the potential tax benefits such as deductible interest.

In order to accomplish these goals, the Sukuk Loan Transaction was structured so that the Debtor purported to transfer the ownership of the ORRI to a "bankruptcy-remote" special purpose vehicle, namely LOH. In turn, LOH granted a first-priority security interest in the ORRI

---

[3] Ayman H. Abdel-Khaleq and Christopher F. Richardson, *New Horizons for Islamic Securities: Emerging Trends in Sukuk Offerings*, 7 Chi. J. Int'l 409, 423 (2007).

[4] *Id.* at 423-424.

to ECG,[5] trustee of the East Cameron Gas Sukuk Trust, in order to secure the payments to the holders of sukuk certificates. The Sukuk Loan Transaction was purposely structured in such a way as to appear to be a sale and exchange of the ORRI, while maintaining many of the terms and conditions typically found in a loan. To better disguise the true nature of the transaction, great care was taken to create multiple layers of special purpose entities and to formulate multitudes of transaction documents to carefully "hide the ball."

### 1. Collateralization of ORRI

ECP and LOH executed a number of documents to effect the collateralization of the ORRI. The most significant Transaction Documents for purposes of this Adversary Proceeding are the Purchase and Sale Agreement, the Contribution Agreement, the Contributed Conveyance, the Purchased Conveyance, the Production, Delivery and Marketing Agreement (the "PDMA"), and the Operating Agreement of LOH, as amended (the "LLC Agreement"). The drafters attempted to structure the Sukuk Loan Transaction in such a manner as to give the ***appearance*** of a sale and exchange of the ORRI to LOH in order to make the deal more appealing to Islamic investors concerned with Shari'ah compliance.

The drafters were proficient in spreading these provisions over so many different documents that a review of any one, two or three documents in isolation would give a reader the impression that a true sale and exchange had occurred. However, when all of the Transaction Documents are carefully examined, the true nature of the transaction is revealed. The existence and shear number of provisions and protections typically found only in financing transactions is startling. Additionally, after reviewing each of the various Transaction Documents, it is clear

[5] The mortgage rights and security interests granted in favor of ECG by LOH with respect to the ORRI, together with LOH's mortgage rights and security interests in the Properties, were collaterally assigned to Deutsche Bank to act as Collateral Agent for the benefit of ECG, pursuant the Collateral Assignment dated July 5, 2006.

that the ORRI was not actually sold or contributed by the Debtor to LOH, but was used as collateral to service the sukuk debt. It also becomes clear that not only does the Debtor remain the owner of the ORRI, but that the special purpose vehicle, LOH, was intimately involved in the production of ORRI from the Properties, and that the loan was a recourse loan for which the Debtor was personally liable.

### 2. Loan Treatment Under the Contribution Agreement and Purchase and Sale Agreement.

The Contribution Agreement and the Purchase and Sale Agreement each specifically stipulate that the tax treatment of the ORRI is consistent with a typical loan. Specifically, they provide that LOH is treated as a disregarded entity from the Debtor. To the extent that LOH cannot be treated as a disregarded entity, the Purchase and Sale Agreement requires that LOH treat the ORRI as collateral for its mortgage, *meaning the Debtor, not LOH*, is the owner of the ORRI. The Contribution Agreement stipulates as follows:

> [ECP] and [LOH] agree to treat [LOH] as an entity disregarded as separate from [ECP] within the meaning of Treasury Regulation Section 1.7701-3, promulgated under the Internal Revenue Code of 1986 as amended (the "Code") for U.S federal income tax purposes. Accordingly, [ECP] and [LOH] agree to treat ***the transfer effected by this Agreement as disregarded for U.S. federal income tax purposes...***"[6]

Similarly, the Purchase and Sale Agreement stipulates as follows:

> [ECP] and [LOH] agree to treat [LOH] as an entity disregarded as separate from [ECP] within the meaning of Treasury Regulation Section 1.7701-3, promulgated under the Internal Revenue Code of 1986 as amended (the "Code") for U.S federal income tax purposes. Accordingly, [ECP] and [LOH] agree to treat ***the transfer effected by this Agreement as disregarded for U.S. federal income tax purposes***...Notwithstanding the foregoing, to the extent that [LOH] is treated as an entity separate from [ECP], [ECP] and [LOH] agree to treat the [Purchased ORRIS] ***as a carved-out production payment under Section 636(a) of the Code.***[7]

---

[6] Contribution Agreement, which is attached to the Complaint as Exhibit "D," at Section 7.02. (emphasis added).

[7] Purchase and Sale Agreement, which is attached to the Complaint as Exhibit "F," at Section 8.02. (emphasis added).

Section 636(a) of the Internal Revenue Code ("IRC"), to which the Purchase and Sale Agreement refers, provides that LOH should treat the ORRI as a *mortgage loan*, and not an ownership interest in property:

> A production payment carved out of mineral property shall be treated, for purposes of this subtitle, ***as if it were a mortgage loan on the property, and shall not qualify as an economic interest in the mineral property.*** In the case of a production payment carved out for exploration or development of a mineral property, the preceding sentence shall apply only if and to the extent gross income from the property (for purposes of section 613) would be realized, in the absence of the application of such sentence, by the person creating the production payment.[8]

### 3. Loan Treatment Under the Contributed Conveyance and the Purchased Conveyance.

Both the Purchased Conveyance and the Contributed Conveyance provide for an ***automatic termination*** of the purported sale and contribution once the loan obligations are repaid. Both documents stipulate that the transferred ORRI automatically terminates and the record title to the ORRI reverts to the Debtor once LOH receives a specified quantity of ORRI sufficient to service the sukuk debt.[9] In other words, once sufficient collateral had been produced from the Properties to service the debt, LOH agreed that it had no right to any further security right in the ORRI.

In order to create the ***appearance*** that the Debtor had no personal liability for a shortfall in production and to give some credence to the notion that the Purchased Conveyance and Contributed Conveyance resulted in an outright transfer of ownership, both the Purchased Conveyance and the Contributed Conveyance stipulate that LOH "shall look solely to the Overriding Royalty Hydrocarbons for satisfaction and discharge of the [ORRI], and [the Debtor]

---

[8] IRC § 636(a). (emphasis added).

[9] Purchased Conveyance, which is attached to the Complaint as Exhibit "E," at Section 1.03; Contributed Conveyance, which is attached to the Complaint as Exhibit "G," at Section 1.03.

shall not be personally liable for the payment and discharge thereof."[10] However, the true nature of the transaction is a loan for which the Debtor is personally liable, as is reflected by the personal liability provisions included in the provisions of the LLC Agreement.[11] As is discussed in more detail below, the LLC Agreement closes the loop on the loan by specifically requiring the Debtor to pay for any shortfall in production.

### 4. Production, Delivery and Marketing Agreement.

The PDMA[12] essentially functions as a master mortgage, security agreement, and loan agreement between the Debtor and LOH by governing and providing additional security for the Debtor's loan obligations. Unlike the Purchased Conveyance and the Contributed Conveyance, the PDMA ***does not purport to transfer title*** of the ORRI to LOH.

#### a. "Loan Covenants".

The PDMA contains numerous loan covenants regarding the preservation, maintenance and delivery of the collateral, and repayment of the Debtor's indebtedness, and gives LOH rights to participate in the production of the Properties. The Debtor's obligations under the PDMA are consistent with common loan covenants, but are totally inconsistent with the characterization of the transaction as a sale or exchange.

By way of example, the following sections of the PDMA are typical "loan covenants":

- Section 5 of the PDMA requires the Debtor to maintain well production at certain rates, thereby ensuring repayment of its indebtedness to LOH in a timely manner.
- Section 6 of the PDMA imposes various notice requirements on the Debtor regarding the ORRI, stipulates the time and manner of delivery, and places the costs of delivery on the Debtor.

---

10 Purchased Conveyance at Section 1.05, Contributed Conveyance at Section 1.05.

11 *See e.g.*, LLC Agreement at Section 13(a).

12 A copy of the PDMA is attached to the Complaint as Exhibit "H."

- Section 7 of the PDMA imposes various obligations on the Debtor with respect to the quality of the ORRI.
- Section 9 of the PDMA imposes various obligations on the Debtor relating to the Properties, including, but not limited to, obligations to keep the leasehold interest in effect, maintain the Properties and related equipment in good condition, notify LOH of any adverse claims, promptly pay all operating expenses, taxes and other charges, comply with applicable environmental laws and maintain title to the Properties.
- Section 10 of the PDMA requires the Debtor to make capital expenditures in connection with the Development Plan (as defined in the PDMA).
- Section 11 of the PDMA requires the Debtor to maintain certain insurance coverages and to name LOH as an additional insured.
- Section 14 of the PDMA requires the Debtor to provide LOH, ECG and the Transaction Administrator, with financial statements, balance sheets, environmental reports and other extensive reporting statements.

Each of these provisions is wholly inconsistent with the characterization of the Sukuk Loan Transaction as a true sale and exchange. Rather, they reveal what is actually a disguised secured financing.

**b. Mortgage and Security Interest.**

In that same vein, Section 16 of the PDMA purportedly grants LOH a mortgage and UCC security interest in all of the Debtor's interest in the Properties and all equipment, fixtures, inventory, goods, accounts, contract rights and general intangibles relating to the Properties.[13]

[13] The Debtor expressly reserves the right to contest the validity, priority, and extent of any and all security interests and mortgage rights allegedly created in connection with the Sukuk Loan Transaction and the amount and extent of the obligations purportedly secured by the PDMA.

Section 16 of the PDMA further provides that if the Debtor defaults on ***any*** of its obligations, LOH has the right to foreclose on the Properties and operate them pending a foreclosure sale.[14]

The existence and function of the expansive Mortgage and Security Interest granted under the PDMA is also described on Pages 22 and 72 of the Final Private Placement Memorandum (the "Prospectus"),[15] issued in connection with the Sukuk Loan Transaction, and provides in relevant part as follows:

> The agreement [PDMA] includes a mortgage and security interest granted to the Purchaser SPV [LOH] by the Originator [the Debtor] in the Properties in order to secure any damages incurred by Purchaser SPV as a result of a breach by the Originator of certain representations or warranties, or of certain covenants, related to the ORRI.[16]
>
> . . .
>
> The Originator grants to the Purchaser SPV a mortgage and security interest in all of Originator's interest in the Properties and in all equipment, inventory, accounts, equipment, fixtures, goods, contract rights and general intangibles related thereto to secure payment of certain amounts that may be advanced to the Originator pursuant to the agreement [PDMA] and performance by the Originator of its obligations under the agreement, the Purchase and Sale Agreement and the Contribution Agreement.[17]

### 5. Creation of Louisiana Offshore Holding, LLC.

LOH was created in connection with the loan structuring and its sole reason for existence is the loan to the Debtor. LOH was set up as a sham entity, the goal of which was to materially divest the Debtor of control of the collateral during the duration of the loan. The purpose of this structure was to enable the lender to expeditiously foreclose on any assets without using one of

---

[14] The mortgage and security interests afforded to LOH under the PDMA, together with all associated rights, were assigned by LOH to Deutsche Bank pursuant to the Collateral Assignment dated July 5, 2006.

[15] A copy of the Prospectus was attached to and incorporated in the Complaint as Exhibit "B".

[16] Prospectus at p. 22.

[17] *Id.* at p. 72.

the prescribed Louisiana financing devices, which ability is in direct violation of the public policy of the State of Louisiana.

The Debtor is the 100% membership interest owner of LOH. However, LOH also has an "Independent Member" which is afforded certain powers and responsibilities intended to prevent LOH from entering bankruptcy. The role of the Independent Member is also to divest the Debtor of control of the collateral during the loan. Accordingly, the Independent Member ceases to be a member of the company under the following circumstances:

> Upon the first to occur of (a) ***payment in full of all sums that are or may become payable by the Company*** under the Funding Agreement or (b) the delivery by [the Debtor] to the Company of (i) the [Contributed ORRI] pursuant to the terms of the Contributed Conveyance and (ii) the [Purchased ORRI] pursuant to the terms of the Purchased Conveyance...[18]

The obvious effect of this provision is to give full control of LOH (and its assets) back to the Debtor once all of the loan obligations have been fulfilled. Because the Independent Member serves the lender, not the company or its member, the LLC Agreement specifically requires that the Independent Member act, not in the best interest of the company and its members (namely, the Debtor), but rather, that the Independent Member "consider the interests of ***[ECG] and the holders of the sukuk issued by [ECG] in connection with all actions taken by the Independent Member pursuant to the Agreement.***"[19]

The LLC Agreement also "closed the loop" on the loan by providing for personal liability on the part of the Debtor for any failure to service the loan debt or any shortfall in production. Specifically, Section 13 of the LLC Agreement provides:

> Section 13. <u>Additional Contributions</u>
>
> (a)...[I]f ***at any time*** the Company does not have sufficient funds to pay any Funding Return (as such term is defined in the Funding Agreement) due and

---

[18] LLC Agreement at Section 5(e). (emphasis added).
[19] *Id.* at Section 9(b)(iv). (emphasis added).

owing pursuant to the Terms of the Funding Agreement, ***[the Debtor] shall be obligated to make additional capital contributions to the Company as may be required to provide the Company with such funds as may be required to pay such Funding Return...***[20]

Section 13 effectively erases Section 1.05(a) of the Purchased Conveyance and the Contributed Conveyance, which suggests a lack of recourse as to the Debtor, by purportedly providing that if the ORRI is insufficient to service the debt under the Funding Agreement, the Debtor must come up with the cash to pay the debt. In other words, it is the Debtor, not LOH, which is purportedly personally liable for the loan.[21]

In sum, placing record title of the ORRI in LOH, which could not take actions relating to the collateral without the consent of the Independent Member, facilitated the investors' attempt to obtain a security interest in the ORRI without using one of the prescribed Louisiana security devices. It allowed the Debtor to ostensibly retain ownership of the collateral but prevented debtor from doing whatever it pleased with the collateral. In fact, the Independent Member is entitled to sell the ORRI by private sale without resorting to the statutorily prescribed and required foreclosure processes or otherwise complying with the procedures applicable to foreclosing on existing Louisiana security devices. LOH was intentionally structured as a bankruptcy-remote entity in an attempt to isolate both LOH and the ORRI from a bankruptcy or insolvency proceeding, to frustrate and preclude the protections offered by the United States Bankruptcy Code, and to circumvent the use of a Louisiana security device in direct violation of the public policy of the State of Louisiana.

[20] LLC Agreement at Section 13(a). (emphasis added).

[21] The Debtor expressly reserves all rights to reject the LLC Agreement, or any other executory contract or unexpired lease, pursuant to Section 365 of the Code, as well as all rights to contest the amount, validity and allowability of any of LOH against the Debtor.

