# UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE

FILED

APR 1 3 2009

J. BARRY DUNFORD, CLERK
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT of LOUISIANA

|  |  |
|---|---|
| IN RE: EAST CAMERON PARTNERS, LP, | Case No. 08-51207 |
| Debtor. | Chapter 11 |
| EAST CAMERON PARTNERS, LP, | Adversary No. 08-5041 |
| Plaintiff, | |
| VERSUS | |
| LOUISIANA OFFSHORE HOLDING, LLC, ET AL, | Lafayette Louisiana March 24, 2009 |
| Defendants. | |

* * * * * * * * * * *

### RULING AND HEARING ON MOTIONS,
### BEFORE THE HONORABLE ROBERT SUMMERHAYS,
### UNITED STATES BANKRUPTCY JUDGE

## APPEARANCES:

For East Cameron
Partners, LP:

Lugenbuhl, Wheaton, Peck, Rankin
& Hubbard
BY:  BENJAMIN KADDEN, ESQ.
BY:  STEWART PECK, ESQ.
601 Poydras St., Ste. 2775
New Orleans, Louisiana 70130

For Louisiana Offshore
Holding, LLC:

Adams & Reese
BY: LISA M. HEDRICK, ESQ.
One Shell Square, Ste. 4500
New Orleans, Louisiana 70139

**APPEARANCES:**  (Cont'd)

For East Cameron Gas Co:

Fulbright & Jaworski
BY:   LOUIS STRUBECK, ESQ.
BY:   MARK A. PLATT, ESQ.
2200 Ross Ave., Ste. 2800
Dallas, Texas 75201

For Sukuk Certificate
Holders:

Liskow & Lewis
BY:   JOSEPH P. HEBERT, ESQ.
822 Harding Street
Lafayette, Louisiana 70505

For Unsecured Creditors
Committee:

Steffes, Vingiello & McKenzie
BY:   MICHAEL H. PIPER, ESQ.
3029 S. Sherwood Forest Blvd.,
Suite 100
Baton Rouge, Louisiana 70816

Court Audio Operator:

Stacey Soileau, E.C.R.O.

Transcriptionist:

Dorothy Bourgeois
84425 Terrell Road
Bogalusa, Louisiana 70427
(985) 886-1015

Proceedings recorded by electronic sound recording, transcript

produced by transcription service.

# **P R O C E E D I N G S**

(Tuesday, March 24, 2009)

(Matter is Called by Clerk)

\*    \*    \*    \*

### **Adversary Number 08-5041**

THE COURT:  Let's go ahead and have the parties make an appearance, that way we can do it once.

MR. PECK:  May it please the Court, Your Honor, Stewart Peck for East Cameron Partners, along with Ben Kadden of my office, and Mr. Evans.  I also have the Global Hunter people, Danny Conwill and Michael Schmidt here today.

MR. HEBERT:  Your Honor, J.P. Hebert with Liskow & Lewis, and also Mr. Strubeck and Mark Platt with Fulbright & Jaworski as special counsel for East Cameron Gas Company and Counsel for the Sukuk Certificate Holders.

MS. HEDRICK:  Good morning, Your Honor, Lisa Hedrick on behalf of Louisiana Offshore Holding and its independent member, Frank Bulotta (phonetic).

MR. PIPER:  Good morning, Your Honor; Michael Piper for the Unsecured Creditors Committee.  I won't be in this motion, but I'll be in the other one.

THE COURT:  The Court had reset this matter for a ruling on the Motions to Dismiss.  All the Defendants in this matter have filed Motions to Dismiss.  The Court is prepared to rule on those motions.

* * * * *

**RULING**

THE COURT:  The present matter before the Court involves a securitization entered into by the Debtor.  The Debtor, is an oil and gas producer; has interests in certain leases.  Now, the facts of this matter are complex.  They're detailed in the Complaint that's been filed, as well as the motions.  And, for purposes of an oral ruling at this preliminary stage, the Court will summarize pertinent facts, as opposed to setting out in detail the factual history of the case.

But, in connection with this securitization, a number of entities were created; the East Cameron Gas/Sukuk Trust, East Cameron Gas Company, Trustee of the East Cameron/Sukuk Trust, Louisiana Offshore Holding, or LOH.  The substance of a securitization is that certain Sukuk Certificate Holders purchased certificates, ownership interest in East Cameron Gas/ Sukuk Trust.  The amount funded, according to the pleadings, was approximately $165 million.

Those funds eventually were advanced to LOH, pursuant to a separate agreement, a funding agreement.  LOH used those funds to purchase a royalty interest in an oil and gas lease, carve-out of an oil and gas lease held by the Debtor, East Cameron Partners.

This transaction involved two overriding royalty

1   interests, a purchase of overriding royalty interests, and a

2   contributed overriding royalty interest.  The contributed

3   overriding royalty interest was in exchange for a certain

4   ownership interest in LOH.

5           On October 6th, 2008, the originator, East Cameron

6   Partners, filed for relief under Chapter 11.  The Debtor filed

7   the present adversary proceeding, seeking, among other things,

8   to recharacterize the securitization as an antichresis under

9   Louisiana law; essentially, a pledge, a finance transaction, a

10  secured transaction, as opposed to a true sale, and to unwind

11  the securitization on that basis.

12          The defendants in this matter have moved to dismiss

13  on a number of grounds.  Let me first state the primary

14  grounds.  There have been arguments that the Court lacks

15  jurisdiction to issue the declaratory relief, but the primary,

16  substantive grounds in the Motions to Dismiss are a request to

17  dismiss under Federal Rule 12(b)(6), for failure to state a

18  claim.

19          The standard here, under (12)(b)(6), is the Complaint

20  is construed in the most favorable light -- in the light most

21  favorable to the plaintiff, accepting as true all well pleaded

22  factual allegations and drawing on all reasonable inferences in

23  the plaintiff's favor.

24          However, in so doing, the Court may not rely on

25  conclusional allegation or legal conclusions disguised as

1  factual allegations.

2  Complaint under 12(b)(6) must be dismissed when it

3  appears, beyond a doubt, that the plaintiff can prove no set of

4  facts in support of its claim, which would entitled him to

5  relief.

6  The defendants raise a number of arguments for

7  dismissal. The first argument relates to 11 USC, Section

8  541(B)(4)(b). That provision states that:

9  "The property estate includes any interest of the

10  debtor in liquid or gaseous hydrocarbons, to the extent

11  that:

12  "One, the debtor has transferred such interests,

13  pursuant to a written conveyance of a production payment,

14  to an entity that does not participate in the operation of

15  the property from which such production payment is

16  transferred and, but for the operation of this paragraph,

17  the estate could include the interest referred to only by

18  virtue of Section 365 or 542 of this Title."

19  There's a lot of content to that provision and the

20  parties have not cited and the Court has been unable to find

21  any case law construing this provision helpful to the issues

22  that have been raised by the parties here.

23  The parties have vigorously contested each and every

24  one of the elements of 541(B)(4)(b). However, the primary

25  element at issue here, and it is really the crux of this entire

1   adversary proceeding, is the requirement that the interest be

2   transferred -- or that the interest is transferred pursuant to

3   a written conveyance of a production payment.

