**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **IN RE:** | **CASE NO. 08-51207** |
| **EAST CAMERON PARTNERS, L.P.** | **CHAPTER 11** |
| **DEBTOR** | |

---

**EAST CAMERON PARTNERS, L.P.**

**VERSUS** **ADV. NO. 08-05041**

**LOUISIANA OFFSHORE HOLDING, LLC,**
**EAST CAMERON GAS COMPANY, and**
**DEUTSCHE BANK TRUST CO. AMERICAS**

# AMENDED COMPLAINT OF EAST CAMERON PARTNERS, L.P. FOR DECLARATORY JUDGMENT

The Amended Complaint of East Cameron Partners, L.P. ("*ECP*" or "*Debtor*"), a Texas limited partnership, duly qualified to do business in Louisiana and with its principal place of business in Houston, Texas, respectfully represents as follows:

## DEFENDANTS

1.

Defendant, Louisiana Offshore Holding, LLC ("*LOH*"), is a Delaware limited liability company qualified to do business in Texas and Louisiana with its principal place of business in Houston, Texas.

2.

Defendant, East Cameron Gas Company ("*ECGC*"), is a Cayman Islands exempted limited liability company doing business in Texas and Louisiana.

3.

Defendant, Deutsche Bank Trust Company Americas ("*Deutsche Bank*"), is a New York banking corporation doing business in Texas and Louisiana with its principal place of business in New York, New York.

**JURISDICTION**

4.

This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. §157(b)(2)(A), (O) and 1334(b)(2) and under Bankruptcy Rule 7001. The matter is a core proceeding over which this Court has jurisdiction.

**APPLICABLE LAW**

5.

For the reasons more fully set forth in the Original Complaint (as defined at Paragraph 6, below), Louisiana law governs the ownership, transfer, encumbrance or any other act affecting the Properties and the ORRI that are the primary subject of this Adversary Proceeding.

**PROCEDURAL BACKGROUND**

6.

On October 16, 2008 (the "*Petition Date*"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On that same day, the Debtor filed its Verified Complaint for Temporary Restraining Order, Preliminary Injunction and Declaratory Judgment (the "*Original Complaint*") in the instant Adversary Proceeding.

7.

On the Petition Date, this Court granted the Debtor's request for a temporary restraining order (Docket No. 3).

8.

Following substantial briefing by all of the parties, and a hearing on November 7, 2008, this Court entered a Preliminary Injunction (Docket No. 56) on November 18, 2008.

9.

On December 19, 2008, ECGC filed its *Motion To Dismiss* (Docket No. 60).

10.

On December 19, 2008, LOH filed its *Motion To Dismiss For Failure To State A Claim Upon Which Relief May Be Granted, Or Alternatively, For Summary Judgment* (Docket No. 67).

11.

On that same day the Sukuk Certificateholders filed their *Motion (I) To Dismiss Plaintiff's Verified Complaint For Temporary Restraining Order, Preliminary Injunction And Declaratory Judgment, Or In The Alternative, (II) For More Definite Statement* (Docket No. 70).

12.

After conducting a lengthy hearing on the various Motions to Dismiss (Docket No. 60, 67, and 70) on January 27, 2009 and the oral ruling of the Court on March 24, 2009, the Court entered an Order on April 19, 2009 that granted the Motions to Dismiss insofar as such Motions sought the dismissal of the above-captioned litigation pursuant to Federal Rule of Civil Procedure 12(b)(6), but denying such Motions to Dismiss as being moot to the extent that they sought a more definite statement under Fed.R.Civ.P. 12(e) or a summary judgment under Fed.R.Civ.P. 56.

13.

The April 19, 2009 Order specifically granted leave to the Debtor up through and including April 23, 2009 to re-plead the allegations set forth in its Complaint in a manner that was consistent with the Court's ruling on the Motions to Dismiss.

**INCORPORATION BY REFERENCE OF THE ORIGINAL COMPLAINT**

14.

The Debtor hereby incorporates all of the Original Complaint, including the exhibits thereto, into this Amended Complaint as if the Original Complaint were restated herein in its entirety.[1] Accordingly, the Original Complaint is attached hereto and incorporated herein as Exhibit "1". Capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Original Complaint.

**FACTS AND GROUNDS FOR RELIEF**

15.

The Debtor is an independent oil and gas exploration and production company holding a leasehold interest in a producing gas and condensate field in the federal waters of the United States, approximately twenty (20) miles offshore the State of Louisiana and within the jurisdiction of this Court.

---

[1] The Debtor is reaffirming and reincorporating the Original Complaint in order to protect and preserve its appeal rights with respect to matters previously litigated in this Adversary Proceeding. This Amended Complaint specifically does not constitute a waiver of any such rights. The Debtor is cognizant of the Court's ruling regarding the Motions to Dismiss and will proceed accordingly.

16.

The Debtor's leasehold interests consist of interests in EC 71 and EC 72 (ECP's interest in EC 71 and EC 72, collectively, the "*Properties*").[2]

17.

The Debtor's leasehold interests are federal oil and gas leases which are governed by the Outer Continental Shelf Lands Act and, therefore, are administered by the Minerals Management Service of the United States Department of the Interior (the "*MMS*").

18.

The Debtor is the official MMS-recognized operator for the Properties and, in its capacity as "operator", controls exploration and production activities related to the Properties. However, LOH also participates in the exploration and production activities related to the Properties.

19.