## LEGAL AUTHORITIES AND ANALYSIS

### I. Standards Under Federal Rules of Civil Procedure 8, 12, and 56.

#### A. Federal Rule of Civil Procedure 8.

In order to comply with the "notice pleading" requirements set forth in Federal Rule of Civil Procedure 8(a) ("Rule 8"), made applicable herein pursuant to Federal Rule of Bankruptcy Procedure 7008, a party asserting a claim for relief must provide a (i) short statement of the basis for the forum court's jurisdiction, (ii) a "short and plain statement of the claim showing that the pleader is entitled to relief", and (iii) a "demand for the relief sought."[22]

With regard to the sufficiency of the claim showing entitlement to relief, all that is required is that the complaint includes "a short and plain statement of the claim that gives the defendants fair notice of what the plaintiff's claim is and the grounds upon which it rests."[23] There is no requirement that the plaintiff "set out in detail the facts upon which [it] bases [its] claim."[24] General factual allegations are sufficient and the court "will presume that general allegations embrace those specific facts that are necessary to support the claim."[25]

Moreover, "[t]he sufficiency of a pleading is tested by the statement of the claim and the demand for judgment is not considered part of the claim. Thus, selection of an improper remedy in the demand will not be fatal to a party's pleading if the statement of the claim indicates the pleader may be entitled to relief of some other type."[26] The Fifth Circuit has "consistently

---

22 Fed.R.Civ.Proc. 8(a).

23 *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Union*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163 (1993) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957)).

24 *Id.*

25 *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 256, 114 S.Ct. 798, 803 (1994) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137 (1992)).

26 Wright and Miller, *Federal Practice and Procedure: Civil 2d*, Section 1255 at 367-68 (1990); *see also Doss v. South Cent. Bell Tel. Co.*, 834 F.2d 421, 425 (5th Cir. 1987).

interpreted [Rule 8(a)(3) regarding the prayer for relief] to allow a plaintiff any relief that the pleaded complaint supports; requesting an improper remedy is not fatal."[27]

**B. Federal Rule of Civil Procedure 12(b)(1).**

A cause of action may only be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1), made applicable herein through Federal Rule of Bankruptcy Procedure 7012 ("Rule 7012"), if it can be demonstrated that the forum court lacks jurisdiction over the subject matter of the allegations made therein.[28] There are three separate bases upon which a court has power to dismiss an action under Rule 12(b)(1): (1) on the complaint alone; (2) on the complaint supplemented by undisputed facts or evidence in the record; or (3) on the complaint supplemented by undisputed facts or evidence in the record plus the Court's resolution of disputed facts.[29] Where, as here, subject matter jurisdiction is challenged on the basis of the face of the complaint itself, the well-pleaded allegations of fact within the complaint are assumed to be true for that purpose.[30]

---

[27] *L.W. Laird v. Integrated Resources*, 897 F.2d 826, 841 (5th Cir. 1990) (citing *Industrial Development Board of the Town of Section, Alabama v. Fuqua Industries, Inc.*, 523 F.2d 1226, 1235 (5th Cir. 1975) ("Under the liberal pleading standard required by the federal rules, the complaint here would encompass relief based on any suitable theory...."); *Kent v. Walter E. Heller & Co., Inc.*, 349 F.2d 480, 481 (5th Cir. 1965) ("The fact that the appellant may have misconceived ... his remedy, would not have warranted dismissal of his complaint unless it appeared to a certainty that he was 'entitled to no relief under any state of facts which could [have been proved] in support of the claim.' "); *Hawkins v. Frick-Reid Supply Corp.*, 154 F.2d 88, 89 (5th Cir. 1946) ("While the pleading appears to be somewhat confused, nevertheless, ... every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings. Accordingly, a complaint is sufficient if it sets forth facts which show that the plaintiff is entitled to any relief which the court can grant....").

[28] Fed.R.Civ.Proc. 12(b)(1).

[29] *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996); *Ynclan v. Department of Air Force*, 943 F.2d 1388, 1390 (5th Cir.1991); *Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380, 1384 (5th Cir.1989).

[30] *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980); *Mortensen v. First Federal Savings and Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir.1977).

Additionally, where subject matter jurisdiction is dependent upon the application of a federal statute, such as the decision whether to abstain from exercising jurisdiction under the DJA, any inquiry into the existence of subject matter jurisdiction is a question related to the merits of a claim under the statute rather than a condition of subject matter jurisdiction.[31] In such a case, a court should treat the Rule 12(b)(1) motion as a motion for summary judgment, and "may dismiss for lack of jurisdiction only if it would be proper to grant summary judgment, *i.e.*, if there are no material facts in dispute as to jurisdiction."[32]

**C. Federal Rule of Civil Procedure 12(b)(6).**

Motions to dismiss are viewed with disfavor and are rarely granted.[33] In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), made applicable herein through Rule 7012, a court accepts as true those well-pleaded factual allegations in the complaint.[34] The complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff,[35] and a court will "bend over backwards to avoid granting a 12(b) motion to dismiss."[36] Indeed, a "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."[37] Finally, a Rule 12(b)(6) motion should be granted only if it appears beyond a

---

[31] *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 548-550 (6th Cir. 2006); *Parington American Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 338 (4th Cir. 2006); *Trimble v. Asarco, Inc.*, 232 F.3d 946, 952-955 (8th Cir. 2000); *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1351-1354 (11th Cir. 1998).

[32] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039-1040 (9th Cir. 2004); *Morrison v. Amway Corp.*, 323 F.3d 920, 924-927 (11th Cir.); *Pringle v. U.S.*, 208 F.3d 1220, 1222-1223 (10th Cir. 2000).

[33] *Shipp v. McMahon*, 199 F.3d 256, 260 (5th Cir. 2000).

[34] *C.C. Port, Ltd. v. Davis-Penn Mortgage Co.*, 61 F.3d 288, 289 (5th Cir. 1995).

[35] *Sloan v. Sharp*, 157 F.3d 980, 982 (5th Cir. 1998).

[36] *McCann v. Texas City Refining, Inc.*, 984 F.2d 667, 673 (5th Cir. 1993).

[37] *Swierkiewicz v. Sorema N.A.* 534 U.S. 506, 514, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (*quoting Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

reasonable doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief.[38]

### D. Federal Rule of Civil Procedure 12(e).

Motions for more definite statement are generally disfavored because of the availability of discovery to obtain additional information as to the claims set forth in the complaint, together with the liberal notice requirements in Rule 8.[39] "Indeed, a 'motion for a more definite statement will not be granted where the moving party can reasonably respond to the non-movant's pleading, but wants the non-movant to plead additional information that could otherwise be later gained through discovery.'"[40] When a defendant or a party-in-interest wants to procure additional information relating to the claims for relief set forth in a complaint, discovery is the favored method.[41]

### E. Federal Rule of Civil Procedure 56.

Summary judgment is entered only if the Court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[42] Rule 56, as made applicable herein pursuant to Federal Rule of Bankruptcy Procedure 7056, requires the non-moving party to "go beyond the pleadings and . . . designate specific facts showing there is a genuine issue for trial."[43] The Court must determine whether the evidence,

---

[38] *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002).

[39] *Mitchell v. E-Z Way Towers, Inc.*, 269 F.2d 126, 130 (5th Cir. 1959).

[40] *Blum v. Roberts*, 2006 WL 2135457, *2 (citing *Gibson v. Deep Delta Contractors, Inc.*, 2000 WL 28174, *6 (E.D.La. 2000)).

[41] *Babcock & Wilcox Co. v. McGriff, Seibels & Williams, Inc.*, 235 F.R.D. 632, 633 (E.D.La. 2006) (citing *Federal Deposit Insurance Corporation v. Fidelity and Deposit of Maryland.*, 118 F.R.D. 435, 437 (M.D.La. 1988)).

[42] Fed. R. Civ. P. 56(c).

[43] *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

viewed in the light most favorable to the non-movant, demonstrates that there is no genuine issue of material fact, and that movers are entitled to judgment as a matter of law.[44]

## II. Subject Matter Jurisdiction over the Present Adversary Proceeding.

### A. This Court has Valid Subject Matter Jurisdiction over the Adversary Proceeding Under 28 U.S.C. § 1334(b)(2) Because it is a "Core Proceeding" as Defined in 28 U.S.C. § 157(A) and (O).

A United States district court's subject matter jurisdiction over bankruptcy-related matters is defined in 28 U.S.C. § 1334, and provides in relevant part as follows:

> (b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district court shall have original, but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.[45]

Under 28 U.S.C. § 157(b)(1), a bankruptcy court's "arising under" jurisdiction specifically includes those matters that are identified as "core" proceedings under 28 U.S.C. 157(b)(2). Core proceedings relate, *inter alia*, to the administration of a debtor's estate, the adjustment of the debtor-creditor relationship, and any other proceeding affecting the administration and liquidation of the debtor's assets."[46] Bankruptcy courts are authorized to enter final judgments in core proceedings.[47]

In its Complaint, the Debtor expressly pleads that this Court has valid subject matter jurisdiction over the claims set forth therein pursuant to 28 U.S.C. §§ 157(b)(2)(A), (O) and

---

[44] *Id.* at 499-500.

[45] 28 U.S.C. § 1334(b).

[46] *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 71,102 S.Ct. 2858, 2871, 73 L.Ed. 2d 598 (1982); *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 189 (5th Cir. 1990) (adopting *Marathon Pipeline* analysis); 28 U.S.C. §157(b)(2)(A), (C).

[47] *Marshall v. Marshall*, 547 U.S. 293, 302, 126 S.Ct. 1735, 1743 (2006); *In re Walker*, 51 F.3d 562, 569 (5th Cir. 1995); *In re Norris*, 192 B.R. 863, 869 (Bankr.W.D.La. 1995).

1334(b)(2).[48] Moreover, in its Answer Deutsche Bank specifically pled that such subject matter jurisdiction exists over the Adversary Proceeding.[49]

### B. The Holders are the ONLY Party Challenging This Court's Subject Matter Jurisdiction.

In fact, the ONLY party that raises any question as to this Court's subject matter jurisdiction in its Motion to Dismiss—the Holders—specifically admits that "[t]he Court has jurisdiction over the Complaint pursuant to 28 U.S.C. §§ 157 and 1334."[50] The only challenge made to this Court's subject matter jurisdiction is raised in the Holders' Motion to Dismiss[51] in two limited contexts relating to the Debtor's claim for declaratory relief, each of which may be disposed of rather easily.[52]

#### 1. A Justicable Controversy Exists in this Adversary Proceeding.

First, the Holders are absolutely correct in their assertion that in order for this Court or any other federal court to exercise jurisdiction, there must exist an ***actual controversy*** between the parties.[53] More accurately, the DJA, provides in pertinent part as follows:

> In a case of actual controversy within its jurisdiction … any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interest party seeking such declaration, whether or not further relief is or could be sought.[54]

In their Motion, the Holders suggest that because they are unable to ascertain exactly what treatment they may ultimately be afforded in a plan of reorganization, and because they may ultimately be willing to consent to such treatment, there is no justicable controversy, and,

---

[48] *See* Complaint at para. 4.
[49] *See* Answer of Deutsche Bank, at para. 1 (Docket No. 65).
[50] Holders' Memorandum at para. 1.
[51] *See* Holders' Memorandum at paras. 91-104.
[52] The Debtor will discuss in greater detail this Court's ability to provide the declaratory relief sought in the Complaint in connection with the discussion of the Defendants' Motions to Dismiss.
[53] *See* Holders' Memorandum at paras. 93-94.
[54] 28 U.S.C. § 2201.

therefore, no subject matter jurisdiction. This argument is absurd. If taken at face value, the Holders are essentially arguing that in any case where the parties may ultimately settle after discovery and litigation, there can never be a justicable controversy because the defendant(s) may ultimately be willing to consent to the relief sought by the plaintiff. The mere fact that this Debtor, the three Defendants and the Holders (collectively referred to herein as "Defendants," unless identified individually) have expended literally thousands of hours and hundreds of thousands of dollars of attorneys' fees clearly evidence the existence of an ***actual controversy*** between the parties.

Moreover, the Holders are not the only parties to this litigation and their ***potential*** willingness to entertain settlement possibilities does not vitiate the need for the instant litigation *vis-à-vis* the remaining holders of the Sukuk Certificates, LOH, ECG or Deutsche Bank. It is obvious that the Holders do not and cannot speak for all of the Defendants to this litigation with regard to the settlement of the Debtor's claim for declaratory relief, and, that the Debtor and the named Defendants indisputably disagree as to the proper legal characterization of the Sukuk Loan Transaction. Therefore, the Holders' non-binding assertion that they *may* be willing to consent to the relief if it was better described, and, therefore, there *may* not be a justicable controversy, is nonsense.

**2. This Court Should NOT Abstain From Exercising Subject Matter Jurisdiction Over the Debtor's Claim for Declaratory Judgment.**

Second, the Holders' suggest that this Court should exercise its judicial discretion, abstain from hearing the Adversary Proceeding under the DJA, and, accordingly, dismiss the suit in its entirety.[55] While it is true that courts have discretion in deciding whether to abstain from hearing a matter brought pursuant to the DJA, this discretion "should be exercised liberally in

[55] *See* Holders' Memorandum at paras. 96-104.

favor of granting such relief in order to accomplish the purposes of the Declaratory Judgment Act."[56]

As is accurately cited by the Holders, the Fifth Circuit has set forth seven (7) non-exclusive factors to consider when deciding whether to hear a matter under the DJA.[57] For the sake of brevity, the Debtor will only discuss in detail those factors that the Holders contend are in favor of abstention. It is worth noting that the Holders freely admit that four (4) of the seven (7) factors are **NOT** applicable to this Adversary Proceeding, and, in fact, such factors weigh heavily against the Court deciding to abstain from considering the Debtor's request for declaratory relief. Specifically, the Holders' do not contend the Complaint (i) is related to a pending state court action; (ii) gives rise to possible inequities in allowing the declaratory plaintiff to gain precedence in time or change forums; (iii) is filed in an inconvenient forum; or (iv) results in this Court construing a state judicial decree.

Despite the inapplicability of more than half of the *Sherwin-Williams* factors, the Holders contend that this Court should abstain from hearing the Debtor's claim for declaratory relief for the following three (3) reasons, each of which will be discussed by the Debtor in turn:

a. Whether the Debtor filed the Adversary Proceeding in anticipation of a lawsuit being filed by the Defendants: In their Motion, the Holders freely admit and acknowledge that the Adversary Proceeding "was not filed in anticipation of a lawsuit being filed by any of the defendants..." but suggest that it was "filed in anticipation of a possible exercise of remedies against the ORRI." [58] The Holders did not, and can not, cite to any case law suggesting that a plaintiff should be prevented from seeking declaratory relief in connection with a potential dispute as

[56] *Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330, 1333 (11th Cir. 1989).
[57] *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 388 (5th Cir. 2003).
[58] Holders' Memorandum at para. 98.

to parties' contractual obligations. Instead, the contrary is true. As is the case in one of the very cases cited by the Holders, "[c]onstruction and interpretation of written instruments…is the principal function of a declaratory judgment proceeding."[59] This case was not and is not intended by the Debtor to short circuit an impending lawsuit by the Defendants, and therefore, this factor does not apply.

b. Whether the Debtor engaged in forum shopping: The Debtor filed the instant Adversary Proceeding in this Court, as it is a "core proceeding" and relates directly to whether the Debtor's single largest source of revenue, the ORRI, remains an asset of the Debtor's estate utilized to collateralize a disguised loan. The mere fact that the Debtor could have filed suit in state court, which it does not admit, does nothing to reduce the obvious reality that this Court is the best and most able court to decide not only the true character and nature of the Sukuk Loan Transaction, but also whether the ORRI would be part of the Debtor's estate or somehow excluded pursuant to Section 541(b)(4)(B) of the Bankruptcy Code as is alleged by the Holders and all other Defendants.