4          That appears, to me, to be the entire crux and the

5   issue in this adversary proceeding.  The defendants have made

6   the argument that the written conveyance of a production

7   payment requirement is a federal standard and that it must be

8   judged purely on the basis of the conveyance document, itself,

9   without considering any other external facts or other documents

10  that may have been executed related to that conveyance.

11         In essence, under this view of the written conveyance

12  requirement, under 541(B)(4)(b), a court would be precluded

13  from recharacterizing a transaction that falls under that

14  provision.  The Court is not inclined to give that reading to

15  this provision in the absence of expressed statutory language,

16  and that expressed statutory language is not there.

17         The Code does not define "written conveyance."

18  Courts generally, where the Code is silent and refers to

19  concepts that are rooted in state law, will look to state law

20  for guidance.

21         Here, the question of whether or not the transfer of

22  the royalty interests to LOH, which is a bankruptcy -- set up

23  as a bankruptcy remote special purpose vehicle, the question of

24  whether that is a true sale, whether that is a conveyance, is

25  an issue that has to be decided in this proceeding, and the

1  application of 541(B)(4)(b) is premature, until that's been

2  decided.

3      The Court denies the Motions to Dismiss on the

4  grounds of 541(B)(4)(b).

5                      *   *   *   *   *

6      THE COURT:  We next move to the argument under

7  Article 9 of the Louisiana version of the UCC.  This presents

8  an equally intriguing issue and also an issue of which

9  virtually there is no case law that directly addresses the

10 issues raised by the parties.

11      The argument made by the defendants here is that the

12 overriding royalty interests that were transferred to the

13 special purpose vehicle are essentially -- or fall within the

14 definition of an account and, therefore, constitute a sale of

15 an account, subject to Article 9.

16      And, the reason why this issue is critical in the

17 present case is that Louisiana's version of the UCC contains a

18 non-uniform provision in Louisiana Statute 10:9-109(e), stating

19 that:

20      "For all purposes, in the absence of fraud or

21      intentional misrepresentations, the party's

22      characterization of a transaction as a sale of accounts,

23      chattel paper, payment of intangibles or promissory notes

24      shall be conclusive that the transaction is a true sale,

25      and is not a secured transaction and that title has passed

1     to the party characterized as the purchaser, regardless of

2     whether the purchaser has any recourse."

3          Those are the relevant provisions of the statute.

4          The starting point for this inquiry is the definition

5     of "an account."  Under Section 9-102(a)(2), an account is

6     defined as:  A right to payment of a monetary obligation.

7          Further in that provision the statute specifically

8     provides that:

9          "An account includes any right to payment owed to a

10         landowner or the owner of a mineral right, such as a bonus

11         rent or royalty, which is payable out of or measured by

12         production of oil, gas or other minerals, whereas

13         otherwise attributable to the mineral right."

14         On first blush, it appears as though a royalty

15     interest should be a right to payment that falls within an

16     account.

17         However, on closer reading, the provision makes a

18     distinction.  It makes a distinction between a right to

19     payment, which is a royalty that arises out of a mineral right.

20     There's a distinction there between the right to payment and

21     the underlying mineral right, which in this case, when you look

22     to the definitions in the Louisiana Comments to the UCC,

23     specifically Paragraph 13, "mineral rights" mean a real right

24     governed by Title 31 of the Revised Statute, including mineral

25     servitudes, mineral leases, mineral royalties, overriding

1    royalties, production payments and net profit interests.

2           From the face of the statute, it appears that there's

3    a distinction, as far as an account, and that an account only

4    goes to the right to payment that flows from a mineral

5    interest, and that the right or that the mineral interest

6    itself, a transfer of the mineral interests would not

7    constitute the sale of an account.

8           There are a number of factors that would support that

9    construction of the statute.

10          First, there's a significant body of regulation in

11   the Mineral Code, and the Louisiana Civil Code governing

12   mineral rights;

13          Second, the expressed provisions of the UCC exclude

14   the application of Article 9 to interests in real property or

15   immovables and provides a carve-out in Section 9-109(11)(e).

16          The opening paragraph to Section 11 states that the

17   creation or transfer of an interest in a lien on real property,

18   including a lease or rents thereunder, that those are excluded

19   from the UCC, Article 9, except to the extent that provision is

20   made for Subparagraph (e) payments due under certain mineral

21   rights.

22          Again, the distinction between payments due and the

23   underlying mineral rights.

24          And, looking to the Comments, the official Louisiana

25   Comments to Section 9-109, Section (e) states in discussing

1  this exclusion:

2         "The exclusion is for emphasis, because Revised

3     Chapter 9 does not apply to immovable property interests,

4     except in very narrow circumstances."

5         Taking guidance from the Comment, the Court will view

6  the definition included in the definition of an account

7  narrowly to include payments arising from a mineral interest

8  and transfer of a payment arising from a mineral interest, but

9  not to the underlying mineral interest and the transfer of the

10  mineral interest, which is governed by the Mineral Code and the

11  Civil Code.

12         Article 9 doesn't apply to the instant transaction.

13         So now we're back to whether or not the plaintiff has

14  pled grounds for recharacterization under Louisiana law.  The

15  courts that have addressed recharacterization apply state

16  standards and state law, as far as whether or not there are

17  grounds to recharacterize a purported sale as a secured

18  transaction, in essence a secured loan.

19         There are extensive or a number of various agreements

20  that make up the securitization transaction.  A number of these

21  agreements specify Texas law, but the conveyance at issue here,

22  the document that purports to convey the royalty interest, is

23  expressly subject to Louisiana law.

24         The plaintiffs raise a number of grounds under

25  Louisiana to recharacterize this transaction.  The first is

1   simulation. Under Louisiana law, a contract is a simulation

2   when, by the mutual agreement of the parties, it does not

3   express the true intent of the parties. And, I'll cite

4   Louisiana Civil Code 2025, and the case of <u>Fulton v Lawrence</u> --

5   it's an unpublished decision by the Bankruptcy Court out of the

6   Eastern District of Louisiana, dated August 29th, 2008. The

7   slip copy, the cite is 2008 WL 5096013. That's an opinion

8   issued by Judge Brown.

9        With respect to a simulation of the true intent of

10   the parties it is expressed in a separate writing, and that

11   writing is termed a "counter-letter."

12        The key element of a simulation is mutual agreement

13   of the parties. The mutual agreement that the documented

14   issues does not express the true intent of the parties.

15        Reviewing the Complaint and the documents reflected

16   referenced in that Complaint, the parties expressly

17   characterize the transfer of those royalty interests as a

18   conveyance. Nothing in the Complaint or in the documents

19   evidences -- and it's the critical element of a simulation -- a

20   mutual agreement of the parties, that the parties did not

21   intend this to be a true sale.

22        An essential element of simulation is not pled in the

23   Complaint. Simulation is grounds to recharacterize the loan.

24   No claim has been pled, based on the current Complaint.

25        The plaintiffs also point to Louisiana case law where

1  courts have recharacterized a sale as a loan, where the
2  defendant in the case attempted to use a sale essentially as a
3  form of security device, and the courts found that the use of
4  the sale was not a true sale, but essentially a secured loan
5  that attempted to get around state law protections for debtors
6  and secured transactions, including the requirements governing
7  foreclosure; that those types of arrangements violated
8  Louisiana public policy and constituted an impermissible
9  forfeiture.