The production facilities for the Properties are comprised of two platforms and two free standing, single-well caissons. The equipment on the platforms consists of an array of pipes, valves, meters, separators, scrubbers, pumps, holding tanks, wellheads and generators.

20.

The Debtor's sole source of revenue consists of the proceeds derived from the production and sale of hydrocarbons from the Properties.

---

[2] The Properties are more fully described on Exhibit "A" to the Original Complaint attached hereto.

## **Sukuk Financing Transaction Overview**

21.

Beginning in early 2006, the Debtor undertook efforts to procure traditional collateralized financing in order to refinance existing indebtedness related to the Properties, and to help realize the significant development potential of the Properties.

22.

However, the Debtor's potential investors preferred to structure the financing as a Shari'ah-compliant transaction in an attempt to create the first asset-backed "sukuk" offering in the United States market.

23.

In order to be Shari'ah compliant, which was critical to procuring investment from Islamic investors, the financing had to be structured in such a manner as to avoid the appearance of charging interest or investing in speculative activities. Bankruptcy remoteness was also an important concern from both an investment and a Shari'ah standpoint.

24.

The loan to the Debtor was ultimately structured as an asset-securitized sukuk secured by an overriding royalty interest in the Properties (the "*ORRI*") and a mortgage and security interest in the Properties and the platforms and related equipment.

25.

The sukuk structure was designed to serve a number of purposes, including, but not limited to, (a) making a recourse financing transaction appear to be a non-recourse Shari'ah compliant investment/sale transaction; (b) improperly circumventing Louisiana's prohibitions on self-help; (c) obtaining a better credit rating on the transaction; (d) obtaining the beneficial tax

treatment of a loan rather than a sale; and (e) preventing the collateral from becoming the subject of a bankruptcy proceeding.

26.

In order to accomplish the goals set forth in Paragraph 25, above, the financing was structured so that the Debtor purported to transfer the ownership of the ORRI to a "bankruptcy-remote" special purpose vehicle, namely, LOH. In turn, LOH granted a first-priority security interest in the ORRI to ECGC, trustee of the East Cameron Gas Sukuk, in order to secure payments to the holders of the Sukuk certificates.

27.

The financing transaction was purposely structured in such a manner as to appear to be a sale and exchange of the ORRI, while maintaining many of the terms and conditions typically found in a loan, such as the usual protections afforded creditors. The financing transaction was structured in such a manner that it purported to eliminate most of the protections required to be afforded borrowers.

28.

ECP's financing was ostensibly structured as a sukuk in the form of an asset-securitized sukuk.

29.

Under the sukuk structure, the loan proceeds flowed from the sukuk certificate holders to ECGC, from ECGC to LOH, and from LOH to the Debtor. As is discussed below, the Debtor is the 100% beneficial owner of LOH, but has been divested of significant control over the company.

30.

ECGC offered approximately $165.67 million of sukuk certificates to investors and then advanced the proceeds of the offering to LOH.

31.

LOH, in turn, used the funds as follows: (a) LOH advanced $113.49 million to the Debtor in exchange for security rights in the Debtor's assets, including the ORRI; (b) LOH deposited $38.28 million in an account (the "*Earnout Account*") to fund future advances to the Debtor under the loan; (c) LOH deposited $9.5 million into an account designed to negate the speculative nature of oil and gas production (the "*Reserve Account*"); and (d) LOH used $4.4 million pursuant to the Hedge Agreements, to purchase natural gas put options in order to further negate the speculative nature of the loan.

32.

The Debtor was then obligated to use the $113.49 million advanced by LOH as follows: (a) to re-acquire net-profit overriding royalty interest in the Properties; (b) pay off a prior loan (which was required for Shari'ah compliance); (c) to pay the fees associated with the current loan; (d) to fund an account for operating expenses (the "*Opex Account*") with an initial balance of $5 million; (e) to pay a fee of $1 million to Merrill Lynch Commodities, Inc. for entering into a Back-up Offtake Agreement with LOH; and (f) to fund a small distribution of $166,000 to the Debtor.

## Collateralization of the ORRI and the Underlying Leases

33.

The ORRI was selected to collateralize the sukuk offering. The financing was additionally collateralized through a mortgage and security interest granted on the Properties, which are the leases underlying the ORRI, and the related equipment and platforms.

34.

The parties executed numerous documents to effect the collateralization of the ORRI, the leases and the related equipment and platforms. The most significant documents for purposes of this Adversary Proceeding are the Purchase and Sale Agreement[3], the Contribution Agreement[4], the Contributed Conveyance[5], the Purchased Conveyance[6], the Production, Delivery and Marketing Agreement (the "*PDMA*")[7], and the Operating Agreement of LOH, as amended (the "*LLC Agreement*")[8].

35.

The drafters of the transaction documents were proficient in spreading the loan-type provisions and the provisions eviscerating Louisiana's prohibition on self help over so many different documents that a review of any one, two or three documents in isolation would give the reader the impression that a legitimate true sale and exchange had occurred.

36.

However, when the transaction documents are examined more carefully, the true inequitable nature of the transaction is revealed.

---

[3] *See* Original Complaint at Exhibit "F".
[4] *See* Original Complaint at Exhibit "D".
[5] *See* Original Complaint at Exhibit "E".
[6] *See* Original Complaint at Exhibit "G".
[7] *See* Original Complaint at Exhibit "H".
[8] *See* Original Complaint at Exhibit "C"

37.