The Holders appear to be arguing in paragraph 99 of their Motion to Dismiss that the entire Bankruptcy Case was filed in bad faith, which is specifically and vehemently denied by the Debtor. If that is their true intention by arguing that the Debtor engaged in forum shopping, the Debtor avers that alternative methods exist for making such an assertion. The sole question for purposes of this factor of the *Sherwin-Williams* test for abstention is whether by filing this Adversary Proceeding, the Debtor engaged in forum shopping.

---

[59] *In re Dowington Indus. & Agr. Sch.*, 172 B.R. 813, 819 fn. 5 (Bankr.E.D.Pa. 1994).

This Court is best suited to decide not only the issues relating to the characterization of the Sukuk Loan Transaction, but also other issues relating to the applicability of the automatic stay and Section 541(b)(4)(B) of the Bankruptcy Code. Additionally, because the Properties are located on the Outer Continental Shelf off the coast of Louisiana, Louisiana state law is applicable, and this Court is well-versed in Louisiana state law. Therefore, any assertion that the Debtor engaged in forum shopping is both unsubstantiated and illogical.

c. Whether retaining the Adversary Proceeding would serve the purposes of judicial economy: The Holders' argument in regards to this factor of the *Sherwin-Williams* analysis is both facially and logically flawed, and should be rejected. Based solely on unsupported and irrelevant information as to the purported efficacy of the Debtor's operations of the properties, the Holders suggest that the Adversary Proceeding and the relief sough therein "is an absolute waste of the parties' and the Court's resources."[60] The mere fact that the Holders have made a unilateral determination as to the competency of the Debtor and the likelihood of the Debtor's success in the Adversary Proceeding does *not*, in and of itself, render the entire Adversary Proceeding a "gross waste of judicial resources."[61] Should the Debtor be successful in procuring a judicial declaration that the Sukuk Loan Transaction is, in fact, a disguised loan and not a true sale and exchange, and that the ORRI is not subject to Section 541(b)(4)(B) of the Bankruptcy Code, the Debtor's entire bankruptcy estate will be placed in a substantially better position. Surely this result is worth this Court's and the

[60] Holders' Memorandum, at para. 102.
[61] Holders' Memorandum, at para. 102.

Debtor's time, effort, and resources. This litigation may also prevent the need for further consideration by this Court, whether it be in an adversary proceeding or contested motion, as to the treatment of the ORRI and the relationship between the parties in the context of preparing and confirming a plan of reorganization.

As is obvious from this discussion, the Holders' conclusory and unsupported statement that "[t]aken together the above factors weigh heavily in favor of this Court declining to exercise jurisdiction over Count 2" cannot be given any credence.[62] Four (4) of the seven (7) *Sherwin-Williams* factors admittedly weigh in favor of this Court exercising its declaratory authority. The remaining three (3) factors also fail to give rise to a case in which this Court should refuse to exercise its liberal discretion to hear the Debtor's claim for declaratory relief. For this reason, the reasons set forth in the discussion below, and because the Court's determination as to the requested relief will directly affect the administration and reorganization of the Debtor's estate, abstention is not appropriate.

## III. The Holders Should NOT be Permitted to Utilize a Motion for More Definite Statement to Obtain a "Sneak Preview" of the Debtor's Proposed Plan of Reorganization.

Like many defendants (or, intervenor in this case), the Holders are attempting to utilize a Rule 12(e) motion for more definite statement to short circuit proper discovery in hopes of gaining a "sneak preview" of information that can and should be procured through the pretrial procedures afforded under the Federal Rules of Civil Procedure. The Holders are also using the motion for more definite statement as a ploy for compelling the Debtor to propose and guarantee plan treatment for the Holders. For these very reasons, motions for more definite statement are generally disfavored in the Fifth Circuit.[63]

[62] Holders' Memorandum, at para. 104.
[63] *Mitchell*, 292 F.2d at 130.

The general animosity toward motions for more definite statement also arises out of the broad "notice pleading" requirements set forth in Rule 8(a), which merely require that the plaintiff set forth sufficient facts to put the defendant on notice as to the claims for relief sought in the complaint.[64] As stated by the Fifth Circuit, "[s]uch simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedure established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.'"[65]

At no point do the Holders suggest that the Debtor has failed to sufficiently plead facts to put the Defendants on notice as to the nature of the claims for relief sought by the Debtor. Instead, the Holders' entire focus with respect to the alleged deficiencies in the Debtor's Complaint is that the Complaint fails to set forth with specificity the precise relief that the Debtor seeks. In other words, the Holders appear to be concerned not with the lack of specificity as to the nature of the claim, but instead are complaining because they are unable to ascertain exactly what the transaction would look like if this Court were to recharacterize the Sukuk Loan Transaction as a loan instead of a sale and exchange.

As recited above, "[t]he sufficiency of a pleading is tested by the statement of the claim and the demand for judgment is not considered part of the claim. Thus, selection of an improper [or incomplete] remedy in the demand will not be fatal to a party's pleading if the statement of the claim indicates the pleader may be entitled to relief of some other type."[66] The Fifth Circuit has "consistently interpreted [Rule 8(a)(3) regarding the prayer for relief] to allow a plaintiff any relief that the pleaded complaint supports; requesting an improper remedy is not fatal."[67] Surely,

[64] *Id.*
[65] *Id.* (citing *Conley v. Gibson*, 355 U.S. at 47-48, 78 S.Ct. at 103.
[66] *See* Fn. 26, *supra.*
[67] *See* Fn. 27, *supra.*

these holdings can be followed to the logical conclusion that not only is an improper prayer for relief not fatal, but also that an incomplete prayer for relief is also not fatal.

Moreover, the Debtor specifically denies that the demand for relief set forth in the Complaint is in any way deficient. To the contrary, the Debtor specifically requests the precise relief that it is seeking, *i.e.*, the recharacterization of the Sukuk Loan Transaction as an antichresis or pledge, as opposed to an outright sale and exchange of the ORRI. Despite the Holders' repeated attempts to characterize the Complaint as a wholesale attempt to vitiate over forty (40) contract documents, no such effort is being undertaken in this Adversary Proceeding. Instead, the Debtor is seeking ONLY what is prayed for, which is the recharacterization of the transaction as a loan and a declaration that the ORRI, although pledged as collateral to LOH, has been and continues to be an asset of the Debtor's estate, or, that the Sukuk Loan Transaction is null and void as being in violation with the public policies of the State of Louisiana.

As will be described in greater detail in the Debtor's discussion as to the applicability of the DJA, the Debtor fully intends to comply with its continuing obligations under the Sukuk Loan Transaction, other than to the extent this Court finds that the Sukuk Loan Transaction violates Louisiana public policy and is null and void, and to the extent that such obligations are modified pursuant to a confirmed plan of reorganization consistent with bankruptcy law.[68] This intention can and will be more fully disclosed not only through discovery in this Adversary Proceeding, but also during the process by which the Debtor will propose, negotiate, and seek confirmation of a plan of reorganization in the Bankruptcy Case. Therefore, a more definite statement, and the concomitant delay associated with filing an amended complaint and responding to any further objections thereto, is unnecessary and inappropriate in this matter.

[68] Provided, however, that if the Court determines that the Sukuk Loan Transaction is structured in such a way as to violate the public policies of the State of Louisiana, and is, therefore, null and void *ab initio*, the Debtor shall comply the obligations as enunciated by the Court.

## IV. The Adversary Proceeding Should NOT be Dismissed Pursuant to Rule 12(b)(6).

Motions to dismiss are generally disfavored.[69] Assuming all of the well-pleaded facts set forth in the Complaint are true, [70] the Motions to Dismiss should only be granted if it appears **beyond a reasonable doubt** that the Debtor can prove no set of facts in support of its claim that would entitle it to relief. [71] For the reasons set forth in the Debtor's previously filed Reply Memorandum in Support of Motion for Preliminary Injunction and for Enforcement of the Automatic Stay (Docket No. 32) ("Debtor's Reply Memorandum"), which are adopted herein as if restated, *in toto*, as well as those reasons set forth below, the Debtor has set forth sufficient factual allegations in its Complaint to establish a *prima facie* cause of action for the issuance of a declaratory judgment as prayed for therein.

### A. 11 U.S.C. 541(b)(4)(B) is NOT Applicable to the ORRI.

In their Memoranda in Support, ECG, LOH and Holders argue that the ORRI does not constitute property of the Debtor's estate by virtue of Section 541(b)(4)(B). This argument is utterly without merit. Section 541(a)(1) of the Bankruptcy Code provides that property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Whether the debtor has a legal or equitable interest in property is generally determined by state law.[72] For example, as set forth in Debtor's Complaint, and the documents attached thereto, the property in dispute, the ORRI, was pledged to LOH as security for a loan to the Debtor or formed part of a prohibited attempt to circumvent the securities laws of Louisiana. Accordingly, under applicable state law, the Debtor remains the owner of the property and the property should be recognized as property of the estate by this Court.

---

69 *Shipp*, 199 F.3d at 256.
70 *C.C. Port, Ltd.*, 61 F.3d at 289.
71 *ABC Arbitrage*, 291 F.3d at 348.
72 *See e.g. Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 918 (1979).

In certain limited situations, the Bankruptcy Code specifies whether certain legal or equitable interests in property should comprise property of the estate. As pointed out by both Defendants and the Debtor, Section 541(b)(4)(B) provides a statutory exception for certain rights to payment arising in connection with mineral rights:

> (b) Property of the estate does not include
>
> ...
>
> (4) any interest of the debtor in liquid or gaseous hydrocarbons to the extent that—
>
> ...
>
> (B)(i) the debtor has transferred such interest ***pursuant to a written conveyance*** of a ***production payment*** to an entity that does ***not participate in the operation of the property*** from which such production payment is transferred; and
>
> (ii) but for the operation of this paragraph, the estate could include the interest referred to in clause (i) ***only by virtue*** of section 365 or 542 of this title...[73]

The proper line of inquiry into the applicability of the statute is straightforward. The standards set forth by Defendants are confusing, ignore the plain language of the statute and miss the mark entirely. Under the plain language of the statute, an interest in hydrocarbons is ***only*** excluded from a debtor's estate ***if*** the interest meets the requirements of ***both*** clause (i) and clause (ii). Each clause has its own unique requirements. Under clause (i), the Court must ask:

1. Was there a transfer pursuant to a written conveyance?
2. Was the thing transferred a production payment?
3. Is the transferee an entity that does not participate in the operation of the property from which the production payment was transferred?

[73] 11 U.S.C. § 541(b)(4)(B) (emphasis added).

Only if the answer to ***all three*** of those questions is yes may the Court move on to clause (ii). Under clause (ii), the Court must ask whether a debtor could include the interest in hydrocarbons in its estate ***only by virtue of*** section 365 or 542 of the Bankruptcy Code. The Debtor has alleged more than sufficient facts, which facts the court must consider true and correct,[74] to show that the answer to each of the four questions presented by the statute is **no**. Accordingly, Section 541(b)(4)(B) is wholly inapplicable to the ORRI.

**1. Proper Analysis.**

**a. Was there a transfer pursuant to a written conveyance?**

The first issue is whether the ORRI was transferred to LOH pursuant to a written conveyance. It was not. The term "transfer" is broadly defined by the Bankruptcy Code and includes a wide array of sales, liens and other encumbrances. There is little question that a sale, exchange, or antichresis would constitute a "transfer" under the Bankruptcy Code. However, the term "written conveyance" is not defined in the Bankruptcy Code. By using this term, Congress sought to limit the types of transfers to which the statute applied. Specifically, the "written conveyance" limitation limits the applicability of the statute to situations where the interest was transferred to a "***bona fide purchaser for value***" who received ownership of the production payment.[75] In fact, Congress' stated intent in enacting Section 541(b)(4)(B) was to protect innocent third party ***purchasers*** of mineral interests from having the ***sale*** treated as a contract right under applicable state law and then rejected under the Bankruptcy Code. For example, the statement of Senator Simpson from the 104th Congress explains:

> A problem has arisen, in that, if the producer declares bankruptcy, then some courts have looked to production payments as a source of additional revenue for unsecured creditors.

[74] *C.C. Port, Ltd.*, 61 F.3d at 289.
[75] 140 Cong. Rec. E. 14461 (Oct. 6, 1994).

> That is a very unfair result, Mr. President, because the owner of the production payments is blameless in the bankruptcy proceeding. Indeed, the owner of a production payment is analogous to what is known in legal terms as a "***bona fide purchaser for value.***"[76]

In enacting Section 541(b)(4)(B) Congress clearly did not intend the statute to apply to the encumbrance of immovable property as security for a debt. To do so would have significantly affected substantive state property law and the vested rights of the owner of the property without the due process of law. Congress only sought "to exclude production payments ***sold by the debtor*** prior to a bankruptcy filing from the debtor's estate in property."[77] Accordingly, the statute only applies to situations in which there has been a true divestiture of ownership pursuant to a sale prior to the bankruptcy filing. As was discussed more fully in the Debtor's Complaint and Reply Memorandum, the "transfer" of the ORRI was an antichresis, not a sale or exchange. Furthermore, on its face, the Contributed ORRI was not transferred pursuant to a sale, but rather, an exchange, and would not fall within the scope of the statute. In either case, the Debtor was never divested of ownership of the ORRI.

**b. Was the thing transferred a "production payment"?**

The second issue is whether the interest in hydrocarbons that was transferred constitutes a production payment? It does not. As noted by the Debtor in its Reply Memorandum, Section 541(b)(4)(B) ***only*** applies to production payments. Section 101(42A) of the Bankruptcy Code defines production payments as follows:

> The term "production payment" means a term overriding royalty satisfiable in cash or in kind—(A) ***contingent on the production*** of a liquid or gaseous hydrocarbon from particular real property; and (B) from a specified volume, or a specified value, from the liquid or gaseous hydrocarbon produced from such property and determined without regard to production costs.[78]

---

[76] 140 Cong. Rec. S. 14461 (Oct. 6, 1004). (emphasis added).
[77] 140 Cong. Rec. E. 2204 (Oct. 7, 1994). (emphasis added).
[78] 11 U.S.C. § 101(42A) (emphasis added).

"Term overriding royalty" is also defined in the Bankruptcy Code and would likely apply to the ORRI. However, the term "production payment" does not include all term overriding royalties. Rather, it only applies to those which are: (a) ***contingent on production*** of a liquid or gaseous hydrocarbon from particular real property; and (b) from a specified volume, or a specified value, from the liquid or gaseous hydrocarbon produced from such property and determined without regard to production costs. The phrase "***contingent on production***" indicates that those production payments included within the scope of 541(b)(4)(B) must have an element of shared risk between the producer and the owner of the production payment. Holders' Memorandum agrees on this point. Specifically, Holders contend that LOH's interest in the ORRI is contingent on the production of liquid or gaseous hydrocarbons because "[i]f there is no production from the Subject Interest, no ORRI will be paid to LOH."[79] The Debtor agrees that if there was a shared risk, then the ORRI might qualify as a production payment under the Bankruptcy Code (though it would still not fall within the scope of 541(b)(4)(B) for the other reasons set forth herein).

Holders once again fail to consider all of the Transaction Documents. Holders rely on Section 1.05 of the Contributed Conveyance and Purchased Conveyance in support of their position that LOH only gets paid if there is production from the Subject Interests. As set forth in the facts section herein, Section 1.05 of those documents (the no personal liability provision) was effectively erased by Section 13 of the LLC Agreement and Section 16 of the PDMA. LOH uses the proceeds from the sale of the ORRI to service the loan debt. It is true that if no ORRI is produced, LOH will not receive any hydrocarbons from the ORRI. However, Holders are incorrect to suggest that if no ORRI is produced in a given month the Debtor does not have to make any payment to LOH.