10         However, in reviewing the cases that have been cited
11  by the plaintiffs, a key element in each one of these cases is
12  that the arrangement, the sale, if enforced, would produce an
13  inequitable result in the sense of a forfeiture. And, I'll
14  cite the DeSalvo v Finance Funds case, 252 So.2d 498, Louisiana
15  Court of Appeals 1970. This is a case that is cited by the
16  plaintiffs. In that case, the defendant required the debtor to
17  sell land to the defendants as security for a loan that was
18  substantially less than the value of the property.

19         The court concluded that if this transaction was
20  enforced as a sale, the result would be an unfair windfall to
21  the defendant if the debtor defaulted. In other words, a
22  forfeiture.

23         I've reviewed the Complaint and the Complaint is
24  devoid of factual allegations that showed that enforcement of
25  the current transactions, as written, as reflected in the

1  documents as a true sale, a conveyance of the royalty interest,

2  would constitute an impermissible forfeiture or work -- in

3  other words, contravene Louisiana law governing foreclosure, or

4  otherwise create an inequitable result of the kind that led the

5  Court in DeSalvo to recharacterize the transaction.

6        The Court finds that these grounds, based on DeSalvo

7  and related cases, do not support the claim pled in the

8  Complaint.

9        Now, finally, the defendants -- or the plaintiffs

10  argue for recharacterization under the In Re: Senior G&A

11  operating case, 957 F.2d 1290, Fifth Circuit 1992.  However, as

12  the Court noted during oral argument, the transaction at issue

13  in that case is distinguishable from the securitization

14  transaction in the present case.  The agreement in that case

15  did not have the unequivocal conveyance language present in

16  this case.  The transaction in G&A also involved the rights of

17  two parties to a specific transaction document in dispute.

18        In the present case, a characterization of the

19  transaction between plaintiff and LOH implicates not only those

20  parties' rights, but also the rights of the Sukuk Certificate

21  Holders.  These holders invested in the Sukuk certificates in

22  reliance on the characterization of the transfer of the royalty

23  interest as a true sale.

24        And, let me note at this point the unique nature of

25  the securitization.  This was a securitization that was

1   structured to be compliant with Sharia or Islamic Holy Law, and
2   the parties contend, the defendants contend that the structure
3   of the securitization was an integral part, as far as the
4   compliance with Sharia law.

5          But, getting back to Senior G&A, the Court finds that
6   case distinguishable.  This case, in contrast, is more
7   analogous to a case cited by LOH in their briefing, the In Re:
8   Doctors Hospital case, 360 BR 787, Bankruptcy Court, Northern
9   District of Illinois, 2007.  In the Doctors Hospital case, the
10  transaction did not involve a securitization structure like the
11  structure in the present case.  However, like the current case,
12  it involved a transfer of assets to a bankruptcy remote special
13  purpose vehicle.

14         One of the arguments made by the debtor in that case,
15  in addition to making alter ego assertions and attempting to
16  collapse the debtor into the special purpose vehicle, made
17  arguments that the purported sale of receivables to the special
18  purpose vehicle should be treated as a secured loan, as opposed
19  to a true sale.

20         The court, in Doctors Hospital relied heavily on the
21  stated intent of the parties as reflected in the transaction
22  documents in declining to recharacterize the sale as a loan.
23  The court also made an important point, that in that case the
24  ultimate investors, whose funds benefited the debtor in that
25  case, invested in reliance on the conveyance of the receivables

1  to a bankruptcy remote vehicle.

2      In the present case, after reviewing the Complaint
3  and the documents and the conveyance document referenced in the
4  Complaint, it's fairly clear from the documents that there is a
5  clear conveyance of the overriding royalty interests.  Now, the
6  Court isn't holding that the plaintiffs can't overcome that
7  stated intent.

8      However, in order to overcome that stated intent the
9  Court is going to require the plaintiffs to make an additional
10  showing that the securitization transaction was created for a
11  fraudulent purpose or to promote fraud, or that the
12  securitization transaction, as enforced as a true sale and a
13  legitimate securitization transaction, is being used to promote
14  an inequity or a forfeiture such that it would fall within the
15  DeSalvo line of cases cited by the plaintiffs in their
16  briefing, but the current Complaint does not make such a
17  showing.

18      The Court grants the Motion to Dismiss in that
19  regard.  However, based on the Court's review of the Complaint,
20  I believe that the defects, the pleading defects could be
21  curable, if the plaintiffs are allowed to amend and attempt to
22  allege facts that make this additional showing and reflect the
23  Court's ruling, as far as the grounds under Louisiana law to
24  recharacterize the sale of the overriding royalty interests.
25      The Court will grant the plaintiffs leave to replead

1  within 30 days.

2  　　　　　　　＊　＊　＊　＊　＊

3  　　　　THE COURT: And, that's the Court's ruling. Where

4  does that leave us?

5  　　　　MR. PECK: May it please the Court, Your Honor:

6  Thank you for a lot of work you put into that ruling,

7  obviously. There have been lengthy briefs and all.

8  　　　　That leaves us -- the Debtor intends to replead. We

9  think we fall within the DeSalvo case. At the same time, it

10  leave us with our Motion to Extend Exclusivity. If we may move

11  on to that, Your Honor, at this time --

12  　　　　Or does anyone have any other comments?

13  　　　　THE COURT: Let me make a note on the forfeiture

14  issue. The Court had observed that, after reviewing the

15  Complaint, that the plaintiffs had not pled any grounds to show

16  that this was a forfeiture. I want to note there that, if

17  you're going to plead that basis, we need to bring this in line

18  with the DeSalvo case.

19  　　　　MR. PECK: Yes, Your Honor.

20  　　　　THE COURT: You know, this is a very different case

21  from the DeSalvo case, in the sense that we have, you know, a

22  term "overriding royalty interest," a set amount of production.

23  The plaintiffs or the Debtor here retains interest, retains its

24  interest in the underlying leases. And, there's not a

25  forfeiture of those underlying leases, based on the conveyance.

1          So, we're going to need to get around that, if we're

2     going to state a successful claim under DeSalvo.

3          MR. PECK:  But, they do -- there is a forfeiture of

4     the VBP, and they don't have to go through foreclosure,

5     Your Honor.  That's the part in the LOH --

6          THE COURT:  That's the royalty interest.

7          But, I mean, the fact that you can forfeit the

8     royalty interest is not the same as the type of forfeiture that

9     is addressed in this DeSalvo line of cases.  The DeSalvo line

10    of cases was that there was a sale of much -- property that was

11    much more valuable than the loan proceeds, and if the debtor or

12    the plaintiff in that case defaulted, they would lose all

13    interest in that property and, therefore, result in a wind-

14    fall.

15         That's my concern here is that I don't see the type

16    of windfall in this case that we were dealing with in the

17    DeSalvo case.  And, we have a securitization transaction that

18    is very clear on its face what the parties are intending to do,

19    and the Debtor took the proceeds and used the proceeds from

20    that securitization transaction in full awareness of what it

21    was doing.

22         And, parties here, the Sukuk Certificate Holders,

23    which have intervened, invested in reliance on the fact that

24    this was a true sale of royalty interest to a bankruptcy remote

25    vehicle.