Specifically, the transaction documents contain numerous provisions aimed at protecting a secured creditor typically found only in financing transactions, coupled with the obvious elimination of the protections required by Louisiana law for the benefit of a debtor and other creditors.

38.

Moreover, when the substance of the financing transaction is examined, in light of Louisiana law, there is no question that LOH could not become the owner of the ORRI in the manner contemplated by the documents because that outcome is inequitable, violates the Louisiana public policy against prohibited forfeiture, violates several Louisiana statutes, and is an absolute nullity.

**Contribution Agreement and Purchase and Sale Agreement**

39.

The Contribution Agreement and the Purchase and Sale Agreement contemplate the terms of the purported transfer of the ORRI from the Debtor to LOH. However, those documents contain numerous provisions that are more appropriate in a secured financing context than in a sale/exchange context.

40.

The Contribution Agreement and the Purchase and Sale Agreement each stipulate that the tax treatment of the ORRI is consistent with a typical loan.

41.

Specifically, they provide that LOH is treated as a disregarded entity from the Debtor.

42.

To the extent that LOH cannot be treated as a disregarded entity, the Purchase and Sale Agreement requires that LOH treat the ORRI as collateral for its mortgage, *meaning the Debtor, not LOH*, is the owner of the ORRI.

43.

The Contribution Agreement stipulates as follows:

> [ECP] and [LOH] agree to treat [LOH] as an entity disregarded as separate from [ECP] within the meaning of Treasury Regulation Section 1.7701-3, promulgated under the Internal Revenue Code of 1986 as amended (the "Code") for U.S federal income tax purposes. Accordingly, [ECP] and [LOH] agree to treat ***the transfer effected by this Agreement as disregarded for U.S. federal income tax purposes…***"[9]

44.

Similarly, the Purchase and Sale Agreement stipulates as follows:

> [ECP] and [LOH] agree to treat [LOH] as an entity disregarded as separate from [ECP] within the meaning of Treasury Regulation Section 1.7701-3, promulgated under the Internal Revenue Code of 1986 as amended (the "Code") for U.S federal income tax purposes. Accordingly, [ECP] and [LOH] agree to treat ***the transfer effected by this Agreement as disregarded for U.S. federal income tax purposes***…Notwithstanding the foregoing, to the extent that [LOH] is treated as an entity separate from [ECP], [ECP] and [LOH] agree to treat the [Purchased ORRIS] ***as a carved-out production payment under Section 636(a) of the Code.***[10]

45.

Section 636(a) of the Internal Revenue Code ("IRC"), to which the Purchase and Sale Agreement refers, provides that LOH should treat the ORRI as a *mortgage loan*, and not an ownership interest in property:

---

[9] Original Complaint at Exhibit "D," Section 7.02. (emphasis added).
[10] Original Complaint at Exhibit "F," Section 8.02. (emphasis added).

> A production payment carved out of mineral property shall be treated, for purposes of this subtitle, ***as if it were a <u>mortgage loan</u> on the property, and shall not qualify as an economic interest in the mineral property.*** In the case of a production payment carved out for exploration or development of a mineral property, the preceding sentence shall apply only if and to the extent gross income from the property (for purposes of section 613) would be realized, in the absence of the application of such sentence, by the person creating the production payment.[11]

**<u>Contributed Conveyance and the Purchased Conveyance</u>**

46.

The Purchased Conveyance and the Contributed Conveyance purport to sell and exchange, respectively, a portion of the ORRI from the Debtor to LOH, and in so doing reveal that the true nature of the transaction is a financing transaction.

47.

Both documents stipulate that the transferred ORRI automatically terminates and the record title to the ORRI reverts to the Debtor once LOH receives a specified quantity of ORRI sufficient to service the sukuk debt.[12]

48.

In other words, once sufficient collateral had been produced from the Properties to service the debt under the Funding Agreement, LOH agreed that it had no right to any further interest in the ORRI and that the sale and exchange would "terminate".

49.

In order to create the appearance that the Debtor had no personal liability for a shortfall in production and to support the position that the Purchased Conveyance and Contributed Conveyance resulted in an outright transfer of ownership, both the Purchased Conveyance and

---

[11] IRC § 636(a). (emphasis added).

[12] Original Complaint at Exhibit "E," Section 1.03; Original Complaint at Exhibit "G," Section 1.03.

the Contributed Conveyance stipulate that LOH "shall look solely to the Overriding Royalty Hydrocarbons for satisfaction and discharge of the [ORRI], and [the Debtor] shall not be personally liable for the payment and discharge thereof."[13]

50.

However, the true nature of the transaction is a secured financing for which the Debtor is personally liable, as is reflected by the personal liability provisions included in the provisions of the LLC Agreement.[14]

51.

As is discussed in more detail below, the LLC Agreement closes the loop on the financing transaction by specifically requiring the Debtor to pay LOH, in cash, for any shortfall in production. Thus, the Debtor is held personally liable for LOH's inability to pay its debt under the Funding Agreement.

**PDMA**

52.

Unlike the Purchased Conveyance and the Contributed Conveyance, the PDMA does not purport to transfer ownership of the ORRI. Rather, the PDMA governs the production of the ORRI and grants LOH a mortgage and security interest in the underlying leases, the platforms and the related equipment.

---

[13] Original Complaint at Exhibit "G", Section 1.05; Original Complaint at Exhibit "E", Section 1.05.