---

[79] Holders' Memorandum at para. 32.

Section 13 of the LLC Operating Agreement expressly states that: "[the Debtor] shall be obligated to make additional capital contributions to [LOH] as may be required to provide [LOH] with such funds as may be required to pay such Funding Return." If there is a shortfall in production of the ORRI such that production is insufficient to service the debt under the Funding Agreement, the Debtor is required to advance the deficiency amount, ***in cash***, to LOH. Similarly, if the Debtor fails to meet its payment obligations, Section 16 of the PDMA gives LOH the right to foreclose on the Properties and operate them during the pendency of the private foreclosure sale. There is simply no element of shared risk between the Debtor and LOH. LOH's rights are not strictly contingent on production and LOH does not share in the risk of production, which is the obvious intent of the statute. Therefore, the ORRI is not "contingent on production" and the ORRI does not constitute a "production payment" in the context of the Bankruptcy Code.

**c. Is the transferee an entity that <u>does not participate</u> in the operation of the property from which the production payment was transferred?**

The third issue is whether LOH is an entity that ***<u>does not participate</u>*** in the operation of the property from which the production payment was transferred? It is not. LOH clearly participates in the operation of the Properties. In its Complaint, the Debtor alleges facts sufficient to establish that LOH participates in the production of the properties and those facts must be considered true at this stage of the litigation. In their Memorandum, Holders summarily argue that "the Conveyances expressly provide that the ORRI is a 'non-operating' interest."[80] Defendants fail to provide any further facts or analysis to support their position. In fact, LOH very clearly participates in the operation of the Properties within the meaning of the statute and Section 541(b)(4)(B) is inapplicable.

[80] Holders' Memorandum at para. 36.

An interest in hydrocarbons remains property of the debtor's estate under § 541(b)(4)(B) if the party to whom the debtor transferred the production payment participates in the operation of the property. The term "participation" is not defined in the Bankruptcy Code. Congress included the "participation" limitation in Section 541(b)(4)(B) in order to limit the scope of the statute to legitimate arm's-length purchasers of production payments. Consequently, the participation limitation prevents extension of the protections of the statute to creditors, like the creditor in *Senior-G & A*, who hold other security rights in the properties or the business of the debtor.[81] The legislative record describes the intent as follows:

> A production payment is an interest in certain reserves of an oil or gas producer that lasts for a limited period of time and that is not affected by production costs. ***The owner has <u>no other interest</u> in the property or business of the producer other than the interest in the reserves.***[82]

LOH is intimately and extensively tied to the Debtor's property and business. The Defendants cannot credibly argue that LOH "has no other interest in the property or business of the producer other than the interest in the reserves."[83] LOH is entirely owned by the Debtor, the leaseholder of the Properties, and is treated as a disregarded entity for tax purposes.[84] LOH derives all of its income from its relationship with the Debtor. Therefore, LOH cannot claim to be a disinterested third party. The LLC Agreement requires the Debtor to make contributions, ***in cash***, to LOH in the event that there is a shortfall in production of the ORRI such that LOH has insufficient funds to service the loan debt under the Funding Agreement.[85] The various loan

---

[81] *See* David G. Dunlap, *Issues in Trade and Vendor Financing: "You Scratch my Back and I'll Scratch Yours,"* ADVANCED OIL, GAS AND MINERAL LAW COURSE 1996, STATE BAR OF TEXAS, available online at http://images.jw.com/com/publications/166.pdf (September 1996).
[82] 140 Cong. Rec. E 2204 (Oct. 7, 1994)(emphasis added).
[83] *Id.*
[84] See Fns. 6 and 7, *supra.*
[85] LLC Agreement at Section 13.

covenants contained in the Transaction Documents further illustrate LOH's involvement in the operation of the Debtor and the Subject Interest.

For example, the Debtor (a) is required to maintain well production at certain rates for the benefit of LOH,[86] (b) must produce ORRI of a particular quality for the benefit of LOH,[87] (c) is obligated to maintain the leasehold interest in effect and notify LOH of adverse claims,[88] (d) must maintain certain insurance coverage on the Properties and name LOH as an additional insured,[89] and (e) must provide LOH with extensive reporting statements regarding its operations including financial statements, balance sheets and environmental reports.[90] In light of all of these loan covenants, it is inconceivable that LOH has any argument that it has no involvement in the Properties.

Additionally, the Debtor cannot abandon any wells without the prior consent of LOH, meaning that the Debtor must have the consent of LOH to manage its business and the Properties as it sees fit.[91] Furthermore, Section 16 of the PDMA grants LOH a mortgage and security interest in the Properties and related collateral. That mortgage and security interest enables LOH to foreclose on the Properties from which the ORRI is produced in the event of any default by the Debtor on any of its obligations, including payment obligations and the foregoing loan covenants.[92] Not only may LOH foreclose on the Properties, LOH has the right to be appointed as the keeper of the Properties and operate them during the pendency of the foreclosure sale, at

[86] *See* PDMA at Section 5.
[87] *Id.* at Section 7.
[88] *Id.* at Section 9.
[89] *Id.* at Section 11.
[90] *See* PDMA at Section 14.
[91] *Id.* at Section 12.
[92] *Id.* at Section 16.

which LOH has the right to bid on and purchase the property.[93] Thus, LOH is involved in and participates in the operation of the property from which the ORRI is produced.

The Defendants did not, and in light of the foregoing facts could not, make any legitimate argument that LOH is not involved in the operation of the Properties. LOH actively and extensively participates in the business of the Debtor and the operation of the Properties. Therefore, for this reason and all of the reasons aforesaid, Section 541(b)(4)(B) does not apply to the ORRI and the ORRI is property of the Debtor's bankruptcy estate.

**d. Can the estate include the ORRI only by virtue of Sections 365 or 542 of the Bankruptcy Code?**

The fourth and final issue is whether the Debtor's estate may include the ORRI only by virtue of section 365 or 542 of the Bankruptcy Code? The answer is no. Throughout the course of this litigation, Defendants have repeatedly stated that the Debtor is relying on Section 542 of the Bankruptcy Code to assert a claim in the ORRI.[94] In fact, the Debtor has not and need not make any claim under Section 542 with respect to the ORRI. As set forth above, Section 541(b)(4)(B) only excludes the ORRI from the Debtor's estate if ***all four tests are met***. Failure to meet even one test means that Section 541(b)(4)(B) is inapplicable to the ORRI. As has been discussed, not a single one of the first three elements has been met. Therefore, any analysis under this fourth test is wholly unnecessary. Regardless, the ORRI also fails to meet this fourth inquiry.

An interest in hydrocarbons will remain property of the debtor's estate under §541(b)(4)(B) if the debtor's claim to the interest arises on some basis other than Section 365 (assumption or rejection of executory leases) or Section 542 (turnover). There is no requirement in the statute that the "other basis" be found in the Bankruptcy Code. Section 542 "addresses

---

[93] *Id.* at Section 16(c).
[94] *See e.g.* ECG's Memorandum at p. 13.

circumstances in which property of the estate is held by a noncustodian third party."[95] The Debtor is the owner of the ORRI under substantive Louisiana law, namely antichresis and the law on prohibited forfeitures.

In reality, the Debtor is the producer of the ORRI and retains corporeal possession of the ORRI hydrocarbons until they are delivered to LOH. Section 3 of the PDMA specifically addresses this issue as follows:

> [The Debtor] at its sole cost and expense shall gather or cause to be gathered all Overriding Royalty Hydrocarbons at the wellheads where produced and transport the same to the Delivery Points (if the Delivery Points are not the well heads), without any charge or deduction to [LOH] for any costs attributable to preparing Hydrocarbons for delivery, and delivering same to the Delivery Points. [The Debtor] ***shall be in exclusive control and possession of the Overriding Royalty Hydrocarbons*** gathered at the wellheads and responsible for any loss, damage or injury caused thereby until the same shall have been redelivered to [LOH]...[96]

Contrary to Defendants' argument, the Debtor need not rely on Section 542 to demand the turnover of possession of its property, nor does it need any third party custodian to turn over possession of the hydrocarbons. As set forth in the PDMA, the Debtor already has the ability to possess the hydrocarbons attributable to the ORRI.

Rather, the Debtor is seeking to have its ownership of the ORRI recognized as a matter of state law. *De Salvo v. Finance Funds Group, Inc.* is instructive.[97] In that case the Court held that a recorded act of sale actually constituted an antichresis because the sale was intended to provide security for a loan.[98] In issuing its judgment the Court provided the debtor with the appropriate relief by ordering that the act of sale "is declared to be without effect as a sale and to constitute only an antichresis of property in favor of Finance Funds Group, Inc., to secure

---

[95] 11 U.S.C. §541, (comment, Overview of Section 542).
[96] *See* PDMA at Section 3 (emphasis added).
[97] *See De Salvo v. Finance Funds Group, Inc.*, 252 So.2d 498, 501-503 (La.App.Ct. 4th Cir. 1971).
[98] *Id.* at 501-503.

repayment without interest of a loan of $15,000.00 due by Mrs. De Salvo to Finance Funds Group, Inc."[99]

The Debtor seeks similar relief herein. The Debtor is not seeking a turnover pursuant to Section 542 of the Bankruptcy Code, nor is it seeking relief pursuant to Section 365 of the Bankruptcy Code. Rather, the Debtor's "claim" to the ORRI arises out of the fact that the Debtor is the unequivocal legal and equitable owner of the ORRI under Louisiana law.[100] Because the Debtor has some basis on which to include the ORRI as property of its estate other than Sections 365 and 542, Section 541(b)(4)(B) does not apply to the ORRI.

**2. Case Law.**

The Defendants' fail to provide any meaningful discussion of *Senior-G & A* in the context of Section 541(b)(4)(B). *Senior-G & A*, which presented similar facts to the instant case, held that the conveyance of a royalty interest constituted a mortgage of the debtor's interest in the well coupled with the pledge of the well's production.[101] Accordingly, the Court held that creditor constituted a secured creditor under Louisiana law rather than a royalty owner.[102] Defendants' have not pointed to anything in the legislative history of Section 541(b)(4)(B) indicating that the statute was intended to overrule that case. In fact, *Senior-G & A* is still applicable in secured financing situations, such as the instant case.[103]

---

99 *Id.* at 502.

100 *See e.g. In re Senior-G & A Operating Co., Inc.*, 957 F.2d 1290 (5th Cir. 1992) (holding that the pledged royalty interest was property of the estate under state law without reference to Section 542 of the Bankruptcy Code).

101 *Id.* at 1296.

102 *Id.* at 1294.

103 *See* David G. Dunalp, *Issues in Trade and Vendor Financing: "You Scratch my Back and I'll Scratch Yours,"* ADVANCED OIL, GAS AND MINERAL LAW COURSE 1996, STATE BAR OF TEXAS, available online at http://images.jw.com/com/publications/166.pdf (September 1996).

> On the basis of [Section 541(b)(4)(B)], it appears that the structuring of a vendor financing transaction as the sale of a production payment would result, under the laws of Texas and many other states, in the rights of the vendor not being affected

The Prospectus concurs with these points.[104] With respect to Section 541(b)(4)(B), the Prospectus correctly explains that rights in immovable or real property do not fall within the scope of the statute:

> The Bankruptcy Code provides certain protections in respect of production payments that ***may apply if the ORRI is ruled to be an executory contract or unexpired lease <u>rather than an ownership interest in real property</u>***. In order to take advantage of these protections, the ORRI must satisfy the Bankruptcy Code's definition of a 'production payment.'[105]

Similarly, the Prospectus correctly recognizes that the ORRI will be deemed an asset of the Debtor's estate if the Sukuk Loan Transaction is found to be a disguised financing:

> It is also possible that a bankruptcy trustee...could seek in a bankruptcy of [the Debtor] to have the ***ORRI classified as a "disguised financing" as opposed to a conveyance of an ownership interest in real property*** in an attempt to have the interests conveyed under the ORRI to [LOH] deemed to be property of [the Debtor]. Under such a scenario, [LOH] could be subject to being classified as a secured or unsecured creditor of [the Debtor]...To the extent the ORRI is construed to be a secured lending arrangement, the debtor could restructure the secured portion of the debt and pay it out over a longer term that currently anticipated under the existing terms of the ORRI. [106]

Defendants instead rely heavily on *In re American Home Mortgage, Inc.* to prevent the Debtor from having the transaction ***properly characterized*** as either an antichresis or an attempted circumvention of Louisiana securities law and an absolute nullity.[107] *American Home* supports the Debtor's analysis set forth above. As discussed by Defendants, *American Home*

---

> by limitations on and impediments to creditors resulting from an insolvency proceeding of the producer. ***This is not to say however, that the rights of the vendor under transaction documents which stretch the limits of traditional production payments would not be at some risk of being re-characterized as a loan or contract right in an insolvency of the producer.*** In this regard, see the decision of the United States Court of Appeals in *In the Matter of Senior-G&A Operating Co., Inc....*

[104] *See* Prospectus at p. 24-25 (discussing the inapplicability of Section 541(b)(4)(B) in the event the ORRI constitutes immovable property or in the event the transaction is deemed disguised financing).

[105] *Id.* at p. 24 (emphasis added).

[106] Prospectus, at p. 25 (emphasis added).

[107] *See e.g.* Holders' Memorandum at p. 20 and ECG's Memorandum at p. 14.

involved the application of a statutory exception to the automatic stay provision of the Bankruptcy Code for a repurchase agreement. In deciding whether the statutory exception was applicable to the repurchase agreement before it, the court held that it must look to the "plain meaning of the statute" and apply it in a manner "consistent with the policy and legislative history underlying the relevant provisions of the Bankruptcy Code."[108] The court then applied the plain meaning of the statute to the terms of the contract and held that the contract qualified as a "repurchase agreement," and that as such it was excluded from the automatic stay.[109]

The Debtor's line of analysis set forth above is analogous. Applying the plain language of the statute, in a manner consistent with the legislative history, the court must ask (1) Was there a transfer pursuant to a written conveyance? (2) Was the thing transferred a production payment? (3) Is the transferee an entity that does not participate in the operation of the property from which the production payment was transferred? (4) Can the estate include the interest in hydrocarbons only by virtue of section 365 or 542 of the Bankruptcy Code? Unlike the statute in *American Home*, Section 541(b)(4)(B), ***on its face***, mandates an inquiry into the relationship between the Debtor and the transferee. Specifically, the statute ***requires*** that the court determine whether the transferee is an entity that participates in the operation of the properties. Clearly, this is a fact-intensive inquiry and not merely a matter of contract interpretation as was the case in *American Home*.