1    You know, I'm not saying that that can't be cured by

2  repleading, but in order to shorten this process, you're going

3  to need to show something more than the fact that, if you look

4  at all the recharacterization factors that courts look at,

5  those recharacterization factors weigh more towards a loan as

6  opposed to a true sale.

7    I think that in the transaction that we're dealing

8  with here, the cases you cite under the Louisiana law, we need

9  a showing of some sort of fraudulent purpose or inequitable

10 conduct on the order that we find in the DeSalvo case.

11    MR. PECK:  We take your guidance, Your Honor, and we

12 will do so, and we will go back and look at the documents and

13 regroup, and talk to my client, and plead accordingly.  But, we

14 intend to file an Amended Complaint, Your Honor.

15    THE COURT:  Okay.

16    MR. PECK:  I can't argue with the Court now.  You've

17 made your ruling.

18    THE COURT:  Yes, I know.  I'm not requesting an

19 argument.  I mean, part of the reason for doing this in an oral

20 ruling is that -- since this is kind of the initial "stab" at

21 this, it's pretty hard to set guidance on a matter as complex

22 as this in a written opinion.  And, I want to provide the

23 parties with some feedback, as to where I'm going, as far as

24 what I would accept as allegations that will support the claims

25 that you're attempting to plead.

1          And, that's what I'm trying to do here.  I'm not

2  inviting additional argument.  I'm giving you additional

3  guidance --

4          MR. PECK:  And, we will --

5          THE COURT:  -- on repleading.

6          MR. PECK:  Excuse me, Your Honor.

7          We will take that guidance and we intend to amend our

8  pleading and then they can address our pleadings, and if they

9  have to dismiss, and the Court does what it does, and then

10  we'll move on to maybe a higher authority.

11          But, I don't mean that in a --

12          THE COURT:  I understand.

13          MR. PECK:  The Court --

14          THE COURT:  It's part of the job.

15          MR. PECK:  Right.  And, that's part of my job, too,

16  Your Honor.  But, I appreciate all the hard work I know the

17  Court put into this.  This is not an easy case, and as we

18  worked on our side, how complex they were, and a lot of work

19  went into it.

20          THE COURT:  I understand, and I have to say that

21  there is no case law to guide the Court in this arena, but the

22  parties have done an incredible job of briefing the issues in

23  this case, including the 84 page brief filed by the

24  plaintiffs.

25          I don't mind long briefs and, in fact, I welcome --

1  especially in a case like this, that we have no case law to

2  guide us.

3        MR. PECK:  And, we will take the Court's guidance and

4  we will plead accordingly, and hopefully this time we will

5  satisfy the Court.

6        THE COURT:  Okay.

7                *    *    *    *

8              **Lead Case Number 08-51207**

9        MR. PECK:  But, if I can segue into our Motion to

10  Extend Exclusive Period, because that was part of the issue for

11  all of us in formulating a plan.  We needed to find out where

12  the Court stood on the recharacterization.  It's very difficult

13  to draft a plan and disclosure statement until we come up with

14  an idea of where we stand with this adversary.

15        However, I will tell the Court we have exchanged a

16  number of terms sheets with the Sukuk Holders, and provided

17  alternatives, already, and now I think, with the Court's ruling

18  and guidance, that may hone down some of the issues, or at

19  least give us some direction.

20        And, one of the factors we cited in our Motion to

21  Extend Exclusivity is were there any contingencies.  It wasn't

22  just the adversary proceeding, because having pending

23  litigation, case law says, that's not sufficient.  But, we did

24  cite a case in our reply brief, where it's sufficient when you

25  have other factors.

1       And, one of those factors was a contingency, and the
2  contingency was:  What would the ruling be after we spent all
3  this time and effort, the Court and the parties, as to what's
4  the Court's beliefs as to this characterization?

5       I think with that ruling now, we can go forward, not
6  only negotiating with the Sukuk Holders with these alternatives
7  we've given to them -- because our alternatives didn't even
8  take into account whether we won or lost the adversary.  We
9  tried to come up with an alternative that would moot that, if
10 you will.

11       And, now with that in mind, we're asking the Court
12 for some additional time, if it's shorter than requested, we
13 understand.  The Court, last time up here, extended it without
14 prejudice for us to seek another extension.  The Court said
15 they were going to keep us under a tight rein to see how our
16 progress is.

17       Now, with this contingency, if you will, as one of
18 the nine factors, how the Court was going to rule, we can not
19 only continue with our good faith efforts with the Sukuk
20 Holders and the Committee to come up with a consensual plan,
21 but the Debtor can now formulate a plan.

22       We've been working on a plan, Your Honor, and you
23 know, I'm working on a disclosure statement, but the guts is
24 what will actually be the treatment.  I was awaiting this
25 ruling.

1        I'd like to tell the Court what we've done in the

2   period of time since -- it's been a short period of time, but

3   the Court has its hearing date such that I needed to get in

4   before the 3rd, and that's why -- you just heard this a little

5   while back, but I need to make sure I protect the record.

6        THE COURT:  Yes, you were requesting an extension to

7   July 3rd of 2009 to file a plan, and an extension of the period

8   for the Debtor to obtain acceptance of that plan until

9   September 1st, 2009.

10       MR. PECK:  Well, I think with the Court's ruling

11  we'll shorten up that request, Your Honor.

12       THE COURT:  Okay.

13       MR. PECK:  I mean, now that -- we don't need that,

14  because, you know, I would probably shorten that up to 60 or 30

15  more days from April 3rd, Your Honor, time.  We need more time

16  beyond April 3rd, Your Honor, to file the plan.

17       THE COURT:  Okay.  So --

18       MR. PECK:  I mean, I'm not going to -- after hearing

19  the Court's ruling and all, I'm not going to ask 90 days from

20  April 3rd.  Right now, I'm going to amend that, if I can, and

21  ask the Court for 60 or 30 additional days from April.  I know

22  the Court wants to keep us on a tighter schedule.

23       THE COURT:  I take from that, that the extent to

24  which the plaintiff is attempt to replead isn't going to be

25  contingent, as far as proposing a plan?

1         MR. PECK:  I don't think so.  I don't think that

2 would be wise of the plaintiff.  I'm going to amend, and I'm

3 going to go forward.  We would like a longer period, but we

4 understand the Court wants to keep us on a tight rein.  If, in

5 fact, replead and we don't get met with another Motion to

6 Dismiss, and the Court keeps this case alive, I'll ask for

7 another one.

8         THE COURT:  Okay.

9         MR. PECK:  But, you know, -- I'm not trying to -- I'm

10 trying to be fair in our requests to the Court about

11 extensions.

12         THE COURT:  Sure.

13         MR. PECK:  We're not using this to pressure people.

14 We just need -- we need time to do something, just because we

15 needed direction.

16         THE COURT:  And, I know that the Court had limited

17 the extension on exclusivity before, to try to promote the

18 parties' negotiating a resolution and also, at that point in

19 time, it was unclear, even in my mind, exactly how this issue

20 on the Motions to Dismiss was going to play out.

21         Again, I want to keep a tight rein on exclusivity,

22 but I want to be able to promote some efficiency here by giving

23 you enough time to negotiate or see if you can come up with a

24 consensual plan, without having to come in and, in the interim,

25 seek an extension.