[14] *See e.g.,* Original Complaint at Exhibit "C", Section 13(a).

53.

The PDMA contains numerous loan covenants regarding the preservation, maintenance and delivery of the collateral, and repayment of the Debtor's indebtedness, and gives LOH rights to participate in the production of the Properties.

54.

The Debtor's obligations under the PDMA are consistent with common loan financing covenants aimed at protecting the interest of a secured lender, but are totally inconsistent with the characterization of the transaction as a sale or exchange.

55.

By way of example, the following sections of the PDMA are typical provisions protecting the interest of a secured lender in a financing transaction:

- Section 5 of the PDMA requires the Debtor to maintain well production at certain rates, thereby ensuring repayment of its indebtedness to LOH in a timely manner.
- Section 6 of the PDMA imposes various notice requirements on the Debtor regarding the ORRI, stipulates the time and manner of delivery, and places the costs of delivery on the Debtor.
- Section 7 of the PDMA imposes various obligations on the Debtor with respect to the quality of the ORRI.
- Section 9 of the PDMA imposes various obligations on the Debtor relating to the Properties, including, but not limited to, obligations to keep the leasehold interest in effect, maintain the Properties and related equipment in good condition, notify LOH of any adverse claims, promptly pay all operating expenses, taxes and other charges, comply with applicable environmental laws and maintain title to the Properties.

- Section 10 of the PDMA requires the Debtor to make capital expenditures in connection with the Development Plan (as defined in the PDMA).
- Section 11 of the PDMA requires the Debtor to maintain certain insurance coverages and to name LOH as an additional insured.
- Section 14 of the PDMA requires the Debtor to provide LOH, ECG and the Transaction Administrator, with financial statements, balance sheets, environmental reports and other extensive reporting statements.

56.

In that same vein, Section 16 of the PDMA purportedly grants LOH a mortgage and UCC security interest in all of the Debtor's interest in the Properties and all equipment, fixtures, inventory, goods, accounts, contract rights and general intangibles relating to the Properties.[15]

57.

Section 16 of the PDMA further provides that if the Debtor defaults on ***any*** of its obligations under the Contribution Agreement, Purchase and Sale Agreement, Contributed Conveyance, or Purchased Conveyance, LOH has the right to foreclose on the Properties, the platforms and the related equipment and to operate them pending a foreclosure sale.[16]

**LOH and Inequitable Treatment of the Debtor**

58.

LOH was set up as a sham entity in connection with the financing transaction, the goal of which was to materially divest the Debtor of control of the collateral during the duration of the

---

[15] The Debtor expressly reserves the right to contest the validity, priority, and extent of any and all security interests and mortgage rights allegedly created in connection with the Sukuk Loan Transaction and the amount and extent of the obligations purportedly secured by the PDMA.

[16] The mortgage and security interests afforded to LOH under the PDMA, together with all associated rights, were assigned by LOH to Deutsche Bank pursuant to the Collateral Assignment dated July 5, 2006.



08-05041 - #125 File 04/23/09 Enter 04/23/09 15:56:39 Main Document Pg 15 of 34

financing without giving the Debtor any of the benefits or protections due to a secured borrower in the State of Louisiana. That structure violates the law and public policy of the State of Louisiana.

59.

The Debtor is the 100% membership interest owner of LOH. However, LOH also has an "Independent Member" which is afforded certain powers and responsibilities intended to prevent LOH from entering bankruptcy and to divest the Debtor of control over the ORRI during the term of the financing.

60.

For instance, the Independent Member is granted the authority to unilaterally sell the ORRI by private sale, without any benefit of advertisement, notice or appraisement and without resort to judicial process.

61.

Specifically, Section 9(b)(i) of the LLC Agreement, which describes the Independent member's primary role in pertinent part, as follows:

> Section 9. Management
>
> (b) Limitation on the Company's Activities.
>
> (i) Notwithstanding the foregoing provisions of Section 9(a), so long as any sum is or may become payable by the Company under the Funding Agreement, the Independent Member shall be entitled, in the name and on behalf of the Company, and without requiring any consent from the Member to (A) following receipt by the Company of an Enforcement Notice from Issuer SPV pursuant to the terms of the Funding Agreement, cause the Company to sell the Overriding Royalties (or any portion thereof specified in the Enforcement Notice) in a commercially reasonable manner and on arms' length terms and conditions consistent with industry practice and, after deducting all costs and expenses incurred by the Independent Member in relation to such sale, cause the proceeds of

such sale to be deposited to the Collection Account (as such term is defined in the Funding Agreement) for application in accordance with the terms of the Funding Agreement, and (B) take such steps as the Independent Member may deem appropriate to enforce the rights and obligations of the Company under the Transaction Documents….

62.

Because the role of the Independent Member acts purely as an agent of the lender during the term of the financing, the Independent Member ceases to be a member of the company under the following circumstances:

> Upon the first to occur of (a) ***payment in full of all sums that are or may become payable by the Company*** under the Funding Agreement or (b) the delivery by [the Debtor] to the Company of (i) the [Contributed ORRI] pursuant to the terms of the Contributed Conveyance and (ii) the [Purchased ORRI] pursuant to the terms of the Purchased Conveyance…[17]

63.

The obvious effect of this provision is to give full control of LOH (and its assets) back to the Debtor once all of the financing obligations have been fulfilled.

64.