Nothing in Section 541(b)(4)(B) indicates that the issue of whether LOH participates in the production of the Properties should be limited to the express language of the Purchased Conveyance and the Contributed Conveyance as Defendants' suggest. Similarly, there is nothing in the Bankruptcy Code that suggests that any of the other factors should be decided solely based

[108] *In re American Home Mortgage, Inc.*, 379 B.R. 503, 517 (D. Del. 2008).
[109] *Id.* at 517-20.

upon to the Purchased Conveyance and the Contributed Conveyance. There are a number of documents governing the parties' relationship and their rights in and to the ORRI and the underlying Properties. All of those documents must be considered. The Debtor has alleged sufficient facts to support its position that Section 541(b)(4)(B) is inapplicable to the ORRI and those facts must be taken as true at this stage of the litigation.[110]

Defendants' entire argument with respect to Section 541(b)(4)(B) is misplaced. Defendants' ignore congressional intent, the plain language of the statute, the controlling Fifth Circuit decision, and the facts of this case. The antichresis/simulated transfer of the ORRI from the Debtor to LOH in connection with the disguised financing transaction does not fall within the scope of the statute for the reasons discussed above. Section 541(b)(4)(B) is inapplicable to the ORRI because (a) the Debtor did not transfer the ORRI to LOH pursuant to a written conveyance; (b) the ORRI does not constitute a production payment within the definition set forth in the Bankruptcy Code because there is no element of shared risk between LOH and the Debtor, (c) LOH directly participates in the operation of the Properties, and (d) Sections 365 and 542 do not provide the only grounds upon which the Debtor could claim that the ORRI constitutes part of its estate.

**B. The ORRI is NOT an "Account" as Defined by the Louisiana Commercial Code, and, Therefore, Chapter 9 of the Louisiana Commercial Code is NOT Applicable.**

Defendants intentionally and completely mischaracterize the Sukuk Loan Transaction as the sale of an "account" governed by Chapter 9 of the La. UCC. As can be seen by reviewing the Prospectus, none of the parties to the Sukuk Loan Transaction ever contemplated or discussed the potential that the Sukuk Loan Transaction or any part thereof would be controlled

---

110 *C.C. Port, Ltd.*, 61 F.3d at 289.

by the La. UCC.[111] Instead, this argument was created after the fact to attempt to confuse the issues before this Court, and is not well-founded.

The Defendants' argument is based upon faulty premises, is totally unsupported by the law or facts of this case, and is utterly without merit. The Defendants' argument rests upon two logically flawed assumptions: (1) that the ORRI constitutes an "account" and (2) that the La. UCC governs the sale and conveyance of mineral royalties. Moreover, the Defendants completely disregard the fact that the Contributed ORRI purports to form part of an **exchange** not a sale, and could not be governed by the UCC even if the Defendants' baseless underlying presumptions were correct.

The ORRI at issue here is simply not an "account" and there is nothing in the La. UCC to suggest that it governs the purported sale, exchange, or encumbrance of immovable property. The Defendants' argument also ignores controlling Louisiana law which expressly provides for the transfer and encumbrance of mineral royalties and other mineral rights pursuant to the Louisiana Mineral Code and the Louisiana Civil Code. Moreover, the Defendants fail to point to even a scintilla of evidence to support their description of the purported sale and exchange of the ORRI as the sale of an account. In short, the argument in favor of the applicability of Chapter 9 of the La. UCC is superficial, glib and contrary to the law cited in the Defendants' own briefs.

Chapter 9 does not apply to the creation of security interests in or the sale of immovable property. Moreover, Chapter 9 does not supersede the law of antichresis, which remains in full

---

[111] *See e.g.* Prospectus at p. 24-34, which discuss potential risk factors facing the Sukuk Loan Transaction, including recharacterization of the transaction as a disguised financing and the possibility that the Debtor and LOH could be subject to substantive consolidation in bankruptcy. *See also,* Fn. 134, *infra.*

effect.[112] The law is ***unambiguous*** on this point. La. UCC Section 9-109(d)(11) expressly provides that Chapter 9 ***does not apply*** to "the creation or transfer of an interest in or ***lien on real property***....", except in certain limited circumstances not applicable here.[113] The introductory comments to Title XX of the Louisiana Civil Code similarly provide that Chapter 9 "regulates the creation of conventional real security interests ***in movables***, whether corporeal (tangible) or incorporeal (intangible) and supplants the laws governing pledge (***pawn***) with a single device, the 'security interest.'"[114] Chapter 9 does not, nor was it ever intended to, affect the creation of security interests (including antichresis) or rights in or over immovables. Mineral rights, including mineral royalties, are ***immovable property*** and real rights under Louisiana law.[115] LOH's Memorandum expressly agrees on this point stating: "The ORRI is a mineral right and therefore, is an incorporeal immovable under Louisiana Law."[116] Mineral rights are not governed by Chapter 9. Mineral rights are governed ***first and foremost*** by the ***Mineral Code***.[117] If the Mineral Code "does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable."[118]

The Mineral Code expressly classifies mineral rights as real rights and immovable property. For instance, Section 16 of the Mineral Code enumerates the types of mineral rights and describes their status as real rights:

> The basic mineral rights that may be created by a landowner are the mineral servitude, the ***mineral royalty*** and the mineral lease. This enumeration

---

[112] *See e.g.* Thomas A. Harrell, *A Guide to the Provisions of Chapter Nine of Louisiana's Commercial Code*, 50 LA. L. REV. 711, 722 (1990) (noting that Chapter 9 does not apply to the pledge of immovables and antichresis).

[113] LA. REV. STAT. 10:9-109(d)(11) (emphasis added).

[114] LA. CIV. CODE, Title XX, Of Pledge (introductory comment).

[115] LA. REV. STAT. 31:16, 18.

[116] LOH's Memorandum at p. 11.

[117] LA. REV. STAT. 31:4.

[118] LA. REV. STAT. 31:2.

> does not exclude the creation of other mineral rights by a landowner. Mineral rights are ***real rights***...[119]

Section 18 of the Mineral Code describes the status of mineral rights as incorporeal immovables:

> A mineral right is an ***incorporeal immovable***. It is alienable and heritable. The situs of a mineral right is the parish or parishes in which the land burdened is located. ***All sales, contracts, and judgments affecting mineral rights are subject to the laws of registry***.[120]

The ORRI is, without question, an incorporeal immovable and real right conferring a right to actual hydrocarbons produced from the Subject Interests.

As an underlying premise of their argument, Defendants state that "Louisiana has expressly legislated that sale and conveyances of mineral overriding royalty interests shall constitute a sale of 'accounts' subject to the La UCC and that, as a result, such transactions shall be governed exclusively by the expressed intent of the parties and the provisions of that statute."[121] This statement is nonsense and flies in the face of the black letter law cited by Defendants. In light of the express statements in Section 9-109 and the introductory comments to Title XX of the Civil Code that Chapter 9 only applies to security interests in movable property, and in light of the express statements in the Mineral Code that mineral rights are immovable property, Chapter 9 does not apply to mineral rights, such as the ORRI, unless some other statutory provision exists. None does.

Defendants effectively contend that the UCC applies by virtue of Section 9-109(d)(11)(E). Section 9-109(d)(11)(E) provides that Chapter 9 "***does not apply to...[t]he creation or transfer of an interest in or lien on real property...<u>except</u> to the extent that provision is made for <u>payments</u> due under certain mineral rights <u>to the extent characterized as</u>***

---

[119] LA. REV. STAT. 31:16 (emphasis added).
[120] LA. REV. STAT. 31:18 (emphasis added).
[121] ECG's Memorandum at p. 18. *See also* Holders' Memorandum at para. 47 and LOH's Memorandum at p. 15.

***accounts.***"[122] On its face, the statute does not include mineral rights within the scope of Chapter 9. The statute only includes ***rights to payment*** arising in connection with mineral rights ***to the extent*** they constitute "***accounts***." The statute does not apply to the mineral rights themselves, which are governed exclusively by the Mineral Code and the Civil Code. Under the express terms of Chapter 9, the ORRI is not governed by the La. UCC unless it constitutes ***both*** an account ***and*** a right to payment. It is neither.

"Account" is a defined term under the La. UCC. An "account" is a "right to payment" arising out of certain transactions listed in Section 9-102(a)(2) of Chapter 9 (*e.g.* a right to payment for property sold or leased, or for services rendered). The term "account" includes a "***right to payment*** owed to a landowner or the owner of a mineral right which is payable out of or measured by production of oil, gas or other minerals, or is otherwise attributable to the mineral right."[123] On its face, the statute recognizes the distinction between the right to payment arising in connection with a mineral right, which constitutes incorporeal movable property governed by Chapter 9 in some instances;[124] and the mineral right itself, which constitutes immovable property and is never governed by Chapter 9.[125]

The ORRI is not a mere right to payment which would qualify as an account under Section 9-102(a)(2). Section 80 of the Mineral Code describes the typical mineral royalty as a right to share in the actual mineral production from a piece of property, and not as a mere right to payment:

---

122 LA. REV. STAT. 10:9-109(d)(11)(E). (emphasis added).

123 LA. REV. STAT. 10:9-102(a)(2) (emphasis added).

124 LA. REV. STAT. 10:9-102, Louisiana Official Revision Comments-2001, Revised 2004 (e)(2)(c) ("A corresponding change is made in R.S. 10:9-109(d)(11)(E). These two changes combine to bring *most rights to payment under mineral rights* within the scope of revised Chapter 9 and the definition of account.").

125 *See* LA. REV. STAT. 31:4, 16, 18.

> A mineral royalty is the right to ***participate in production*** of minerals from land owned by another or land subject to a mineral servitude owned by another. Unless expressly qualified by the parties, a royalty is a right to share in gross production free of mining or drilling and production costs.[126]

Therefore, the typical mineral royalty encompasses a right in the actual minerals produced from the property, not a right to payment, and would not constitute an "account." The ORRI is similarly a right to actual hydrocarbons produced from the Subject Interests.

In the instant case, the ORRI constitutes a real right and immovable incorporeal property under Louisiana law. The ORRI is not a mere right to payment and, therefore, is not governed by the La. UCC. Furthermore, Section 9-109(e), which Defendants cite in support of their argument, is utterly inapplicable because the ORRI is not an account and because its purported sale and exchange were never characterized as a sale of an account. The Transaction Documents also conclusively show that the ORRI is immovable property, not an account. Defendants did not, and cannot, point to anything in the Transaction Documents supporting their describing the antichresis of the ORRI as the sale of an account. Defendants also failed to provide any analysis whatsoever on what is clearly the threshold issue in its argument, i.e., ***whether the ORRI even constitutes an account.***

The ORRI does not constitute an account. The Contribution Agreement, Purchase and Sale Agreement, Contributed Conveyance and Purchased Conveyance all describe the ORRI as immovable property.[127] The Transaction Documents specifically describe the ORRI as immovable property conferring a ***right in actual hydrocarbons***, not a right to payment.[128] For

---

[126] LA. REV. STAT. 31:80 (emphasis added).

[127] *See* Section 3.01(h) of the Contribution Agreement, which is attached to the Complaint as Exhibit D; *see also* Section 3.01(h) of the Contribution Agreement, which is attached to the Complaint as Exhibit F; *see also* Section 1.02 of the Contributed Conveyance; *see also* Section 1.02 of the Purchased Conveyance.

[128] *See* Section 1.01 of the Contributed Conveyance; *see also*, Section 1.02 of the Purchased Conveyance.

instance, Section 1.02 of the Purchased Conveyance, which is virtually identical to Section 1.02 the Contributed Conveyance, describes the ORRI as immovable property:

> ...The [ORRI] conveyed herein is a non-operating, non-expense-bearing limited overriding royalty interest in and to the Subject interests (***being a real (immovable) property interest***...This Conveyance is an absolute conveyance of a ***real (immovable) property interest.***[129]

Section 1.04 of the Purchased Conveyance, which is virtually identical to Section 1.04 of the Contributed Conveyance, also directs ECP to deliver ***actual hydrocarbons***, not payments, to LOH or its designee:

> The Overriding Royalty Hydrocarbons shall be delivered to [LOH] or to the credit of [LOH], as directed by [LOH] into the facilities of the First Transporter...

In short, applicable Louisiana law and the facts of this case prove that the ORRI is an incorporeal immovable property interest which entitles LOH to a share of actual hydrocarbons produced from the Properties. Defendants' argument that the ORRI constitutes an account is meritless and is based on flawed and circular logic. Defendants are attempting to conflate an immovable property right into the sale of an account governed by Chapter 9 in direct contravention to the facts of this case and the law of the State of Louisiana.

In an attempt to further confuse the issues before the Court, the Defendants fail to discuss the distinction between the Contributed ORRI and the Purchased ORRI in the context of their meritless La. UCC argument. Whereas the Purchased ORRI was purportedly transferred by the Debtor to LOH via a contract of **sale**, the Contributed ORRI was purportedly transferred by the Debtor to LOH via a contract of **exchange**. Defendants expressly concede that the Contributed ORRI was purportedly transferred to LOH pursuant to the contract of **exchange** and not the

---

[129] *See* Section 1.02 of the Contributed Conveyance (emphasis added).

contract of sale.[130] However, Defendants fail to even mention this important distinction in their La. UCC arguments. Rather, the Defendants summarily contend that all of the ORRI was transferred pursuant to a sale, despite their earlier admission that the Contributed ORRI was purportedly transferred pursuant to an exchange.[131] Defendants' statements to this effect utterly disregard the facts of this case.

Louisiana UCC 9-109(a)(3), upon which Defendants base their argument, **only** applies to the ***sale*** of accounts. It simply does not apply to the ***exchange*** of accounts. Louisiana La. UCC 9-109(a)(3) provides, in pertinent part, as follows:

> (a) General scope of Chapter. Except as provided in subsections (c) and (d), this Chapter applies to:
>
> (3) a ***sale of accounts***, chattel paper, payment intangibles, or promissory notes.[132]

The term "sale" is expressly defined in the La. UCC as follows:

> (17) "Sale" means a contract whereby a person transfers ownership of property to another person for a ***price in money***.[133]

This definition is virtually identical to the definition of sale contained in the Louisiana Civil Code, which states:

---

[130] *See e.g.* LOH's Memorandum at p. 8 ("Under the Contribution Agreement, ECP agreed to contribute to LOH the Contributed Overriding Royalty ***in exchange for a membership interest in LOH***"), at p. 9 ("Pursuant to the Conveyance of Contributed Overriding Royalty Interest...ECP, as Grantor, conveyed the Contributed Overriding Royalty to LOH, as Grantee ***in exchange for a membership interest in LOH.***").

[131] *See e.g.* LOH's Memorandum at p. 8 ("Under the Contribution Agreement, ECP agreed to contribute to LOH the Contributed Overriding Royalty ***in exchange for a membership interest in LOH***"), at p. 9 ("Pursuant to the Conveyance of Contributed Overriding Royalty Interest...ECP, as Grantor, conveyed the Contributed Overriding Royalty to LOH, as Grantee ***in exchange for a membership interest in LOH.***"). *But see e.g.* LOH's Memorandum at p. 15 (Here, the transfer of the ORRI is a ***sale*** of accounts..."), ECG's Memorandum at p. 17 ("Because the Conveyances unambiguously state that Debtor ***sold*** the ORRI to LOH, the intent of the parties to those documents must be sought within the four corners thereof...")

[132] La. UCC 9-109(a)(3) (emphasis added).

[133] La. UCC 9-102(d)(17) (emphasis added).

> Sale is a contract whereby a person transfers ownership of a thing to another for a ***price in money***.
>
> The thing, the price and the consent of the parties are requirements for the perfection of a sale.[134]

The contract of sale is distinguishable from the contract of exchange, because it requires the payment of a ***price in money***. If the contract does not contain a price in money, then it is not a sale and cannot constitute the sale of an account under the La. UCC. The Louisiana Civil Code explains the distinction between the contract of sale and the contract of exchange as follows:

> **Art. 2660. Exchange, definition**
>
> *Exchange* is a contract, by which the parties to the contract give to one another, one thing for another, whatever it be, **except money; for in that case it would be a sale.**[135]

Defendants expressly concede that the Contributed ORRI was not transferred pursuant to a sale. In its Memorandum, LOH states:

> ECP **exchanged** the Contributed Overriding Royalty for its membership interest in LOH. ECP's consent to the exchange is clearly evidenced in the Contribution Agreement and the Contributed Conveyance. The Contributed Conveyance meets the Louisiana law requirements for an authentic act. **Thus, it is clear that the Contributed Conveyance meets the requirements for a valid exchange under Louisiana law**.[136]

Defendants have not and cannot point to anything in the La. UCC which would extend its applicability to the "exchange" of accounts. The La. UCC does not apply to the contract of exchange and it therefore does not apply to the exchange of the Contributed ORRI.