1      MR. PECK: Well, with that in mind, I'd like 90 days,

2 Your Honor, but I just didn't want -- I'm cognizant of the fact

3 -- we're not trying to drag this case out, we're really not.

4 And, we've really been -- I want to tell you, a few things have

5 happened since now. We have an accounting firm we hired,

6 Postlewaite-Netterville. They've been in. I believe we solved

7 the accounting issues -- because the U.S. Trustee told you the

8 last time we were here we satisfied them.

9      The Committee has -- I thought they were seeking to

10 withdraw it -- continued their motion for an examiner. I think

11 we've got the accounting behind us.

12      I think significantly I want this Court to know that

13 we have hired Global Hunter -- no one has objected. Danny

14 Conwill is here today, he's a financial advisor. I'll give you

15 a little brief rundown on Mr. Conwill. He's done a hundred

16 financings of Jeffries (phonetic); over $10 billion. He's done

17 70 M&A deals; over a billion dollars. He did the Plains

18 Exploration, drilling, cliffs drilling, a deal for raising

19 capital. He did an IPO for W&T Offshore, a well known oil

20 company down here. He was the man that did the IPO for Tracy

21 Krohn at W&T.

22      He's been involved in restructuring -- Mr. Strubeck

23 is familiar with him -- the Coho Chapter 11, oil and gas

24 Chapter 11. He did the Jack Stanley TransAmerica Refinery,

25 Chapter 11.

1          He sold a lot of properties.  He's chairman and CEO.
2     He runs an investment banking firm that has 15 investment
3     bankers in New Orleans, Houston, L.A. and Hong Kong.  He's been
4     involved in restructurings.  I think he's on our team now.  I
5     think he's going to be very helpful.

6          I think that Mr. Strubeck -- we all have come to
7     recognize, there's a business deal here as opposed to a
8     litigation deal here.  I think the Sukuk Holders need us.  We
9     need them, and we need to come to a business deal.

10         Mr. Conwill and his firm will help facilitate that by
11    raising exit financing and capital.

12         THE COURT:  Based on the work that he's done, as well
13    as the exchange of the terms sheets, we're looking at 30 to 60
14    days before you intend to propose a plan?

15         MR. PECK:  Yeah, I would like 60 days, Your Honor.
16    We have exchanged term sheets with the Committee and the Sukuk
17    Holders.  The Sukuk Holders are trying to get their arms around
18    the engineering there, Your Honor, in order to evaluate, --

19         THE COURT:  Yes.

20         MR. PECK:  -- and I think they need time to get their
21    arms around --

22         THE COURT:  I mean, that's a primary thing I needed
23    to know from you.  You know, I know where you are as far as
24    putting a plan together.  I know your time frame, and you've
25    made representations to me that there has been an exchange of

1    term sheets in an effort to work with the Certificate Holders.

2         Let me go ahead and hear from the defendants or the

3    Certificate Holders, as far as the request to extend

4    exclusivity.

5         MR. STRUBECK:  Good morning, Your Honor; Louis

6    Strubeck with Fulbright & Jaworski, both as special counsel for

7    East Cameron Gas Company and counsel for the Sukuk Certificate

8    Holders.

9         I was trying to get up earlier, when Your Honor said,

10   "Where does this leave us," after your ruling, and so this

11   argument may be a little bit disjointed, because Mr. Hebert was

12   going to respond to the request for extended exclusivity.

13        Let me touch upon a couple of things very quickly.

14        First, I want to echo what Mr. Peck had to say.  I

15   know that this was a lot of work that you had to put into this

16   and I think the first time that I appeared in front of

17   Your Honor, back when we were trying to intervene, I told you,

18   unfortunately, it was going to be complex, and there was some

19   novel issues, and I guess, unfortunately, that proved to be the

20   case, and we appreciate all the hard work, and we know you had

21   a lot to review.

22        Where I think this leaves us, Judge, -- and this was

23   the first point I wanted to make -- is I don't know that the

24   scheduling order we talked about in chambers a couple of weeks

25   ago -- which we talked about unofficially -- you had the good

1  foresight to say maybe we should wait until we hear the ruling

2  before we finalize something.

3       That schedule probably doesn't work anymore, as a

4  practical matter, because if you take today's date, and you add

5  30 days, which is when the repled Complaint would be filed,

6  we're at the end of April, and then another 30 days for us to

7  answer, we're at the end of May.  And, so probably a trial

8  setting in early July is aggressive -- maybe not possible, but

9  aggressive.

10      So, we probably should all try to take a step back

11  and think about whether the scheduling order we talked about a

12  couple of weeks ago in chambers really makes sense.  And as

13  Mr. Peck and I have done throughout this case, I will visit

14  with him and let Your Honor know what we think is workable in

15  light of your ruling.

16      THE COURT:  I believe I've entered an order releasing

17  the current trial date, and we have not entered an order

18  setting that.  And, the discussion was that the parties were

19  going to confer on dates, as well as trial dates.  And, subject

20  to availability on the Court's calendar, the Court would allow

21  the parties to put together an agreed scheduling order.

22      I'm not as concerned about pushing this out, now,

23  because I don't see this as driving the progress, as far as a

24  plan at this stage.

25      MR. STRUBECK:  Right.

1          THE COURT:  So, you know, I'll allow the parties to
2    confer in that regard.  I agree, I think July is aggressive,
3    given that we have a 30 day period to replead, and assuming
4    that the plaintiffs do attempt to replead, there will be a
5    motion practice after that, I'm assuming.

6          So what I'd do is I'd ask the parties to confer on a
7    schedule going forward that would incorporate the 30 days to
8    replead, as well as a briefing schedule on motions.  And then,
9    based on that, a proposed schedule going forward.  You know, it
10   looks like we're probably looking at August or September for a
11   trial date.  So, I'd ask the parties to look for available
12   blocks of time in those two months.

13         MR. STRUBECK:  Okay.  And then, Judge, on the second
14   point, and then I'll turn it over -- I've been the one
15   principally involved, on at least this side of the courtroom,
16   when it comes to discussions with Mr. Peck, and actually the
17   discussions to try to work something out in connection with
18   these issues started long before the bankruptcy case was filed.
19   They go back until right before Mr. Peck and I were both
20   retained in the case.

21         And, we continue to have a dialogue, but we're not
22   anywhere close to working something out, you know.  Your Honor,
23   I know, is as familiar if not more familiar than I am as to how
24   these things typically run their course.

25         I don't know that extending exclusivity in this case

1  actually will promote and facilitate any kind of an agreement
2  between the parties. It may actually have the opposite effect,
3  and if exclusivity were to be terminated, or at least it were
4  to stay on this current schedule, which is April 2nd, that may
5  actually have the effect of bringing us closer to the table,
6  because "guns" are to everybody's heads, and getting us to a
7  point where maybe we can negotiate something.

8          I do agree with Mr. Peck, that this is a case that
9  makes a whole lot of sense to work out a consensual deal. In
10 fact, when Mr. Hebert makes his presentation, hopefully the
11 Court will conclude that, in the absence of a consensual deal,
12 I don't know that there can be a plan confirmed here, at least
13 on the Debtor's side.