Unlike the traditional member-LLC relationship, LOH's Independent Member serves ECGC and the Sukuk Certificateholders, not the LOH or its sole equity holder. Specifically, the LLC Agreement requires that the Independent Member act, not in the best interest of the company and its members (namely, the Debtor), but rather, that the Independent Member "consider the interests of ***[ECG] and the holders of the sukuk issued by [ECG] in connection with all actions taken by the Independent Member pursuant to the Agreement.***"[18]

---

[17] Original Complaint at Exhibit "C", Section 5(e). (emphasis added).
[18] *Id.* at Section 9(b)(iv). (emphasis added).

65.

The LLC Agreement also "closes the loop" on the recourse aspect of the financing transaction by providing for personal liability on the part of the Debtor, in the form of a mandatory cash capital contribution, in the event that LOH was unable to meet its obligations under the Funding Agreement.

66.

Specifically, Section 13 of the LLC Agreement provides:

> Section 13. Additional Contributions
>
> (a)…[I]f ***at any time*** the Company does not have sufficient funds to pay any Funding Return (as such term is defined in the Funding Agreement) due and owing pursuant to the Terms of the Funding Agreement, ***[the Debtor] shall be obligated to make additional capital contributions to the Company as may be required to provide the Company with such funds as may be required to pay such Funding Return…***[19]

67.

Section 13 attempts to erase Section 1.05(a) of the Purchased Conveyance and the Contributed Conveyance, which suggests a lack of recourse as to the Debtor, by purportedly providing that if the ORRI is insufficient to service the debt under the Funding Agreement, the Debtor must come up with the cash to pay the debt. In other words, it is the Debtor, not LOH, which is purportedly personally liable for the loan.[20]

68.

As structured, the financing transaction is wholly inconsistent and inequitable because it treats the relationship between the Debtor and LOH as that of seller and purchaser, respectively,

---

[19] *Id.* at Section 13(a). (emphasis added).

[20] The Debtor expressly reserves all rights to reject the LLC Agreement, or any other executory contract or unexpired lease, pursuant to Section 365 of the Code, as well as all rights to contest the amount, validity and allowability of any of LOH against the Debtor.

in one context (such as the Purchased Conveyance and the Contributed Conveyance), and then turns around and in the same financing transaction treats the relationship as that of debtor and creditor to a recourse loan (such as in the LLC Agreement). It is inconceivable in a legitimate true sale and exchange context that a seller would be required to pay money to the purchaser because of the purchaser's inability to pay its own loan obligations.

69.

Placing record title of the ORRI in LOH, which could not take actions relating to the collateral without the consent of the Independent Member, facilitated the investors' attempt to obtain a security interest in the ORRI without using one of the prescribed Louisiana security devices. The contracts of sale and exchange are not legitime security devices in Louisiana.

70.

The inequitable sale/exchange structure of the transaction allows the Independent Member to sell the ORRI by private sale without resorting to the statutorily prescribed and required foreclosure processes or otherwise complying with the procedures applicable to foreclosure under a legitimate Louisiana security device.

71.

Even if the Independent Member chose to sell the ORRI at public sale, the Independent Member is not required to provide the Debtor with any notice or any opportunity to appoint an appraiser, as would typically occur in a legitimate Louisiana foreclosure proceeding.

72.

LOH was intentionally structured as a bankruptcy-remote entity in an attempt to isolate both LOH and the ORRI from a bankruptcy or insolvency proceeding, to frustrate and preclude the protections offered by the United States Bankruptcy Code, and to circumvent and inequitably

frustrate the use of a Louisiana security device and the prescribed foreclosure process in direct violation of the public policy of the State of Louisiana.

**INEQUITABLE STRUCTURE IN VIOLATION OF LOUISIANA LAW**

73.

As written, the sukuk financing transaction described above, including specifically the Purchase and Sale Agreement, the Contribution Agreement, the Purchased Conveyance, the Contributed Conveyance, the PDMA and the LLC Agreement were documents designed to constitute an inequitable financing transaction pursuant to which the Debtor was deprived of the rights afforded to any debtor whose debt is secured by immovable property located in the State of Louisiana.

74.

The structure of the sukuk financing transaction is inequitable and violates the public policy of the State of Louisiana and, accordingly, the transaction should not be enforced as written[21]. Due to the unenforceability of the transaction, the ownership of the ORRI never transferred from the Debtor to LOH. Instead, the ORRI remains an asset of the Debtor which is, perhaps, subject to a pledge or antichresis in favor of LOH as security for the financing.

75.

The attempted transfer (via exchange and sale) of the ownership of ORRI to LOH as security for the Debtor's financing obligations is nothing more than the attempted circumvention of Louisiana securities laws and the delays and uncertainties associated with judicial foreclosure. Moreover, such an attempt to circumvent the established Louisiana security devices and the

---

[21] *See* Guste v Hibernia National Bank in New Orleans, 655 So.2d 724 (La. Ct. App. 4th Cir. 1995); DeSalvo v. Finance Funds Group, Inc. 252 So. 2d 498 (La. Ct. App. 4th Cir. 1971).

proscribed methods of enforcement (i.e. ordinary and executory process) constitutes an absolute nullity and a violation of the public policy of this State.[22]

76.

Louisiana has a strong public policy prohibiting the use of self help by secured creditors and the Louisiana Legislature has enacted numerous statutes in furtherance of that public policy.

77.