Defendants further misrepresent the facts of this case by claiming that LOH recorded UCC financing statements to perfect the so-called "sale of an account."[137] This allegation is

---

[134] LA. CIV. CODE art. 2439 (emphasis added).

[135] LA. CIV. CODE art. 2660 (emphasis added).

[136] LOH's Memorandum at p. 12 (emphasis added).

[137] *See* Holders' Memorandum at p. 32 ("To comply with La UCC 9-310(a)'s perfection requirements, LOH, the purchaser and the owner of the ORRI, did, indeed properly record UCC financing statements in both Texas and Louisiana.")

baseless and directly contradicted by the facts. Because the Contributed Conveyance and Purchased Conveyance affect mineral rights and immovable property, specifically the ORRI, the parties recorded the instruments in the property records of Cameron Parish, in accordance with the Louisiana Mineral Code and the Louisiana law of registry.[138] Had those documents constituted the sale of an account, the parties presumably would have filed UCC financing statements in order to perfect the sale. In fact, **no financing statements were filed in connection with either the Purchased Conveyance or the Contributed Conveyance** and Defendants allegations to the contrary are untrue.

The Debtor and LOH did file one UCC financing statement in Texas and one UCC financing statement in Louisiana (the "Financing Statements") in connection with the PDMA in order to perfect the security interests provided for in that instrument. These Financing Statements are the same ones Defendants now claim were filed in order to perfect the so-called sale of an account. Defendants' claim is baseless. Defendants have not pointed to, and in fact, there is no language in the PDMA purporting to "sell" any type of property to LOH, much less an account. The PDMA contains no language purporting to transfer ownership of anything. Defendants have no legal basis whatsoever on which to now claim that the PDMA created greater rights in property than those purportedly created in the document itself. Similarly, Defendants have no basis on which to support their claim that the Financing Statements filed in connection with the PDMA were intended to perfect the sale of an account, when they clearly were not.[139]

---

[138] *See* LA. REV. STAT. 31:18.

[139] *See e.g.*, Holders' Memorandum at para. 51 ("To comply with La UCC 9-310(a)'s perfection requirements, LOH, the purchaser and owner of the ORRI, did indeed properly record UCC financing statements in both Texas and Louisiana.")

Both the Contribution Agreement and the Purchase and Sale Agreement specify that the Financing Statements were filed in connection with the security interest created in the PDMA, not the purported sale or exchange contained in the Contributed Conveyance or the Purchased Conveyance. Sections 6.02 of the Contribution Agreement and the Purchase and Sale Agreement are identical, and provide, in pertinent part, as follows:

> ***6.02 Documents to Be Executed at Closing.*** The following actions shall occur at the Closing:
>
> ...
>
> (b) [ECP] shall execute, acknowledge and deliver the following instruments:
>
> ...
>
> (iii) financing statements in form and substance satisfactory to [LOH] as may be necessary or appropriate ***to perfect the Liens granted to [LOH] in Section 16 of the Production, Delivery and Marketing Agreement***...[140]

Similarly, Section 16 of the PDMA specifically provides that it creates a security interest, not a sale:

> ***16. Remedies of Grantee; Mortgage and Security Interest.***
>
> ...
>
> (b) In order to secure the performance and payment (as applicable) by [ECP] of all of the Obligations, [the Debtor] does hereby mortgage, grant affect and hypothecate to [LOH], and grant to [LOH] a ***lien and security interest*** in all of [the Debtor's] interest in the Subject Interests and all of [the Debtor's] equipment, fixtures, inventory, goods, accounts, contracts [sic] rights and general intangibles...The mortgage, lien and security interest granted pursuant hereto is granted pursuant to the laws of the State of Louisiana, and [LOH] shall be entitled to exercise all of the rights and remedies of a Grantee and a secured party under the laws of the state of Louisiana in the event of any default by [ECP] in the performance or payment (as applicable) of the Obligations...

[140] Contribution Agreement at Section 6.02; Purchase and Sale Agreement at Section 6.02. (emphasis added).

. . .

> (h) This Agreement is ***intended to be a security agreement*** pursuant to the Uniform Commercial Code as in effect in the State of Louisiana, as amended from time to time…[141]

Moreover, any reference to the content of Financing Statements themselves further belies Defendants' nonsensical argument. The parties did not select the "SELLER/BUYER" box in Section 5 of **either** Financing Statement.[142] If the parties intended to file the Financing Statements in connection with the sale of an account, that box certainly would have been selected.[143]

In light of the foregoing provisions of the PDMA, the Purchase and Sale Agreement, and the Contribution Agreement, and in light of the fact that the "SELLER/BUYER" box is not selected on either Financing Statement, Defendants' assertion that the Financing Statements were filed to perfect the sale of an account is without merit and is easily dispensed with. Clearly, the Financing Statements were filed to perfect a security interest in the **movable property** located on and related to the Properties. Therefore, even if the loan documents did constitute the sale of an account (which they certainly do not), the sale would be unperfected for failure to file a financing statement meaning that LOH effectively lost its priority interest in those accounts upon the Debtor's bankruptcy filing.[144]

---

[141] Section 16 of the PDMA (emphasis added).

[142] *See* ECG's Objection to Debtor's Motion for Preliminary Injunction (Docket No. 18), at Exhibit "A."

[143] *See e.g.,* Instruction 5 to National UCC Filing Form. The designation of "seller and buyer" is used to indicate the sale of accounts, among other collateral.

[144] *See* LA. REV. STAT. 10:9-310, 318. *See also* Holders' Memorandum at para. 51 ("Moreover, because the La UCC governs all sales of accounts, any purchaser of such accounts must comply with the perfection requirements of La UCC 9-310(a), or risk losing its interests in those accounts...").

Defendants' argument relating to the applicability of Chapter 9 of the La. UCC is disingenuous, self-serving, baseless, and in direct opposition to the laws of this State and the facts of this case. Defendants are playing fast and loose by summarily labeling the pledge of the ORRI as the sale of an account without any factual or legal basis. The ORRI is an interest in and right to actual hydrocarbons produced from the Subject Interests. It is not a mere right to payment or an account, governed by Chapter 9. The ORRI is an incorporeal immovable property interest governed by the Mineral Code and the Louisiana Civil Code, including the section on antichresis. Antichresis has been a valid and enforceable civilian security device for over 1400 years. Nothing in the enactment of the La. UCC changed that fact. More importantly, both antichresis and *Senior-G & A* are relevant law applicable to the facts of this case. The Defendants have decidedly failed to show otherwise.

### C. When Viewed as a Whole, the Sukuk Loan Transaction is Actually an Antichresis or Pledge of the ORRI as Collateral for a Loan.

As set forth more fully in the Debtor's Complaint and Memorandum in Support, the Transaction Documents constitute a disguised loan. The arguments presented in the Defendants' Memoranda ignore the true substance of the transaction and the full import of the entirety of the Transaction Documents. Rather, the Defendants focus on the superficial aspects of the Purchased Conveyance and the Contributed Conveyance, effectively ignoring the remaining documents to which the Debtor and the Defendants were parties. Louisiana law, which expressly permits parol evidence in the situation presented, permits this Court to examine all of the relevant documents and other pertinent evidence in the interest of justice. When all of the documents are considered, there is no question that: (a) the Debtor received a loan, (b) the funding for the loan was raised through an offering of sukuk, (c) LOH was created in order to manage the loan collateral in the interest of the Holders, and (d) that the ORRI and the monies

associated therewith formed part of the security for the loan. The Debtor has alleged more than sufficient facts, most of which are found verbatim in the Transaction Documents to which the Debtor and LOH were parties and which have been introduced into evidence, to support its characterization of the transaction as a loan. The evidence found within the Transaction Documents leads to the undeniable conclusion that the Sukuk Loan Transaction is a disguised loan, and that the Debtor was never divested of ownership of the ORRI.

In their Memoranda, Defendants essentially seek to prevent the Court from considering any documents other than the Purchased Conveyance and Contributed Conveyance in determining whether the ORRI was sold, exchange or otherwise used as collateral for a loan, despite the fact that Defendants have already agreed to the introduction of and validity of the other documents on which the Debtor relies. Contrary to Defendants' argument, the Debtor need not allege ambiguity in the documents in order to introduce parol evidence where the Debtor has alleged a simulation. The Debtor has alleged facts, which must be considered as true at this stage of the litigation, sufficient to support its allegation that the documents constitute a simulation and a disguised loan. Louisiana Civil Code article 1848 **expressly** permits the introduction of parol evidence where there is an alleged simulation:

> **Art. 1848. Testimonial or other evidence not admitted to disprove a writing**
>
> Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. ***Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent oral agreement.***[145]

[145] LA. CIV. CODE art. 2439 (emphasis added).

Louisiana courts readily admit parol evidence to prove that an act of sale or other act translative of ownership (such as a sale or exchange) is actually intended as security for a loan.[146] In seeking to have the Transaction Documents declared a simulation and a disguised financing transaction, the Debtor is free to introduce parol evidence, including the remaining Transaction Documents. Consideration of any documents to which both LOH and the Debtor were parties is particularly just and appropriate. All of these documents form a part of the relationship between the parties, not merely the Purchased Conveyance and Contributed Conveyance. In fact, Holders have effectively **demanded** that the Debtor address all of the documents.[147] The Debtor is simply asking this Court to look at the substance of all the relevant Transaction Documents, as is required by Louisiana law, in light of the surrounding circumstances and to hold that the substance of the transaction was the attempt to use a purported "sale" and "exchange" as security for a loan.

Defendants present an utterly meritless argument that the transaction constituted a true sale under the La. UCC, and in so doing attempt to discredit binding Fifth Circuit precedent, namely, *In re Senior-G & A Operating Co., Inc.* 957 F.2d 1290 (5th Cir. 1992), and further to discredit the longstanding civilian doctrines of antichresis and prohibited forfeiture. As discussed more fully above, Defendants' arguments are baseless and illustrate a fundamental misstatement of law and fact. *Senior-G & A*, antichresis, and Louisiana public policy with respect to security devices are current and valid law, and all are fully applicable and controlling in this case.[148] Defendants argue that *Senior-G & A* and antichresis are not applicable in light of

---

[146] *See e.g. H. Ware & Son v. Morris*, 1871 WL 7002 (La. 1871); *Hancock v. Bridges*, 547 So.2d 1103 (La.App.Ct. 2nd Cir. 1989).

[147] Holders' Memorandum at para. 82.

[148] Indeed, the Louisiana Supreme Court has referred to antichresis as a valid, albeit infrequently utilized, security device as recently as 2001. *See Diamond Serv. Corp. v. Benoit*, 780 So. 2d 367, Fn. 6 (La. 2001).

the subsequent adoption of the La. UCC. As was more fully discussed above, this argument is not supported by the law or facts of this case, is based on numerous errors of fact and law, and should be disregarded entirely.

Defendants further argue that even if *Senior-G & A* is applicable (which it clearly is), the case is distinguishable from the instant case because the document title in *Senior-G & A* contained the word "loan" whereas the documents in the instant case do not.[149] Defendants' argument on this point fails to consider the actual holding of *Senior-G & A* or any of the relevant Louisiana cases on antichresis or parol evidence. The *Senior-G & A* court stated as follows:

> PSI's interest arises under the terms of an instrument called "Production Payment *Loan* Agreement." This instrument does not purport to be a mineral transfer; indeed, it is denominated by the parties as a *loan* agreement. ***However, in determining the nature of a transaction the court will look to its substance, not merely to the descriptive title. We will therefore look to the substance of the agreement enlightened by Louisiana law.***[150]

Under *Senior-G & A*, this Court should look at the actual content of the Transaction Documents as enlightened by Louisiana law, specifically the provisions pertaining to antichresis, the admission of parol evidence, and public policy regarding security devices. As set forth more fully in the Complaint, under substantive Louisiana law the Transaction Documents amounted to a disguised loan and an antichresis. Defendants' argument that *Senior-G & A* is distinguishable because that case involved a document using the word "loan" and the instant case involved acts translative of ownership (namely, a sale and an exchange) is clearly unconvincing in light of the applicable cases cited by the Debtor in its Complaint regarding antichresis.[151] As explained in the Complaint, many cases of antichresis involve an act translative of ownership coupled with

---

[149] *See* Holders' Memorandum at para. 64.
[150] *Senior-G & A*, 957 F.2d at 1296 (emphasis added).
[151] *See* Complaint at paras. 75-77.

other evidence that the true nature of the transaction is a loan.[152] The real issue is whether the substance of the Transaction Documents and other parol evidence supports the Debtor's description of this transaction as a loan.

The evidence of a loan in this case is overwhelming. The evidence against the Sukuk Loan Transaction being treated as a true sale and exchange is equally overwhelming. Both the Debtor and LOH are parties to the Purchase and Sale Agreement and the Contribution Agreement. The Purchase and Sale Agreement and the Contribution Agreement stipulate that LOH is treated as an entity disregarded as separate from the Debtor for tax purposes.[153] To the extent that LOH is treated as a separate entity, the Purchase and Sale Agreement stipulates that the ORRI is treated as a **mortgage loan** under IRC § 636(a), meaning that the Debtor, not LOH, owns an economic interest in the ORRI.[154] The tax treatment of the transaction is strong evidence that the true nature of the transaction is a loan and the Defendants failed to discuss the likely impossibility of the transfers being both a loan and a sale and exchange. A similar tax election was a determining factor in *Senior-G & A* in holding that the transaction was a loan.[155] The Defendants have provided no explanation regarding how the transfer of the ORRI can be both a true sale and exchange, but yet also be a loan.

The automatic termination of the purported sale and exchange of the ORRI once the loan obligations are repaid is further evidence that the true nature of the transaction is a loan. For instance, both the Purchased Conveyance and the Contributed Conveyance provide that the purported transfers of the ORRI automatically "terminate" and the title ownership reverts to the

---

[152] *Id.* at paras. 75-77.

[153] *See* Purchase and Sale Agreement at Section 8.02 and Contribution Agreement at Section 7.02.

[154] *See* Purchase and Sale Agreement at Section 8.02; *see also* IRC § 636(a).

[155] *Senior-G & A*, 957 F.2d at 1293.