14         There are a lot of issues here. It is a complex
15 case, on the one hand. But, on the other hand, it's really
16 just a two-party dispute -- no offense to Mr. Piper, but he
17 represents a group of unsecured creditors, as counsel for the
18 Committee, and there's plenty of cash, as the Court knows, from
19 the schedules that were filed, to pay off the unsecured claims
20 in full.

21         So I think the real issue here comes down to the
22 Certificate Holders, that I represent, and the Debtor. And,
23 Mr. Peck and I are trying to work something out, but my only
24 comment to the Court, before I turn over the podium, is that I
25 really don't think an extension of exclusivity will promote a

1 settlement here. And, in fact, as I told Mr. Peck before we

2 came into court, my clients are not prepared to file a plan

3 now.

4 We would like to, and we intend to file a plan at

5 some point, but we're trying to get our arms around some

6 engineering issues, which we're going to need the Debtor's

7 cooperation to do. So, as a practical matter, if you refuse to

8 extend exclusivity, there's not a danger that my clients are

9 coming in and filing a plan anytime soon, and I expect

10 Mr. Piper will probably tell you the Committee doesn't have an

11 intention of filing a plan anytime soon.

12 So, what it does is it doesn't disadvantage the

13 Debtor, and I think it actually will promote settlement

14 discussions and maybe get us closer to a consensual deal.

15 That's all I had to say, Your Honor.

16 THE COURT: Thank you.

17 MR. PIPER: Your Honor, Michael Piper for the

18 Committee. I guess there's a couple of interesting points from

19 both sides on this.

20 First is that they're not anywhere close to an

21 agreement, and that's kind of the Committee's concern. Our

22 concern is the continuing running of time, for this reason:

23 The Debtor has burned through -- they mention that there's a

24 lot of cash on-hand. They've burned through $2 million in

25 cash. They're going to continue to burn through anywhere from

1  $200,000 to $400,000 a month, while they operate.

2  So, until they take the steps to "right that ship,"

3  this estate is going to dissipate.  At some point in time,

4  they'll have burned through all the cash.  Right now, there's

5  enough cash to pay the unsecured creditors.  That, eventually,

6  is going to go away.

7  I think everyone is in agreement that the adversary

8  doesn't need to drive the timing on the plan.  You know, I

9  that's excellent, because I think the adversary is going to be

10  another year.  I mean, the way we're looking; we're looking at

11  30 days to amend motions, possible trial, appeal.  You know, it

12  seems like an appeal is inevitable to --

13  THE COURT:  I think we've done a lot of the hard work

14  today.

15  MR. PIPER:  Well, --

16  THE COURT:  I would be surprised if the adversary

17  takes a year, and I would not be very happy if the adversary

18  took another year to litigate.

19  MR. PIPER:  You know, I think whichever side wins or

20  loses on that, with the dollars at stake, there's going to be

21  an appeal, and I'm factoring that in when I say a year, because

22  I don't know who's going to get it in the district court, and

23  even on to the Fifth Circuit.  And, I can guarantee a year with

24  the Fifth Circuit.

25  So, I think separating the two tracks -- you know,

1  not tying the filing of a plan to the timing on the adversary
2  is an appropriate way to handle this.

3         It's correct that the negotiations are basically
4  between the Sukuk Holders and the Debtor.  The Debtor, we got
5  -- actually Friday, you know, I don't know if you'd call this
6  negotiation, but we got a two page letter saying basically
7  there are some proposals out there and the unsecured creditors
8  should get paid 100 percent.  That's great.  We're all for
9  that, you know.  No one is arguing that.

10        We understand, not through any formal presentation,
11 but we understand that if the Sukuk Holders get to the point
12 where they file something, they may propose the same thing.

13        So, from the standpoint of the Committee, if there's
14 two possible plans out there that are going to present 100
15 percent payment to the unsecured creditors, we don't see the
16 need to continue the delay and also continue exclusivity to get
17 those plans out, whenever they're ready to file.

18        So, our thought is:  If you want to do 30 days,
19 because, you know, the Sukuk Holders aren't going to be ready
20 in 30 days, that's fine.  But, after that, with exclusivity and
21 whoever is ready to go forward with the plan, let them go
22 forward.

23        The Committee is not going to be confused by having
24 to choose between two competing plans in this matter.  These
25 are business men.  They're sophisticated.  Most of them have

1   independent counsel, as well the Committee having counsel.  So

2   no one is going to be hurt by having two plans out there.

3         The complex issues are those in the adversary.  When

4   you get to the Committee and a plan, the issues are very

5   straightforward, and the Committee can vote, or the unsecured

6   creditors can vote whichever way they want to go on this,

7   whoever is in a position to put forward a plan first.

8         So we'd ask that, at a maximum, exclusivity be

9   extended 30 days, and after that, allow two competing plans to

10  be filed.  And, I think that's really in the best interest of

11  the creditors and the unsecured creditors, when you look at the

12  cash burning every month.  That cash dissipation is a real

13  concern, and it's an alarming thing.

14        We haven't brought a motion to appoint a Trustee or

15  to convert, but if the cash continues to dissipate and we don't

16  have a plan, that's where the Committee sees itself going in a

17  couple of months.  So, we'd rather have a plan, and we're not

18  going to propose one, so let one of these two competing

19  interests put forward a plan, and I think that's in the best

20  interest of everyone.

21        Thank you.

22        MR. PHILLIPS:  Your Honor, if I might.  Before

23  Mr. Hebert speaks, I have just a brief comment or two -- Louis

24  M. Phillips on behalf of the General Partner of the Debtor.

25        A couple of matters of note:  Number one, I believe

1    the notice period on the request to retain Global Hunter is

2    expiring today.  There's not been an order entered, so while we

3    have -- the Debtor has, with the approval of the General

4    Partner, retained the investment banking group, they can talk

5    with us, but there's a limit to what they can do, number one,

6    until they're retained, pursuant to a Court order.

7            THE COURT:  So the notice period has expired, and no

8    one has filed an objection?

9            MR. PHILLIPS:  I think that's correct, Your Honor.

10   That's what Mr. Peck --

11           THE COURT:  Because that was the issue.  I had an

12   immediate order, but there was, as in many of these matters,

13   some concern that there was going to be an opposition.  And, if

14   there has not been an opposition filed, --

15           MR. PHILLIPS:  Yes, and that's point number one, Your

16   Honor.

17           Point number two is that, in addition to the absence

18   of ability to have the professional involved in the

19   marketplace, because there was no order and the time just

20   hadn't run, as the Court may be aware, the past 30 to 60 or 90

21   days have been days where there was not much transparency in

22   the capital markets.  We don't know that there's going to be

23   any.  We don't know, but I do know a couple of things.

24           Number one, once the Court enters the order, the

25   investment assistance can, in fact, commence.

1    Number two, we think that -- and I know of one

2  entity, the name of which I've related to Mr. Strubeck, --

3    THE COURT:  Is this related to the point made on the

4  cash --

5    MR. PHILLIPS:  No, this is another point.  I'm going

6  to get to that one.  But, there is starting to be in the energy

7  arena, first of all, fallout from the fact that the prices have

8  fallen out.  I hope that the prices will come back, and review

9  of possible deals is starting to commence, and we think that

10  once we get the investment bankers on board, then that can

11  commence, finally.