The purpose of Louisiana's prohibition on self help is multifaceted. It both protects the debtor by giving him the benefits of appraisal, public sale and judicial process. The prohibition also protects other creditors of the debtor by ensuring that the collateral is sold at public sale and the proceeds distributed among all creditors in accordance with the preference and priority of their claims.

78.

Security devices in Louisiana may **only** be established by legislation and their ranking vis a vis one another is similarly established only by legislation.[23]

79.

Louisiana law presently recognizes the security devices of suretyship, pledge (pawn, antichresis and La. UCC security interests), conventional mortgages, legal mortgages, judicial mortgages, privileges and statutory liens.[24]

---

[22] *See* LA. CIV. CODE arts. 7, 2030 and 3179.
[23] *See* LA. CIV. CODE arts. 1913, 3133 *et seq.*, 3182 *et seq.*, and 3278 *et seq.*
[24] *See* Guste v. Hibernia National Bank in New Orleans, 655 So.2d 724, 731 (La.App.Ct. 4th Cir. 1995). *See also* LA. CIV. CODE arts. 1913, 3133 *et seq.*, 3182 *et seq.*, and 3278 *et seq.*

80.

Security devices are designed to "protect a creditor's privilege against property held as security."[25] The secured party is "given the right to seize and sell the property of the debtor and to apply the proceeds to the satisfaction of his obligation in preference to the claim of others."[26]

81.

In order to seize and sell the property of a debtor, a secured party must institute a foreclosure procedure via an ordinary proceeding or an executory proceeding in accordance with the Louisiana Code of Civil Procedure and proceed to a public sale of the property.[27]

82.

Furthermore, the Louisiana Code of Civil Procedure provides that in order to recover any deficiency against a debtor for the deficiency due on the debt after the distribution of the proceeds of the judicial sale, the property must have been sold with the benefit of appraisal.[28]

83.

When property is sold with the benefit of appraisal, both the debtor and the foreclosing creditor are given the opportunity to select their own appraisers to appraise the property.[29] If the appraisers cannot agree as to the value of the property, the law prescribes methods to resolve the discrepancy.[30]

---

[25] *Guste*, 655 So.2d at 731.
[26] *Guste*, 655 So.2d at 729-30. *See also* LA. CIV CODE arts. 3178 (antichresis), 3186 (privilege), 3279 (mortgage).
[27] *Guste*, 655 So.2d at at 730.
[28] *See e.g.* LA. CODE CIV. PROC. arts. 2336-37, 2771.
[29] *See* LA. REV. STAT. 13:4363.
[30] *See* LA. REV. STAT. 13:4365

84.

The appraisal process protects the interests of both the debtor and the debtor's other creditors by ensuring that the property is sold for a reasonable price and by placing limitations on the amount of the deficiency owed the foreclosing creditor.

85.

Judicial foreclosure via ordinary and/or executory process are the ***exclusive*** methods for the enforcement of security devices.[31] Only the Legislature has the authority to expand these procedural remedies and they may not be expanded or avoided by contract.[32]

86.

"Accordingly, it is against the public policy of this state for [a secured party and a debtor] to incorporate…any procedure designed to completely bypass and waive the laws regarding foreclosure so that the [secured party] regains title merely upon default of payment without the necessity of a seizure and judicial sale and with the [debtor] forfeiting any claim on the surplus remaining because of prior payment or because of enhancement of value of the mortgaged property."[33]

87.

The structure of the sukuk financing transaction violates the law and public policy of the State of Louisiana and is inequitable because it seeks to expand and avoid, by private contract, the procedural process and protections which would otherwise be available to the Debtor in an event of default, thus resulting in a windfall to LOH.

---

[31] Guste v. Hibernia National Bank in New Orleans, 655 So.2d 724, 730 (La.App.Ct. 4th Cir. 1995).

[32] *Id.* (emphasis added).

[33] *Id.*

88.

By purporting to place ownership of the ORRI, which is merely the collateral for a financing transaction, into LOH, the financing transaction improperly uses the contracts of sale and exchange as security devices. The Debtor and the Debtor's other creditors have, accordingly, been unduly deprived of the prescribed protections of Louisiana law.

89.

As was set forth above, the Independent Member has the authority upon an event of default to unilaterally sell the ORRI by private sale and without appraisement, advertisement or notice.

90.

That arrangement explicitly violates Louisiana law which provides that a secured party is merely given the right to utilize judicial foreclosure in order cause the sheriff to seize and sell the property of the debtor at public sale and to apply the proceeds to the satisfaction of the debt owed.

91.

Under no circumstances would a secured creditor in Louisiana have the ability to sell immovable property without resorting to judicial process. Such attempts at self help constitute prohibited forfeitures and are not allowed in Louisiana.

92.

The current arrangement unfairly and inequitably denies the Debtor any benefit of appraisement while still requiring the Debtor to pay for any deficiency, potentially resulting in a windfall to LOH.

93.

Specifically, Section 9(b)(i) of the LLC Agreement allows the Independent Member to sell the ORRI at a private sale without appraisement while Section 13(a) of the LLC Agreement requires the Debtor to make a payment in cash to LOH for any deficiency between LOH's cash on hand and the amount due under the Funding Agreement. That forfeiture without resort to judicial process is unfair.

94.

The current arrangement is likely to result in a windfall to LOH because it allows the Independent Member to sell the ORRI at private sale without appraisement and still requires the Debtor to pay for any deficiency. Without the benefits of appraisement and public sale, the Debtor has no ability to ensure that the ORRI is sold for its fair market value or to otherwise impose a limit on the amount of the deficiency.