Debtor once LOH receives a specified quantity of ORRI.[156] Effectively, the purported "sale" and "exchange" of the ORRI end when the Debtor has provided sufficient ORRI to service the sukuk debt. The termination provision clearly evidences the parties' intent to use the sale and exchange as security for a loan. If this had been a true sale and exchange, there would not have been any automatic termination. In *Senior-G & A* the Fifth Circuit found similar provisions indicative of a loan.[157]

The terms of the LLC Agreement further illustrate that the true nature of the transaction is a loan. For example, the Section 13 of the LLC Agreement specifically provides that LOH has personal recourse against the Debtor in the event of a shortfall in production:

> Section 13. Additional Contributions
>
> (a) ...[I]f at any time the Company does not have sufficient funds to pay any Funding Return (as such term is defined in the Funding Agreement) due and owing pursuant to the terms of the Funding Agreement, ***[the Debtor] shall be obligated to make additional capital contributions to the Company as*** may be required to provide the Company with such funds as may be required to pay such Funding Return....[158]

Therefore, if the ORRI is insufficient to service the debt under the Funding Agreement, the Debtor must come up with the cash to pay the debt. It is ***inconceivable*** under a "true sale" or exchange transaction, as the Defendants allege, that the "seller" would have to pay money to the "buyer." Under both the Louisiana Civil Code and the La. UCC, a sale is a contract whereby the seller transfers ownership of a thing to a buyer in exchange for the buyer paying price in

[156] Purchased Conveyance, at Section 1.03 and Contributed Conveyance, at Section 1.03.
[157] *Senior-G & A*, 957 F.2d at 1295-96.
[158] LLC Agreement at Section 13(a) (emphasis added).

money to the seller.[159] However, the instant case presents the reverse situation where the so-called "seller" must pay the "buyer."

The Defendants actually concede that whether LOH has recourse against the Debtor is pertinent to the determination of whether the transaction constitutes a loan. For example, in the section of its Memorandum entitled: "The Conveyances of ORRI by the Debtor to LOH Were Not Subject to Recourse," ECG states as follows:

> It is ***important to note that the two conveyances of ORRI at issue were <u>not subject to recourse or repurchase on the part of the Debtor</u>***. Section 1.05(a) of the ORRI instrument provides:
>
> > 'Grantee shall look solely to the Overriding Royalty Hydrocarbons for satisfaction and discharge of the Purchased Overriding Royalty, and Grantor shall not be personally liable for the payment and discharge thereof.'
>
> Unlike a ***<u>typical loan transaction</u>***, the Grantee (LOH) has no recourse against the Debtor. For example, if gas prices were to fall dramatically, resulting in inadequate ORRI hydrocarbon production to repay the purchase price, the Grantee bears the risk of loss.[160]

Defendants simply failed to recognize that the LLC Agreement specifically provides for recourse against the Debtor. By Defendants' own admission, Section 13 of the LLC Agreement is evidence that the transaction constitutes a loan.

Not only do the terms of the LLC Agreement indicate that the true nature of the transaction is a loan, they also reveal LOH for what it really is: a sham entity whose sole purpose is to materially divest the Debtor of the control of its property during the duration of the loan in order to enable the lender to expeditiously foreclose on any assets. The existence of and the role of the Independent Member is evidence of a loan and the true purpose of LOH. In its Memorandum, LOH admits that, pursuant to the LLC Agreement, the "Independent Member

---

[159] *See e.g.* LA. CIV. CODE art. 2439 ("Sale is a contract whereby a person transfers ownership of a thing to another for a price in money."), La. UCC 9-102(d)(17) (" 'Sale' means a contract whereby a person transfers ownership of property to another person for a price in money".)

[160] ECG's Memorandum at p. 27 (emphasis added).

shall be entitled, in the name of and on behalf of LOH, ***without requiring any consent from [the Debtor]***, to take such steps as the Independent Member deems appropriate to enforce the rights and obligations of LOH under the Transaction Documents."[161] Interestingly, the LLC Agreement provides that the Independent Member is no longer a member of the company under the following circumstances:

> Upon the first to occur of (a) ***payment in full of all sums that are or may become payable by the Company under the Funding Agreement*** or (b) the delivery by [the Debtor] to the Company of (i) the [Contributed ORRI] pursuant to the terms of the Contributed Conveyance and (ii) the [Purchased ORRI] pursuant to the terms of the Purchased Conveyance]...[162]

The effect of this provision is to give full control of LOH back to the Debtor once all of the loan obligations have been fulfilled. Clearly, the entire purpose of placing substantial control of the ORRI in LOH and putting the Independent Member in charge of important decisions during the term of the loan was to protect the interests of the original lenders, namely, the Holders, in the collateral for the loan. In fact, the LLC Agreement specifically requires that the Independent Member act, not in the best interest of the company and its members (namely, the Debtor), but rather, that the Independent Member "consider the interests of [ECG] and the holders of the sukuk issued by [ECG] in connection with all actions taken by the Independent Member pursuant to the Agreement."[163] The fact that the Independent Member, an officer LOH, is required to value the interests of a third party over the interest of LOH and owes a lesser fiduciary duty to LOH and the members of LOH illustrates that the underlying purpose of the company was to enhance security for a loan. Similarly, when security is no longer needed for the loan, i.e. when the Debtor has delivered all of the ORRI or LOH has made all its payments under the Funding Agreement, the Independent Member ceases to be a member of LOH and the Debtor regains full

---

[161] LOH Memorandum at p. 3.

[162] LLC Agreement at Section 5(e) (emphasis added).

[163] LLC Agreement at Section 9(b)(iv).

control of LOH, and consequently the pledged assets. LOH is a sham entity whose entire purpose is to separate the Debtor from control over the collateral during the term of the loan.

The PDMA shows further evidence of a loan. LOH summarily argues that the PDMA is merely a production and marketing agreement.[164] That argument is superficial and ignores the bulk of the substantive provisions of the PDMA, which are clearly aimed at protecting LOH's interest in the collateral. The argument also disregards the holding of *Senior-G & A*, which is to say the argument ignores binding Fifth Circuit precedent.

For instance, Section 10 of the PDMA requires the Debtor to make capital expenditures in connection with the Development Plan (as defined in the PDMA). It is virtually unheard of for a document executed in connection with a sale or exchange to require the seller to make capital improvements after the effective date of the transfer. In *Senior-G & A*, the Court found that the debtor's obligations to improve and develop the underlying properties burdened by the royalty interest provided clear evidence of a loan.[165] The instant case is indistinguishable and the Defendants made no effort to distinguish the Debtor's obligation from that of the debtor in *Senior-G & A*.

In fact, the PDMA contains even more evidence of a loan than was present in *Senior-G & A*. Section 11 of the PDMA requires the Debtor to maintain insurance on the collateral and to name LOH as an additional insured on the insurance policies. Sellers are not generally required to insure the interest of the buyer, whereas debtors are often required to insure the interest of their creditors in the collateral. Section 14 of the PDMA requires the Debtor to routinely provide multitudes of financial statements, environmental reports, and other reporting statements to LOH, ECG, and the Transaction Administrator. Again, sellers/transferors are not generally

---

[164] *See* LOH's Memorandum, at page 14.
[165] *Senior-G & A*, 957 F.2d at 1296.

required to provide purchasers with periodic financial statements after the date of sale/exchange. However, debtors are often required to provide their lenders with financial statements after the closing date of the loan. Incredibly, not only is the Debtor required to proffer documents to LOH, the Debtor is also required to proffer these documents to parties that directly represent the sukuk holders. If the transfer of the ORRI was indeed a true sale and exchange, what rationale could possibly exist for requiring the Debtor to provide ECG, the trustee of the sukuk holders, with periodic financial statements? There is no question that this reporting obligation was made to ensure the Debtor had the financial viability ECG that, as a lender, required in its debtor. The Transaction Documents, taken as a whole, clearly show that true purpose of the transaction was a loan and that the ORRI was used as security for that loan.

### D. The Sukuk Loan Transaction Also Violates the Public Policy of the State of Louisiana and is an Absolute Nullity.

If the Court holds the Sukuk Loan Transaction to be an antichresis, the Court is essentially holding that the transaction was a "relative simulation," which the Civil Code defines as follows:

> **Art. 2027 Relative simulation**
>
> A simulation is relative when the parties intend that their contract shall produce effects between them though different from those recited in their contract. A relative simulation produced between the parties the effects they intended if all requirements for those effects have been met.[166]

Simulations may also have effects as to third persons.[167]

However, even if the Court does not find that an antichresis took place, the Court should hold that the transaction is an absolute nullity in violation of the express public policy of the State of Louisiana. The attempted transfer (via exchange and sale) of the ownership of ORRI to

---

[166] LA. CIV. CODE art. 2028.
[167] LA. CIV. CODE art. 2029.

LOH as security for the Debtor's loan obligations is nothing more than the attempted circumvention of Louisiana securities laws and the delays and uncertainties associated with judicial foreclosure. Moreover, such an attempt to circumvent the established Louisiana security devices and the proscribed methods of enforcement (i.e. ordinary and executory process) constitutes an ***absolute nullity*** and a ***violation of the public policy*** of this State.[168]

Security devices in Louisiana may **only** be established by legislation.[169] Louisiana law presently recognizes the security devices of suretyship, pledge (pawn, antichresis and La. UCC security interests), conventional mortgages, legal mortgages, judicial mortgages, privileges and statutory liens.[170] Security devices are designed to "protect a creditor's privilege against property held as security."[171] The secured party is "given the right to seize and sell the property of the debtor and to apply the proceeds to the satisfaction of his obligation in preference to the claim of others."[172] In order to seize and sell the property of the debtor, the secured party must institute a foreclosure procedure via an ordinary proceeding or an executory proceeding in accordance with the Louisiana Code of Civil Procedure.[173] These foreclosure actions are the ***exclusive*** methods for the enforcement of security devices.[174] "Any expansion of these procedural remedies lies within the ***exclusive power of the Legislature***."[175] These procedural remedies may not be expanded or avoided by private contract. "Accordingly, it is against the public policy of this state for [a secured party and a debtor] to incorporate...any procedure

---

[168] *See* Complaint at para. 7. *See also* LA. CIV. CODE arts. 7, 2030 and 3179.

[169] *See* LA. CIV. CODE arts. 1913, 3133 *et seq.*, 3182 *et seq.*, and 3278 *et seq.*

[170] *See Guste v. Hibernia National Bank in New Orleans*, 655 So.2d 724, 731 (La.App.Ct. 4th Cir. 1995). *See also* LA. CIV. CODE arts. 1913, 3133 *et seq.*, 3182 *et seq.*, and 3278 *et seq.*

[171] *Guste*, 655 So.2d at 731.

[172] *Id.* at 729-30. *See also* LA. CIV CODE arts. 3178 (antichresis), 3186 (privilege), 3279 (mortgage).

[173] *Id.* at 730.

[174] *Id.*

[175] *Id.* (emphasis added).

designed to completely bypass and waive the laws regarding foreclosure so that the [secured party] regains title merely upon default of payment without the necessity of a seizure and judicial sale and with the [debtor] forfeiting any claim on the surplus remaining because of prior payment or because of enhancement of value of the mortgaged property."[176]

Security devices do not, under any circumstances, "transfer title or ownership to the creditor-they only give the creditor a preference for payment of his claim" because to transfer title would constitute a **prohibited forfeiture**.[177] Any provision to the contrary, therefore, violates the public policy of this State and is an absolute nullity.[178] Accordingly, acts such as a *dation en paiement*, sale, and exchange are **not** valid security devices because they transfer title of the property to the creditor.[179]

Any attempt to use a non-authorized security device is absolutely null and without effect. Louisiana Civil Code article 2030 provides that "[a] contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral." Unlike a relatively null contract, an absolutely null contract may not be confirmed.[180] Article 2030 further provides that "[a]bsolute nullity may be invoked by any person or ***declared by the court on its own initiative.***" As explained above, prohibited forfeitures are **expressly** against the public policy of Louisiana and have been "condemned by the civil law for 1,400 years as *contra bonos mores* and unconscionable."[181] Prohibited forfeitures and the attempted circumvention of established Louisiana security devices are against the public policy of this State and are absolute nullities. Accordingly, Louisiana courts take a dim view of creditors who seek to create security devices

---

[176] *Guste*, 655 So.2d at 730.
[177] *Id.*
[178] *Id.*
[179] *Id.*
[180] LA. CIV. CODE art. 2030.
[181] *Alcolea v. Smith*, 90 So. 769, 772 (La. 1922).

which "bypass Louisiana law that ***prohibits a secured lender-mortgagee from becoming the owner of the security upon default of the debtor without resort to judicial process.***"[182] The outcomes of such invented security devices vary depending on whether the court finds the transaction to be a relative simulation or an absolute nullity. The court may treat the transaction as a relative simulation if the court can ascribe some other legitimate purpose to the contract which does not violate the public policy of this State.[183] However, where the parties, in lieu of utilizing one of the legitimate Louisiana security devices, attempt to create a new security device and avoid the rules of foreclosure, the contract must be held to be an absolute nullity in direct violation of the public policy of the State of Louisiana and utterly void.[184] For instance, in *De Salvo v. Finance Funds Group, Inc.* the court held that the attempted use of a sale with a right of redemption as a security device constituted an antichresis rather than a sale.[185] In contrast, in *Guste v. Hibernia* the court held that the attempted use of a *dation en paiement* (or "giving in payment") as a security device was an absolute nullity and without any effect whatsoever.[186]

In *De Salvo*, the plaintiff brought an action in lesion beyond moiety against the defendant alleging that she had sold her land to defendant for $15,000, when in fact it was worth over $50,000.[187] The defendant, in answer, claimed that "in addition to the $15,000, and as part consideration of the sale, defendant at the time of the purchase granted plaintiff an option to repurchase the property within six months for $20,000 plus an amount equal to eight per cent interest from the date to act of sale."[188] The plaintiff alleged, and the court agreed, that the true purpose of the transaction was a loan, not a sale. By requiring the plaintiff to execute a "sale" of

---

[182] *Guste*, 655 So.2d at 731 (emphasis added).
[183] *See* LA. CIV. CODE arts. 2027-30.
[184] *See* LA. CIV. CODE art. 2030.
[185] *De Salvo*, 252 So.2d at 501.
[186] *Guste*, 655 So.2d at 732.
[187] *De Salvo,* 252 So. 2d at 498.
[188] *Id.*

her land as security for a loan in an amount substantially less than the value of the property the defendant was most likely hoping for an unjust enrichment in that plaintiff would be unable to redeem the property leaving the defendant/lender with a windfall.[189] The court noting that the defendant had improperly used a sale as security for a loan, indicated an inclination to hold the entire transaction a nullity stating:

> We believe further balance would be accomplished by holding, where a Louisiana lender spurns legitimate Louisiana security devices-and adopts a device which might, contrary to Louisiana law not only of mortgage but also of antichresis, allow the lender to become the owner on default of payment-**that the Louisiana lender having rejected security has no security.**[190]

However, the court felt bound by the oft-criticized holding of *Gautreaux v. Harang* to give some effect to the contract, effectively treating it as a relative nullity. Accordingly, the court held that the sale of immovable property to secure a debt constituted an antichresis "in spite of the lender's refusal to utilize a Louisiana security device."[191]

In *Guste*, the plaintiff, by act of credit sale, sold a tract of land, consisting of three parcels, to FSI.[192] FSI's indebtedness was evidenced by two promissory notes, both of which were secured by vendor's liens (mortgages) on the property.[193] Contemporaneously with the execution of the credit sale, plaintiff required FSI to execute two *dations in paiement* (giving in payment) in favor of plaintiff.[194] The first *dation* transferred parcels 2 and 3 back to plaintiff in the event FSI defaulted on the first promissory note.[195] Similarly, the second *dation* transferred parcel 3 back to plaintiff in the event FSI defaulted on the second promissory note.[196] The

---

[189] *De Salvo,* 252 So. 2d at 501.
[190] *Id.* at 501 (emphasis added")
[191] *De Salvo*, 252 So.2d at 501.
[192] *Guste*, 655 So.2d at 726.
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Guste*, 655 So.2d at 726.