12    With respect to the cash, there's two things:

13    Number one, it is happening.

14    Number two, when the case first started, the prices

15  had not collapsed -- getting rigs and stuff was bad.  Now the

16  prices have collapsed; now they've come back a little.  We

17  don't know exactly how to go about fixing that problem.

18    With respect to the cash drain, it's been ongoing.

19  We're discussing with the Debtor the prospect of some low cost

20  operations.  With respect to the Unsecured Committee, we're

21  discussing amongst ourselves -- of course, it would have to be

22  subject to the approval of the Sukuks, and would have to be put

23  into some kind of plan, but an informalized setting aside of

24  "X" number of dollars to act as cash collateral kind of for

25  plan purposes going forward, so that we don't have to hear from

1  the unsecureds.  They're going to get into our pie, and we're

2  going to be out to lunch.

3          With respect to -- and I've heard this a lot -- with

4  respect to the post-petition payments to insiders, one of the

5  things that -- I listened to it last time I was here, and one

6  of things that we're doing -- because my client is one of the

7  post-petition insiders, who supposedly got money before I got

8  to be the lawyer -- one of the things we're doing is coming up

9  with a report to see just, in fact, what component of the money

10  that went through the insiders actually was sent to third

11  parties in connection with operations on the platforms in

12  connection with the operation of the Debtor.

13          Some of the people that got paid, we think, and we're

14  going to share this with the Sukuk, share this with the

15  Unsecured Committee, share this with the United States

16  Trustee's Office, some of the people that got paid, we think,

17  were the insurers, who had to be paid, were the utility

18  companies, who had to be paid, and there's going to be some

19  questions, I guess, but I think what we're finding out is that

20  this was not a situation where the insiders who were doing the

21  payroll, who were doing the operations, retaining the

22  helicopter, who were doing this type of operations, paid and

23  then made a claim for reimbursement.

24          This was bills that had come in that were presented

25  to ECP by the insiders where money flowed through to these

1  third parties.

2        The question is:  If these people are going to be

3  paid 100 cents on the dollar, does it behoove us to spend

4  whatever it spends to file 22 adversary proceedings to get the

5  money back from the immediate transferees?  Can we do something

6  with respect to the insiders; hold up a half a month's worth of

7  payroll, that sort of thing, to get that money paid back?

8        But that's in the works and going to be worked out

9  within the next week or so.  We'll be able to circulate this to

10  everybody.

11        But my point was that we filed, Mr. Peck filed a

12  motion to employ the third party, investment banking outfit, so

13  that we could have a third party between the Sukuks and us.

14  There's been no opposition.  We think that one of the things

15  militating in favor of an extension of exclusivity is getting

16  these people on the ground and ready to work.  That's happened.

17  Now they can work, once we get the order.

18        Secondly, we're hoping that the combination of that,

19  plus, perhaps, a little thaw in the credit markets will allow

20  those people to interact with third parties.  That's their job,

21  to bring financing to the table, so that we can tell the Sukuk

22  Holders:  This is the way we're going forward, and we don't

23  need to fight with you.

24        Finally, I think we all need about three days to

25  figure out the relationship, now, between the possible lawsuit

1 and the plan process. If the lawsuit is not driving the train,

2 then the lawsuit is somewhere along the track, and we just have

3 to figure out how that works together.

4 Thank you.

5 THE COURT: Thank you.

6 MR. PIPER: Your Honor, just for the record, we do

7 not oppose the retention of Global Hunter and would actually

8 support getting that order issued. We think that's an

9 encouraging development, and I think the U.S. Trustee's Office

10 had done some analysis; if we can, I guess, share it with them,

11 if they don't have it, on what happened with the money and who

12 got what --

13 THE COURT: And, that's something that you can work

14 out with counsel, as far as the provision of that information.

15 Thank you.

16 Mr. Hebert.

17 MR. HEBERT: Your Honor, as Mr. Peck pointed out,

18 we're here again kinda on the same issues, the same arguments.

19 I wanted to start off by addressing whether the --

20 well, let me back up a second.

21 In terms of plan formulation, I note that the Debtor

22 has recognized that it probably needs -- the ongoing problem,

23 the ultimate problem that we have with that idea, why we think

24 we're going to simple end up, again, with a two-party dispute

25 asking why we're in a bankruptcy case, is our clients put up

1  real money, put up $165 million.  This wasn't a Bernie Madoff.

2  He said give me your money and I'll give you returns on paper.

3  But, when you come to ask for that money, it's not there.

4          Up front, our clients gave real money.

5          Now, if the Debtor can take that fact or take the

6  Complaint, despite that fact, despite the fact that the client

7  put up hard money -- let me see the funding -- and argue that

8  somehow this was a fraudulent transaction and it was done for

9  an improper purpose, more power to them.

10          But, I would submit to the Court that's a very, very

11  difficult issue and I think anybody with a reasonable view

12  would say:  You put up $165 million.  Certainly, you didn't

13  intend to commit fraud.

14          People who commit fraud don't put up $165 million.

15          The second thing is, to the extent that the Debtor is

16  relying a change in the timing of the product price to

17  influence this Court as to whether exclusivity should be

18  granted, I don't think that's a relevant factor.  Actually, to

19  some extent, our clients, because we strictly have a volumetric

20  overriding royalty interest, our clients are totally depending

21  on what the market is at any point in time.  All we're looking

22  at is recovering back whatever product, you know, based on

23  whatever the price happens to be at that time.

24          The third thing is, with regard to the payments made

25  by the Debtor to the affiliates, obviously we saw the Debtor's

1    explanation of why those payments may have been made.  The

2    problem persists, though, that there is no checks and balances

3    right now on the Debtor.  You know, in a lot of bankruptcy

4    cases, you may have a debtor with an affiliate and the debtor

5    may be paying the affiliate or something.

6             But, in this case, almost all of the costs and

7    expenses to operate the Debtor are being run through the

8    affiliates.  There's no real checks and balances, unless, you

9    know, you look at it as the old joke, "the Debtor writes the

10   check, the affiliate is the balance."  But, other than that,

11   there's no check on whether or not the Debtor is paying a true

12   third party, arm's-length cost that it would ordinarily be

13   paying to a third party.  It may be paying the affiliate more;

14   we just don't know that.

15            So, as long as that situation continues, I think

16   Mr. Piper has a legitimate gripe that we're going to continue

17   to see cash drain out of the estate.

18            I want to skip forward.  In an effort to simplify it,

19   where I think we are, if the Debtor comes forward with a plan,

20   I think the plan is problematic, unless it's a consensual plan,

21   and here's why:  If there's no recharacterization, the Debtor

22   has eight percent of the NRI to pay all the claims.

23            Now, under that scenario -- I don't think there are

24   any secured creditors.  The Debtor obviously has listed the

25   Sukuk Certificate Holders and LOH as secured creditors, but

1  that assumes that recharacterization takes place.  If it

2  doesn't take place, basically the class is boiled downed to

3  these, and I want to make a comment about the MMS and insured

4  classes.  Mr. Peck stated before, we still got to deal with MMS

5  and the insurance companies.

6      Well, I think with regard to the MMS, the MMS

7  essentially controls the only revenue source that the Debtor

8  has.  The Debtor, whether it assumes those leases under 365, if

9  they're subject to 365, or whatever else it needs to do, the

10  MMS is really not a claimant.  The MMS has got to be satisfied,

11  period, end of story.  Otherwise, we'd all go home with nothing

12  in our pockets.