95.

Even if the Independent Member did choose to sell the ORRI at a public sale, the Independent Member is not required to provide notice to the Debtor of the sale or to sell the ORRI with the benefits of appraisal.

96.

It is inequitable to require the Debtor to pay LOH any deficiency via the capital contribution required in the LLC Agreement when the Debtor has been denied the benefit of the statutorily prescribed appraisal process.

97.

The windfall sustained by LOH will unduly harm the Debtor, as well as the Debtor's other creditors, because the pool of funds from which the Debtor can draw to pay other debts will be unjustly depleted for the benefit of LOH.

98.

The mortgage and security interest granted to LOH under the PDMA provides LOH with even further ability to exploit its unfair position and create a windfall in its own favor and to the detriment of the Debtor and other creditors.

99.

The PDMA purports to grant LOH a mortgage and security interest on the Properties, including the underlying leases, and on the platforms and related equipment.[34]

100.

In the event of any default by the Debtor under the PDMA or the other transaction documents, the PDMA purports to grant LOH the ability to foreclose on the Properties, the platforms and the related equipment.[35]

101.

In such event, the Debtor's reversionary interest in the ORRI would likely be worthless and effectively forfeited because the Debtor would have forfeited ownership of the underlying leases.

---

[34] *See* Original Complaint at Exhibit "H", Section 16.
[35] *See* Original Complaint at Exhibit "H", Section 16.

102.

A default sufficient to trigger LOH's foreclosure rights under the PDMA could also trigger the Independent Member's ability to sell the ORRI and/or demand a payment from the Debtor, as discussed above.

103.

As the sukuk financing transaction is structured, LOH has opportunity for a double recovery. Upon an event of default, LOH could immediately sell the ORRI at private sale, without the benefit of appraisement. LOH could simultaneously demand that the Debtor make a cash payment for the shortfall without regard to the actual fair market value of the ORRI. Meanwhile, LOH could also exercise its rights under the PDMA to have the leases, platforms, and related equipment seized and sold in a judicial foreclosure proceeding.

104.

The nature of the inequity here is analogous to the inequity addressed in *De Salvo v. Finance Funds Group, Inc.*[36]

105.

In *De Salvo*, the plaintiff brought an action in lesion beyond moiety against the defendant alleging that she had sold her land to defendant for $15,000, when in fact it was worth over $50,000.[37]

106.

The defendant, in answer, claimed that "in addition to the $15,000, and as part consideration of the sale, defendant at the time of the purchase granted plaintiff an option to

---

[36] 252 So.2d 498 (La. Ct. App. 4th Cir. 1971).
[37] *Id.* at 498.

repurchase the property within six months for $20,000 plus an amount equal to eight per cent interest from the date to act of sale."[38]

107.

The plaintiff alleged, and the court agreed, that the true purpose of the transaction was a loan, not a sale. By requiring the plaintiff to execute a "sale" of her land as security for a loan in an amount substantially less than the value of the property the defendant was most likely hoping for an unjust enrichment in that plaintiff would be unable to redeem the property leaving the defendant/lender with a windfall.[39]

108.

The court noting that the defendant had improperly used a sale as security for a loan, indicated an inclination to hold the entire transaction a nullity stating:

> We believe further balance would be accomplished by holding, where a Louisiana lender spurns legitimate Louisiana security devices-and adopts a device which might, contrary to Louisiana law not only of mortgage but also of antichresis, allow the lender to become the owner on default of payment-**that the Louisiana lender having rejected security has no security.**[40]

109.

However, the court held that the sale of immovable property to secure a debt constituted an antichresis "in spite of the lender's refusal to utilize a Louisiana security device."[41]

110.

The inequity in the instant case is more severe because, as described above, LOH has the opportunity to exploit the provisions of the LLC Agreement allowing for the private sale of the ORRI, without appraisement, or a public sale without notice to the Debtor or appraisement, and

---

[38] *Id.*
[39] *Id.* at 501.
[40] *De Salvo*, 252 So.2d. at 501 (emphasis added)
[41] *Id.*

calling for an automatic deficiency payment by the Debtor, as well as the opportunity to recover a second or third windfall through enforcement of the mortgage and security interest granted in the PDMA.

111.

The case of *Guste v. Hibernia National Bank in New Orleans* is also applicable.

112.

In *Guste*, the plaintiff, by act of credit sale, sold a tract of land, consisting of three parcels, to FSI.[42] FSI's indebtedness was evidenced by two promissory notes, both of which were secured by vendor's liens (mortgages) on the property.[43]

113.

Contemporaneously with the execution of the credit sale, plaintiff required FSI to execute two *dations in paiement* (giving in payment) in favor of plaintiff.[44] The first *dation* transferred parcels 2 and 3 back to plaintiff in the event FSI defaulted on the first promissory note.[45] Similarly, the second *dation* transferred parcel 3 back to plaintiff in the event FSI defaulted on the second promissory note.[46]

114.

The *dations* were given to defendant, Hibernia, to be held in escrow pursuant to an escrow agreement.[47] Hibernia subsequently lent funds to FSI for development of the property taking a collateral mortgage behind the mortgage in favor of plaintiff.[48] FSI defaulted in its

---

[42] Guste v. Hibernia National Bank in New Orleans, 655 So.2d 724, 726 (La. App. 4 Cir. 1995).
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.* at 727.
[48] *Id.*

payment and plaintiff demanded that Hibernia release the first *dation* and also cancel its collateral mortgage.[49] Hibernia released the *dation* but refused to release its collateral mortgage, and so litigation ensued.[50]

115.