*dations* were given to defendant, Hibernia, to be held in escrow pursuant to an escrow agreement.[197] Hibernia subsequently lent funds to FSI for development of the property taking a collateral mortgage behind the mortgage in favor of plaintiff.[198] FSI defaulted in its payment and plaintiff demanded that Hibernia release the first *dation* and also cancel its collateral mortgage.[199] Hibernia released the *dation* but refused to release its collateral mortgage, and so litigation ensued.[200]

Hibernia filed an exception of no cause of action contending that the *dations* were confected in a manner that violated public policy and were null and void, and, therefore, plaintiffs could not maintain a cause of action against Hibernia for damages.[201] The court agreed.[202] The court held that the *dations* were against public policy and absolute nullities under Louisiana Civil Code article 2030 because "plaintiffs were attempting to create by contract with their debtor a *new* method of enforcing their mortgage in a manner *not* provided by law."[203] "By the use of the *dations* the parties were incorporating in the mortgage a complete waiver of the entire foreclosure procedure thus avoiding the necessity of a judicial sale."[204] The court noted that security devices could only be established by law and there was nothing in the law to support the use of a *dation* as a security device.[205] Specifically, the court stated:

> In the present case, we find that plaintiffs sought to create by the execution of these Dations a security device which would bypass Louisiana law that prohibits a secured lender-mortgagee from becoming the owner of the security upon default of the debtor

[197] *Id.* at 727.
[198] *Id.*
[199] *Id.*
[200] *Id.*
[201] *Guste*, 655 So.2d at 728.
[202] *Id.*
[203] *Id.* at 729.
[204] *Id.* at 730.
[205] *Id.* at 730-32.

without resort to judicial process. ***We find no law that permits a dation to be used as a security device.***[206]

In the instant case, there is no question that the creditor attempted to use a sale, exchange and a limited liability company operating agreement as security for a loan. The situation is analogous to *Guste*. As set forth above, like the *dations* in *Guste*, the contracts of sale and exchange and the formation of a limited liability company do not constitute legitimate Louisiana security devices because they transfer ownership of the property to the creditor without the necessity of judicial foreclosure. Defendants have not and cannot point to any law to support their attempted utilization of these acts as security for a loan. Rather, like the *dations* in *Guste*, the sale, exchange and use of a limited liability company as security for a loan are in **direct violation of the public policy of Louisiana and are absolute nullities**.

As has been discussed, there is no question that the true purpose of the transaction was a loan and there can be no question that the attempted sale and exchange of the ORRI was intended as security for that loan. The sole purpose of LOH and its Independent Member was to deprive the Debtor of control of the collateral in an attempt to avoid the judicial foreclosure process of this state. As a condition of the loan, the Debtor was required to sell and exchange the ORRI to LOH. Debtor is the 100% owner of LOH. Despite being the sole owner of LOH, the LLC Agreement and the Independent Member, who effectively controls the collateral, explicitly deprive Debtor of control over the ORRI during the term of the loan. Notably, the LLC Agreement also provides the Independent Member with unilateral authority to sell the ORRI by private sale without the consent of the Debtor and without complying with any judicial foreclosure process recognized under Louisiana law.[207] Should the Debtor default on its loan obligations, the lender ostensibly need not resort to judicial process to foreclose on the ORRI

---

[206] *Guste*, 655 So.2d at 731-32 (emphasis added).
[207] LLC Agreement at Section 9(b)(i).

because LOH is purportedly the owner of the ORRI. Conversely, if the Debtor meets all of its loan obligations the Independent Member ceases to be a member of LOH and the Debtor regains control of the collateral. This transaction is analogous to *Guste* where, pursuant to the escrow agreement, Hibernia would release the *dations* upon default of the debtor allowing the lender to immediately gain ownership of the collateral without resorting to a judicial foreclosure proceeding.

In sum, the by attempting to circumvent the prescribed Louisiana securities laws, the Sukuk Loan Transaction violates a strong public policy of this State and is an absolute nullity. Accordingly, those parts of the transaction (such as the Contributed Conveyance, Purchased Conveyance and LLC Agreement) which explicitly violate the public policy of this State are without any effect whatsoever and, at best, Defendants might constitute unsecured creditors of the Debtor. Accordingly, if the transaction is not deemed to constitute an antichresis, then it amounts to the attempted unauthorized use of a sale, exchange and business entity in lieu of a valid security device in violation of the public policy of this State and is an absolute nullity which the Court must strike down.

### E. The Debtor is NOT Attempting to Utilize the DJA to Vitiate or Modify Over Forty (40) Documents.

#### 1. The Debtor is Seeking Declaration as to the True Nature of the Sukuk Loan Transaction as a Whole.

As an initial matter, it is noteworthy that the ONLY party attacking the Debtor's ability to seek recharacterization of the Sukuk Loan Transaction is a party that is NOT a signatory to one single document comprising this Transaction. Therefore, the Debtor respectfully suggests that the Holders' are without standing to contest the Debtor's invocation of the DJA. However, because the Holders' arguments were adopted by various other parties, it is necessary to

distinguish between the Debtor's attempt to seek this Court's interpretation of the Sukuk Loan Transaction and what the Holders' characterize as an attempt to "vitiate numerous unambiguous obligations set forth in the Transaction Documents."[208]

There can be no doubt that a plaintiff can utilize the DJA to obtain a court's interpretation and clarification of the rights and obligations of parties to a contract.[209] In fact, it is entirely common that bankruptcy courts will utilize the DJA to recharacterize purported lease and "true sale" agreements as disguised financing agreements.[210] In response to this common practice, the Holders attempt to recast the relief sought by the Debtor as an attempt to change, vitiate and modify over forty (40) separate documents by expending nearly twelve (12) pages discussing specific provisions that will allegedly be vitiated by the entry of a declaratory judgment in the Debtor's favor.

The Debtor understands that it cannot, in this Adversary Proceeding, rewrite or reformulate the terms of the Sukuk Loan Transaction.[211] However, the Debtor is NOT trying to rewrite or change the terms or conditions of the various documents underlying the Sukuk Loan Transaction, nor is it attempting to alleviate itself of the need to comply with the principal

[208] *See* Holders' Memorandum, at para. 67.

[209] *Dowington*, 172 B.R. 813, 819 fn. 5 (quoting *Lehigh Coal & Navigation Co. v. Central R.R. of N.J.*, 33 F.Supp. 362, 365 (E.D.Pa. 1940) (holding that "[c]onstruction and interpretation of written instruments … is the principle function of a declaratory judgment proceeding.")).

[210] *In re Morande Enter., Inc.*, 346 B.R. 886, 890 (Bankr.M.D.Fla. 2006) (analyzing various bankruptcy cases in which the court was faced with the decision whether a purported "true lease" should be recharacterized as a financing agreement for commercial and bankruptcy law purposes); *In re Ecco Drilling Co., Ltd.*, 390 B.R. 221 (Bankr.E.D.Tex. 2008); *In re Lamar*, 249 B.R. 822 (Bankr.S.D.Ga. 2000); *see also In re Commercial Loan Corp.*, 316 B.R. 690, 700-703 (Bankr.N.D.Ill. 2004) (discussing the potential ability of a Chapter 11 trustee to seek the recharacterization of the sale of a financial asset a disguised loan).

[211] The Debtor expressly reserves all rights under the Code and existing law to modify certain terms and conditions of the Transaction in connection with the Debtor's plan of reorganization, and to exercise any all rights granted to the Debtor under Sections 365, 502 and 506 of the Code, including, but not limited to, the assumption/rejection of contracts and unexpired leases, and efforts to disallow, subordinate or otherwise object to any claims against the Debtor's estate.

obligations under these documents, subject to the reservation of rights set forth in Footnotes 211 and 214 hereinbelow. Instead, the sole purpose of the Debtor's claim for declaratory relief is to request a declaration by this Court that the Sukuk Loan Transaction, when taken as a whole, is a disguised financing, and NOT a true sale and exchange.

By analogy, bankruptcy courts are frequently asked to resolve whether a contract that purports to be a lease is, in fact, a disguised financing.[212] In making this determination, a court will typically look to the economic realities test of the putative transaction, with an eye toward the applicable state or local law.[213] This is exactly what the Debtor in this matter is asking of this Court. When the totality of the Sukuk Loan Transaction is considered in the context of the surrounding economic realities, together with the State of Louisiana's concepts regarding the pledge of an immovable, the Sukuk Loan Transaction is undoubtedly a disguised loan. It then logically follows that the ORRI remains property of the estate.

Importantly, the Debtor does not seek to jettison the entirety of the Sukuk Loan Transaction. Instead, other than the recharacterization of the transaction as a whole as a disguised loan, the Debtor sees no reason why many, if not all, of the remaining documents, as well as the terms and conditions set forth therein, cannot survive.[214] For example, assuming the Court is to declare that the Sukuk Loan Transaction is, in fact, a disguised loan, the total amount

---

[212] See Fn. 210, *supra.*

[213] *Ecco Drilling,* 390 B.R. at 226-227 (citing *Lamar*, 249 B.R. at 825).

[214] To the extent that the Sukuk Loan Transaction is recharacterized as a disguised loan, the Debtor specifically reserves any and all rights to renegotiate the terms of the same with any and all interested parties during the creation, negotiation and implementation of its plan of reorganization. The Debtor is in no way committing to incorporate the structure described herein into its proposed plan of reorganization, but provides this explanation as to the likely form of the recharacterized loan prior to the confirmation of any plan of reorganization. The Debtor expressly reserves its rights under the Bankruptcy Code and applicable law to modify the transaction in the context of a plan of reorganization and to seek disallowance of any and all alleged claims against the Debtor's estate, all in accordance with the Bankruptcy Code and applicable law.

owed pursuant to the Funding Agreement will remain in place as the principal amount owed on the disguised loan.[215] Moreover, the Sukuk Return (or interest) will continue to be paid as interest on the principal, and the thirteen (13) year payment schedule existing in the Sukuk Loan Transaction can survive as the "amortization schedule."[216]

Furthermore, the security interests and mortgages granted pursuant to the Sukuk Loan Transaction may survive, together with the Collateral Assignment in favor of Deutsche Bank, and the general payment mechanism set forth in the Funding Agreement, Deposit and Disbursement Agreement and the various other documents comprising the Sukuk Loan Transaction.[217]

Therefore, because the Debtor does not seek to change, modify or vitiate the various documents underlying the Sukuk Loan Transaction in connection with this Adversary Proceeding, but merely asks for a declaration as to the true nature and character of the transaction, this Court is absolutely vested with jurisdiction under the DJA to provide the relief requested in Count 2 of the Debtor's Complaint.

### 2. The Debtor Also is Seeking a Declaration that the Sukuk Loan Transaction Violates the Public Policy of the State of Louisiana and is an Absolute Nullity.

The Debtor is also seeking a declaration by this Court that the Sukuk Loan Transaction, when taken as a whole, violates the public policies of the State of Louisiana and is null and void. As was the case in *Guste v. Hibernia,*[218] a Louisiana State Court or federal court applying Louisiana state law may determine that a transaction or certain provisions thereof violate the public policies of the State of Louisiana and is null and void *ab initio*. Moreover, such courts

---

[215] *See* Fns. 211 and 214, *supra*.
[216] *Id.*
[217] *Id.*
[218] *See* Fn. 170, *supra*.

have power to raise public policy violates *sua sponte.*[219] Therefore, this Court is well within its rights to issue a declaration that the Sukuk Loan Transaction is null and void and in violation of the public policies of the State of Louisiana.

**F. The Holders' Request for Dismissal of Counts One and Three is Unfounded and Unwarranted.**

**1. Dismissal of Count One is not Proper Because the Court has Previously Granted the Requested Relief and the Debtor has NOT Requested a *Permanent* Injunction.**

Near the conclusion of their Memorandum, the Holders ask that the Court dismiss Count One in the Complaint, which they aver includes a request for *permanent* injunction. A review of Count One of the Complaint, the Debtor's Emergency Application for Temporary Restraining Order and Motion for Preliminary Injunction (Docket No. 2) and the associated briefing reveals that the Debtor has never specifically requested the issuance of a *permanent* injunction. Instead, all that the Debtor has sought and received was a temporary restraining order and preliminary injunction in the form and style that was ultimately entered by this Court. Therefore, the Holders' empty request to dismiss Count One of the Complaint must be denied.

**2. Dismissal of Count 3 is Also Improper.**

The Holders conclude their Memorandum by suggesting that the Stay Order requested by the Debtor in Count Three of the Complaint should be dismissed because the Holders have unilaterally determined for themselves, this Court and all other affected parties, that the *Properties*, as that term is defined in the Complaint, are adequately protected by the automatic stay and no declaration by this Court is needed. While this admission of the applicability of the automatic stay to the Properties is comforting, the Holders do not speak for all interested parties and lack standing to bind such parties to their interpretation. Moreover, to the extent that the

[219] *See* LA. CIV. CODE art. 2030 ("Absolute nullity may be invoked by any person or ***may be declared by the court on its own initiative***") (emphasis added).

term *Properties* is inclusive not just of the physical property, but also the interests arising therefrom such as the ORRI, the applicability of the automatic stay under Section 362 of the Code undoubtedly remains in dispute. This Court has unquestionable authority to make determinations as to the applicability of the Section 362 automatic stay, and the cavalier attempt by the Holders to toss aside Count Three of the Complaint should be rejected.

## V. Summary Judgment is Inappropriate and Unwarranted.

As is set forth in greater detail above, neither LOH nor any other Defendant in this Adversary Proceeding is entitled to judgment as a matter of law at this juncture. Moreover, as is plainly clear from the briefing currently before this Court, substantial and substantive issues of material fact remain at dispute, including, but not limited to, the intent of the Debtor with regard to the alienation of the ORRI and the true nature of the Sukuk Loan Transaction. Therefore, LOH's half-hearted attempt to buttress their Motion to Dismiss with an alternative motion for summary judgment should be rejected.

## CONCLUSION

For the foregoing reasons, all of the Motions to Dismiss, the Motion for More Definite Statement and the Motion for Summary Judgment should be denied, and the Adversary Proceeding should proceed toward a trial on the merits.

Respectfully Submitted,

LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD

STEWART F. PECK (#10403)
CHRISTOPHER T. CAPLINGER (#25357)
BENJAMIN W. KADDEN (#29927)
ELIZABETH R. CARTER (#31090)
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
Email: speck@lawla.com; ccaplinger@lawla.com;
bkadden@lawla.com; ecarter@lawla.com
*Attorneys for the Debtor*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Debtor, East Cameron Partners, L.P.'s, Memorandum in Opposition to the Motions to Dismiss filed by the Sukuk Certificateholders (the "Holders") (Docket No. 70), East Cameron Gas Company (Docket No. 60), and Louisiana Offshore Holding, LLC ("LOH") (Docket No. 67); the Motion for More Definite Statement by the Holders (Docket No. 70); and, the Motion for Summary Judgment by LOH (Docket No. 67) has been served upon those parties receiving electronic notification via the Court's CM/ECF System, as well the parties listed below first class mail on this 14th day of January 2009.

Office of United States Trustee
300 Fannin St., Suite 3196
Shreveport, LA 71101-3122

J. Maxwell Tucker
Patton Boggs LLP
2001 Ross Ave., Suite 3000
Dallas, TX 75201-8001