13      I would venture to say that's the same thing with

14  insurance.  The Debtor has to have insurance.  Now, whether it

15  changes insurers or continues to pay this insurance company --

16  and I'm not exactly sure who Mr. Peck was talking about --

17  again, they're not really a claimant that the Debtor has much

18  choice in dealing with.  So, whether you classify them or not,

19  they can't be impaired if they're claimants.

20      So that leaves just two remaining classes, Class 5,

21  which I don't think exists, and that would be -- if you look at

22  Judge Schiff's ruling in WRT, there's an argument that if

23  royalties are unpaid on a pre-petition basis, those might be

24  some types of claims.  I believe he classified them as

25  unsecured claims, but if they don't fall into the general

1 unsecured pie, then they would have their class. And, maybe
2 that would be a class, but I would venture to say that
3 Louisiana Offshore, which is controlled by the independent
4 member, would probably vote that class no -- unless, again,
5 it's paid in full.

6     Unsecured creditors, again, I've already put words in
7 Mr. Piper's mouth from the last hearing, but I tend to think
8 that they would vote no, unless they get 100 percent plus
9 interest at whatever rate state law provides.

10     If the Debtor is successful in recharacterization, I
11 think, in effect, that boosts the Debtor up to 80 percent of
12 the NRI, because, according to the Debtor's theory, the
13 ownership of the overriding royalty would move from Louisiana
14 Offshore to the Debtor, thereby abolishing the overriding
15 royalty, and the Debtor's net revenue interest would go from
16 eight to approximately 80 percent.

17     But, of course, under that scenario, presumably, East
18 Cameron Gas and the Certificate Holders would fall into the
19 secured creditor class, by themselves, and possibly -- and
20 there's been some mention of this -- and possibly that the
21 Debtor would try to take some of the approximate $165 million
22 and throw that in the unsecured class, on the basis that the
23 Certificate Holders are oversecured.

24     But, even if recharacterization occurs, as you can
25 see, we basically have all this classes where the only

1 difference is now the Certificate Holders come in, making it

2 two classes, and there are still not any classes that would

3 vote in favor of the Debtor's plan or, alternatively, that

4 could vote, because they're unimpaired.

5 So, again, I'm not sure what we're accomplishing by

6 continuing a bankruptcy case to solve what is made clear by

7 this, is really a two party dispute. But that's what we're

8 doing.

9 Given that, I think the simplest way to continue this

10 is to do what Mr. Strubeck suggested and simply lift

11 exclusivity. As he said, we're not prepared to file right now.

12 The Debtor is not prepared to file right now, but it's clear

13 that the Debtor needs the Certificate Holders agreement.

14 Otherwise, he couldn't go forward.

15 And, perhaps Mr. Peck is right. The Certificate

16 Holders best business decision will be to work with the Debtor.

17 And, if so, then I think, being businessmen, they will work

18 with the Debtor.

19 But, simply allowing this case to go on, thinking

20 that somehow there's going to be a plan generated if the

21 Certificate Holders and the Debtor don't agree, I think that's

22 just a view that's incorrect. It's not going to happen.

23 There's just no way the Debtor can formulate a plan and

24 override the Certificate Holders.

25 THE COURT: The parties --

1    MR. HEBERT:  Given that, Your Honor, again, we see no

2  reason to continue exclusivity.  Again, we represent we're not

3  prepared to file a plan, but the best thing to do right now is

4  simply lift exclusivity and hopefully that will force the

5  Certificate Holders and the Debtor to come to a reasonable

6  conclusion as to what should have been the case in the first

7  place.

8         Thank you.

9         THE COURT:  Mr. Hebert, the parties haven't had a

10  chance, though, to come or at least take a stab at a consensual

11  plan.  Assuming that that is the only way out of this case, in

12  light of the Court's ruling, which obviously that's on me

13  because you all were waiting for my ruling, but now that that

14  ruling has been made, the parties have not had a chance to take

15  a stab at reaching a consensual plan on that basis.

16         MR. HEBERT:  Your Honor, if I can respond to that.

17         Two points.  First of all, as we discussed the last

18  time, this whole issue started long before the case was filed.

19  So, the parties have been talking through various channels for

20  quite some time -- getting up on a year, now.

21         The second thing is, with regard to that issue, it

22  seems to me that doesn't play into exclusivity.  I mean,

23  clearly the parties have a reason to talk.  They've always had

24  a reason to talk, and maybe there are more reasons now.  But,

25  there's no reason to keep the Debtor in sole control of the

1  plan process.

2       THE COURT:  At some point, I agree with you.  I mean,
3  I think that this case is -- we haven't been going on a year
4  yet, and the Court has attempted to maintain fairly strict
5  control over exclusivity, as opposed to a number of cases that
6  I've been involved in where exclusivity seems to be granted as
7  a matter of course and unending.

8       I'm inclined to cut off exclusivity at some point.
9  My concern here is that I want to give my ruling here time to
10 allow the parties to take another stab at moving forward.

11      But, you know, the arguments that you've raised, the
12 arguments that Mr. Piper has raised do create some concern with
13 me, as far as allowing exclusivity to go on without limit, and
14 I will put some restrictions on that.

15      I'm inclined -- I know the parties have argued -- I
16 have enough here to rule.  The standard -- the Code allows
17 extension of exclusivity for cause.  There are a number of
18 factors that the courts apply, as far as whether or not the
19 Debtor has shown cause to extend exclusivity, including the
20 size and complexity of the case.

21      You know, I agree with the Certificate Holders'
22 position here that, you know, this is not a standard bankruptcy
23 case where you have a lot of players, a lot of creditors; that
24 this is a more focused case and, you know, even though there
25 are other creditors, the primary parties-in-interest here are

1  the Debtor and the Certificate Holders and the parties to the

2  securitization transaction.  However, that, in itself, as the

3  parties well realize, is a complex transaction.

4        The length of time that the case has been pending is

5  another factor.  This case has been pending a number of months,

6  but as far as the spectrum of exclusivity in bankruptcy cases,

7  I don't find this at the far end of the spectrum, and I know

8  that the parties have filed motions, as far as an examiner and

9  to appoint a Trustee -- some of the issues here that have been

10  raised with respect to exclusivity bear on some of the

11  arguments in relation to those motions.  One of those motions

12  which was scheduled for today is being continued.  Those can be

13  addressed in the context of those motions.

14        I'm not inclined, at this point, to cut off

15  exclusivity.  I'm inclined to grant exclusivity through June

16  3rd.  That's approximately two weeks after -- two to three

17  weeks after we have a hearing on the motions relating to an

18  examiner and to a trustee.  I'm going to say at that point I'm

19  not going to bar any further extensions of exclusivity, but I'm

20  going to be reluctant to extend exclusivity beyond June 3rd.

21        As far as the period in which the Debtor must obtain

22  acceptance of the plan, I'm going to extend that to August 5th.

23        Anything else?  Then we are done.

24            *    *    *    *    *

25            **(Hearing is Concluded)**

# C E R T I F I C A T E

        I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

_Dorothy Bourgeois_
**Dorothy M. Bourgeois**

4/7/09
**Date**