Hibernia filed an exception of no cause of action contending that the *dations* were confected in a manner that violated public policy and were null and void, and, therefore, plaintiffs could not maintain a cause of action against Hibernia for damages.[51]

116.

The court agreed holding that the *dations* were against public policy and absolute nullities under Louisiana Civil Code article 2030 because "plaintiffs were attempting to create by contract with their debtor a *new* method of enforcing their mortgage in a manner *not* provided by law."[52]

117.

"By the use of the *dations* the parties were incorporating in the mortgage a complete waiver of the entire foreclosure procedure thus avoiding the necessity of a judicial sale."[53] The court noted that security devices could only be established by law and there was nothing in the law to support the use of a *dation* as a security device.[54]

---

[49] *Id.*
[50] *Id.*
[51] *Guste*, 655 So.2d at 728.
[52] *Id.* at 729.
[53] *Id.* at 730.
[54] *Id.* at 730-32.

118.

Specifically, the court stated:

> In the present case, we find that plaintiffs sought to create by the execution of these Dations a security device which would bypass Louisiana law that prohibits a secured lender-mortgagee from becoming the owner of the security upon default of the debtor without resort to judicial process. ***We find no law that permits a dation to be used as a security device.***[55]

119.

In the instant case, there is no question that the creditor attempted to use a sale, exchange and a limited liability company operating agreement as security devices and the situation is analogous to *Guste*.

120.

As set forth above, like the *dations* in *Guste*, the contracts of sale and exchange and the formation of a limited liability company, namely LOH, do not constitute legitimate Louisiana security devices because they transfer ownership of the property to the creditor without the necessity of judicial foreclosure or any of the other protections afforded borrowers in Louisiana.

121.

The transaction, as structured, improperly places control of the ORRI in the hands of the Independent Member who owes no fiduciary duties to the Debtor, but rather, to the lender. Placing control of the ORRI in the hands of the Independent Member, who has the right to sell the ORRI upon default is the functional equivalent of the *dation* in escrow situation is *Guste* because it allows the creditor to entirely circumvent the judicial foreclosure process.

---

[55] *Id.* at 731-32 (emphasis added).

122.

Accordingly, like the *dations* in *Guste*, the current structure of the sukuk financing transaction violates the public policy of the State of Louisiana, is prohibited by law, and should be struck down.

123.

By attempting to circumvent the prescribed Louisiana securities laws, the sukuk financing transaction violates a strong public policy of this State and in so doing provides the opportunity for an inequitable windfall benefitting LOH and harming the Debtor and its other creditors.

124.

Those parts of the transaction which explicitly violate the public policy of the State of Louisiana or which are otherwise inequitable should be struck down by this Honorable Court and the Debtor should be declared the owner of the ORRI with LOH as its secured or unsecured creditor.

125.

Additionally, the Court should hold that the obligation of the Debtor to make capital contributions to LOH in order to account for LOH's inability to meet its obligations under the Funding Agreement is deemed an absolute nullity and any claim with respect to the same is disallowed.

## COUNT 1

## Continued Relief

126.

The Debtor requests that this Court continue the relief previously granted in this proceeding.

## COUNT 2

## Declaratory Relief

127.

The Debtor requests that this Court provide declaratory relief declaring the following, cumulatively, or individually, as may be appropriate: (a) the sukuk financing transaction described herein is inequitable and violates the law and public policy of the State of Louisiana as presently structured; (b) the Purchased Conveyance and the Contributed Conveyance did not transfer ownership of the ORRI to LOH; (c) LOH does not have the ability to sell the ORRI at private sale, public sale, or otherwise; (d) the ORRI remains an asset of the Debtor and of its estate; (e) the Debtor is not liable to LOH for any deficiency payment or capital contributions, and any claim for the same be disallowed and deemed an absolute nullity and/or waived; and/or (f) LOH's only interest in the ORRI is that of a creditor.

**WHEREFORE**, ECP, the Debtor herein, prays that the Court grant the following:

1. An Order continuing the relief previously granted in this Adversary Proceeding;
2. Judgment in favor of the Debtor and against the Defendants, as may be appropriate, for Declaratory Relief as prayed for herein; and
3. All other further general and equitable relief as this Court deems just and proper.

Respectfully submitted,

LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD

STEWART F. PECK (#10403)
CHRISTOPHER T. CAPLINGER (#25357)
BENJAMIN W. KADDEN (#29927)
ELIZABETH R. CARTER (#31090)
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
Email: speck@lawla.com ; ccaplinger@lawla.com;
bkadden@lawla.com; ecarter@lawla.com
*Attorneys for East Cameron Partners, L.P.*

**Please Issue Summons To:**

**Louisiana Offshore Holding, LLC**
through its Registered Agent for Service of Process:
C T Corporation System
111 Eight Avenue
New York, NY 10011

**East Cameron Gas Company**
through its Registered Agent for Service of Process:
C T Corporation System
111 Eighth Avenue
New York, NY 10011

**Deutsche Bank Trust Company Americas**
60 Wall Street
Mail Stop NYC 60-2710
New York, NY 10005-2858
Attention: Project Finance Group
through Richard L. Buckwalter, Vice President OR
through Kerry C. Warwicker, Vice President